NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x
In re:                                                          :          Chapter 11
                                                                :
Basic Food Group, LLC,                                          :          Case No. 15-10892 (JLG)
                                                                :
                                        Debtor.                 :
-------------------------------------------------------------------------x
Jae Ho Lee, Soyoun Park and                                     :
Basic Food Groups, LLC,                                         :
                                        Plaintiffs,             :
                                                                :
                                                                :
        -against-                                               :          Adv. Pro. No. 15-01119 (JLG)
                                                                :
Ahne Law, P.C., Samuel Ahne, Noah Bank,                         :
Edwin Shin, Cheol Min Kim, and                                  :
Aspen Market Place Corp.,                                       :
                                        Defendants.             :
-------------------------------------------------------------------------x

**MEMORANDUM DECISION ON DEFENDANTS' MOTION TO DISMISS**

A P E A R A N C E S :

THE BASIL LAW GROUP
*Attorneys for Noah Bank*
1270 Broadway
Suite #305
New York, New York 10001
By:     Robert J. Basil, Esq.

KURTZMAN MATERA, PC
*Attorneys for the Debtor*
664 Chestnut Ridge Road
Spring Valley, New York 10977
By:     Rosemarie E. Matera, Esq.

KIMM LAW FIRM
Attorneys for the Plaintiffs
333 Sylvan Avenue
Suite #106
Englewood Cliffs, New Jersey 07632
By:     Adam Garcia, Esq.

**JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

Jae Ho Lee ("**Lee**"), his wife, Soyoun Park ("**Park**"), and Basic Food Groups LLC

("**Basic Food**," and collectively with Lee and Park, the "**Plaintiffs**") have brought this action

against Noah Bank ("**Noah**"), Edward Shin ("**Shin**"), Ahne Law, P.C ("**Ahne P.C.**"), Samuel

Ahne, Cheol Min Kim ("**Kim**"), and Aspen Market Place Corporation ("**Aspen**," and

collectively with Ahne P.C., Samuel Ahne, Noah, Shin and Kim, the "**Defendants**").   Their

Second Amended Complaint ("**Complaint**" or "**SAC**," DC ECF Doc. #37) alleges seven causes

of action, consisting of (a) two claims under the Racketeer Influenced and Corrupt Organizations

Act ("**RICO**"): (i) violation of 18 U.S.C. § 1962(c) (against all Defendants) and (ii) conspiracy

to violate 18 U.S.C. § 1962(c) (against all Defendants) (collectively, the "**RICO Claims**"); and

(b) five state law claims: (i) breach of fiduciary duty (against Samuel Ahne and Ahne P.C.); (ii)

declaratory judgment (against all Defendants); (iii) breach of agreement and implied covenant of

good faith and fair dealing (against all Defendants); (iv) fraud in the inducement (against Kim

and Aspen); and (v) fraud in the inducement (against Shin and Noah).

The Defendants have jointly moved (the "**Motion**") to dismiss the RICO Claims for

failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).  *See* DC ECF Doc. #54.

The Plaintiffs oppose the Motion.[1]  For the reasons stated below, the Motion is **GRANTED**.

---

[1]     In support of the Motion, Defendants submitted their Brief In Support of Joint Motion to Dismiss Plaintiffs' Complaint Pursuant to Rules 12(b)(6), 12(b)(1) and 9(b) ("**Def. Mem**.") [DC ECF Doc. #54] and their Reply Brief In Support of Joint Motion to Dismiss Plaintiffs' Complaint Pursuant to Rules 12(b)(6), 12(b)(1) and 9(b) [DC ECF Doc. #89].  In opposition to the Motion, Plaintiffs submitted their Memorandum of Law In Opposition To Defendants' Motion to Dismiss the Second Amended Complaint ("**Pl. Opp. Mem**.") [DC ECF Doc. #85].  Citations to "DC ECF" refers to the electronic case filing docket in the United States District Court for the Southern District of New York, Case No. 1:14−cv−07908−RMB−RLE.

# BACKGROUND

A.    **Procedural Background**

Lee and Park filed a complaint initiating this adversary proceeding on September 30, 2014, in the United States District Court for the Southern District of New York.  [DC ECF Doc. #1].[2]  On October 16, 2014, they filed their First Amended Complaint.  [DC ECF Doc. #4].  Neither the initial complaint, nor the First Amended Complaint, contained any claims for relief predicated on alleged RICO violations.  Rather, the sole basis for subject matter jurisdiction alleged in those complaints was diversity jurisdiction under 28 U.S.C. § 1332(a)(1).  The Defendants maintained that the District Court lacked subject matter jurisdiction over the First Amended Complaint because there was not complete diversity jurisdiction between the plaintiffs, Lee and Park, and the Defendants.  Accordingly, after Lee and Park filed their First Amended Complaint, the Defendants promptly sought leave of the Court to file a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss the complaint for lack of subject matter jurisdiction.  [DC ECF Doc. #7].  The District Court (Berman, J.) conducted a pre-motion conference among the parties, at which time, counsel for Lee and Park advised the court that the Plaintiffs wished to file a further amended complaint to address the subject matter jurisdiction issues raised by the Defendants.  Judge Berman authorized Lee and Park to file a further amended complaint, but in doing so, he advised the parties that if the Defendants prevailed on a motion to dismiss that complaint, the dismissal would be with prejudice to the Plaintiffs' right to replead.  On December 16, 2014, Lee and Park added Basic Food as a plaintiff in this action, and filed the Second Amended Complaint.  Subsequent to that filing, Judge Berman conducted another pre-motion conference on December 23, 2014, during which he reiterated to the parties

---

[2]  The original complaint was not served, but subsequently amended.

that Defendant's dismissal motion, when fully briefed, would "be decided on submission with prejudice." [DC ECF Doc. 12/23/2014 Minute Entry]. *See also* Transcript of Proceedings Held on December 23, 2014 at 4:13-24 [DC ECF Doc. #48] (the "December 23 Transcript").[3] Thereafter, the Motion was filed with the matter being fully briefed and submitted to the District Court on February 27, 2015.

On April 10, 2015, Basic Food filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court. By order dated June 29, 2015, and pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference Re: Title 11, 12 Misc. 32 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.), the District Court referred the adversary proceeding to this Court.

B.    **Factual Background**[4]

Noah is a bank organized under the laws of the Commonwealth of Pennsylvania. (SAC ¶ 6). It is a "Preferred Lender" under the Small Business Administration's ("**SBA**") Section 7(a) Loan Guaranty Program. (SAC ¶ 18). Since 2010, it has aggressively marketed SBA loans to the Korean-American small business community in the tristate area and holds itself out as the Korean-American business community's largest SBA lender. (SAC ¶ 26). Shin is a shareholder of Noah and controls Noah's lending practices. (SAC ¶¶ 26, 31, 44). Basic Food is a limited liability company whose principal asset is a deli/café located at 24 W. 40th Street in New York City (the "**New York Deli**"). (SAC ¶¶ 3, 12). Lee owns 99% and Park owns the remaining 1% of the membership interests in Basic Food. (SAC ¶¶ 1, 3). They acquired those interests from

---

[3]    The Court takes judicial notice under Federal Rule of Evidence 201(c)(1) of the December 23 Transcript and the docket entry on the same day solely for the purpose of confirming that the District Court advised the parties to this proceeding that if the RICO Claims are dismissed, the Plaintiffs would not be permitted to replead those claims.

[4]    In resolving the Motion, this Court is not required to state findings of fact or conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. Accordingly, the facts recited are those alleged in the Complaint, which must be presumed as true for purposes of this Motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Kim in December 2012 for the sum of $1.8 million (the "**Acquisition"**).  (SAC ¶¶ 13, 88, 93,

100).  They financed part of the purchase price with a $1.3 million SBA guaranteed loan from

Noah to Basic Food (the "**Financing**").  (SAC ¶ 88).  Lee and Park have guaranteed payment of

that loan.  (SAC ¶¶ 85, 86).

At its core, the Plaintiffs' complaint is that Kim, with the assistance of Shin and Samuel

Ahne, the attorney who represented Lee and Park in the Acquisition and Financing transactions,

duped and defrauded them into paying $1.8 million for Kim's interests in Basic Food and into

having Basic Food incur $1.3 million of indebtedness from Noah to do so.  They say that at that

time, Shin and Kim knew that the New York Deli, which is Basic Food's sole asset, was

operating at a loss and that its business was worth far less than $1.8 million, but that, with

Samuel Ahne's help, the Defendants concealed those and other facts material to the transactions

from Lee and Park.  The Plaintiffs say that such concealment was because at that time, Basic

Food was in danger of defaulting on a $1 million loan from Noah that Kim had obtained, and

that Shin, desperate to avoid the default, needed to find someone who would "step into Kim's

shoes," refinance the $1 million loan, and operate the business.  The facts surrounding the

transaction and the allegations of fraud are set forth below.

In 2009, Kim formed Basic Food and used it to acquire the New York Deli for the sum of

$2.3 million.  (SAC ¶¶ 52, 53).  He financed a portion of the purchase price with a loan from

Woori America Bank ("**Woori**").  (SAC ¶ 53).  Thereafter, Kim operated the deli and in the

spring of 2011, he approached Shin, who he knew socially, to explore business opportunities

that, with Noah's financial support, would enable Kim to refinance the Woori loan and expand

his business operations.  (SAC ¶ 53).  In December 2011, Kim, with Samuel Ahne as his

counsel, arranged to pay off the Woori loan with a $1 million SBA guaranteed loan from Noah.

In May 2012, Kim expanded his business operations by organizing and opening a deli/café in

Hoboken, New Jersey (the "**Hoboken Deli**") using Aspen, an entity owned, operated and/or

controlled by Kim, as the acquisition vehicle.  (SAC ¶¶ 9, 56, 57).  Kim financed a portion of

Aspen's acquisition costs with an SBA guaranteed loan from Noah.  (SAC ¶¶ 57, 65).

During the course of 2012, Shin, in furtherance of Noah's obligation to monitor its SBA

loans, received periodic reports from Kim regarding the New York Deli's operations.  (SAC ¶¶

19, 56).  By November 2012, those reports showed that the business was declining and that Basic

Food required an influx of capital if it was to avoid defaulting on the Noah loan.  (*Id*.)  The

Plaintiffs contend that by then, Kim had determined that he could not continue to operate both

the New York Deli and the Hoboken Deli, because the former was losing money and the latter

was a start-up without an established revenue stream.  (SAC ¶ 57).  The Plaintiffs allege that

Kim and Shin agreed that Kim could best address those financial problems by selling the New

York Deli business and transferring its operations to someone with the ability to assume control

of the deli operations and acquire 100% of Kim's membership interest in Basic Food in a "turn-

key" transaction.  (SAC ¶ 59).

At that time Lee was operating a deli/café located at 300 Albany Street in New York

City.  (SAC ¶ 58).  With Shin's assistance, in November 2012, Kim approached Lee and began

discussions with him regarding Lee's possible acquisition of 100% of Kim's membership

interests in Basic Food. (SAC ¶¶ 12, 58, 59).  The Plaintiffs allege that, to that end, on multiple

occasions beginning in November 2012 and through the closing of the sale on December 13,

2012, Shin and Kim represented to Lee during in-person meetings and over the telephone that

Basic Food's business was "doing great" and generated an annual net revenue of $200,000 to

$400,000 which could be distributed at year-end to its owners.  (SAC ¶¶ 12, 59, 60, 100).  The

Plaintiffs contend that not only were those representations false, but that Kim and Shin knew that

the New York Deli business did not generate net revenue, and that it had lost money in each of

the three years that Kim operated it. (SAC ¶¶ 60, 100). They also contend that Kim

misrepresented to Lee that the New York Deli had a small operating profit during the first seven

(7) months of 2012, when, in reality, the business was failing. They allege that by September

2012, the business was doing so poorly that Basic Food lacked the cash flow to pay its rent and

briefly suspended operations – all of which was hidden from Lee. (SAC ¶¶ 60-62).

   As allegedly conceived by Shin and Kim, the deal with Lee contemplated that Basic Food

would refinance its $1 million loan with Noah. (SAC ¶ 66). Lee needed legal representation for

both the Acquisition and Financing transactions and the Plaintiffs maintain that Kim and Shin, in

furtherance of their fraudulent scheme, persuaded him to retain Samuel Ahne as his counsel.

(SAC ¶¶ 13, 66, 69). The Plaintiffs contend that Shin (through Kim (SAC ¶ 67)) caused Lee to

retain Ahne P.C. as his counsel because Shin knew that Samuel Ahne would be loyal to Kim and

Noah, to Lee's detriment, since Samuel Ahne had represented Kim in the 2011 restructuring of

the Woori loan (SAC ¶ 75), and because Noah provides Ahne P.C. with substantial amounts of

business. (SAC ¶¶ 68, 74, 75). They say that in vouching for Samuel Ahne, Shin advised Lee

that he was on Noah's list of "pre-approved" and "pre-screened" lawyers, that he was objective

and conflict free, and that he was the attorney most suitable to represent Lee in both the

acquisition of Basic Food and in obtaining the acquisition financing from Noah. (SAC ¶ 66).

The Plaintiffs further allege that Shin advised Lee that Noah was prepared to refinance its

existing loan to Basic Food with a new loan in connection with Lee's acquisition of the business,

but would not do so unless Lee retained Samuel Ahne as his counsel. (*Id.*). Shin allegedly did

not inform Lee that he knew Samuel Ahne, that Ahne had represented Noah in other

6

transactions, and that Noah and Shin had referred a "stream" of matters to Ahne.  (SAC ¶ 68).

Samuel Ahne allegedly did not disclose his relationship with Shin, Noah and Kim to Lee, either.

(SAC ¶ 77).

The Acquisition and Financing closed on December 13, 2012.  Lee and Park paid Kim

$1.8 million, consisting of $1.5 million in cash and a $300,000 note, for 100% of the

membership interests in Basic Food.  (SAC ¶¶ 88-90).  The cash payment was generated, in part,

by a $1.3 million loan from Noah to Basic Food, which is guaranteed by Lee and Park. (SAC ¶¶

85, 86).  At the closing, approximately $900,000 was credited to Noah in full satisfaction of

Basic Food's outstanding loan and Kim received approximately $600,000 of the sales proceeds.

(SAC ¶¶ 90-91).  At the closing, among other things, Lee and Park executed (i) a "buy-back"

agreement giving Kim the option of reacquiring his interests in Basic Food (SAC ¶ 78-79); (ii)

guarantees in favor of Kim (SAC ¶ 85);  and (iii) releases.  (SAC ¶¶ 80-81).

The Plaintiffs contend that Samuel Ahne breached his fiduciary duties to them because

throughout the course of his representation of them, he acted for Noah, Shin and Kim's benefit,

not their benefit.  (SAC ¶ 68).  They say that prior to the December 13 closing, Samuel Ahne did

not meet with them or provide them with copies of the documents they would execute at the

closing, and did not give them legal advice with regard to either the Acquisition or Financing

transactions.  (SAC ¶ 70).  Moreover, they maintain that Samuel Ahne did not undertake any due

diligence in connection with the transactions.  To that end, the Plaintiffs allege that he did not: (i)

review Basic Food's business records and sale journals; (ii) review Basic Food's tax records; (iii)

review corporate and financial records; (iv) conduct a title, lien or judgment search; (v)

investigate potential labor issues; or (vi) review Basic Food's financial obligations.  (SAC ¶¶ 70,

71).  They say that Samuel Ahne's malfeasance continued at the December 13, 2012 closing

when he counselled Lee and Park to execute various documents – that they were seeing for the

first time at the closing – including a Release and Guarantee, and misrepresented to them the

nature of a "buy back" agreement that they executed for Kim's benefit.  (SAC ¶¶ 78-86).  As to

the latter, they say that prior to closing the Acquisition, Samuel Ahne told them "that they were

'getting a great deal' because [they] were not infusing any out-of-pocket cash and emphasized

that, if [they] were dissatisfied with the acquisition, 'you can back out at any time, on the same

terms as your acquisition.'"  (SAC ¶ 76).  However, the Plaintiffs allege that "[r]eality was not

the case," and that although Lee negotiated an agreement with Kim for Kim to "buy back" the

interests in Basic Food if the New York Deli's actual sales and expenses did not support a

"profitable business," Samuel Ahne, in consultation with Shim and Kim, drafted a "buy back"

agreement for Kim's benefit.  (SAC ¶¶ 76, 79).  They say that the "clear and unambiguous

language of the so-called buy back option states that the option is available solely to defendant

Kim and not to plaintiff such that plaintiff could not *force or compel or require* defendant Kim to

buy the business interests back due to poor revenue information of for any other reason."  (*Id.*)

The Plaintiffs contend that Shin, Noah and Samuel Ahne's fraud did not end at the

December 13, 2012 closing of the Acquisition and Financing.  They allege that in a letter dated

July 22, 2014, they sought clarification from Samuel Ahne regarding the advice he had given to

them on matters relating to the Acquisition.  Specifically, they contend that in that letter, their

counsel advised Samuel Ahne that the Plaintiffs understood that in connection with the

Acquisition, "Noah Bank insisted on a 'stock transfer' rather that an asset sale/purchase," and

requested a detailed explanation from Samuel Ahne on "why the [Acquisition] was done as a

'stock transfer' rather than an asset sale."  (SAC ¶ 96) (quoting July 22 letter).  The letter further

requested Samuel Ahne to provide the Plaintiffs with "a copy of all written disclosure of the

8

'pros and cons' of such a mode of transfer." (*Id.*); *see also* SAC ¶ 109 (quoting additional text of July 22 letter). They maintain that in a letter dated August 8, 2014, Samuel Ahne stated that he "was told by Messrs. Kim & Lee that [the stock transfer] was decided by them as landlord consent was difficult to obtain and they wanted to do the deal quickly . . . " (SAC ¶ 97); *see also* SAC ¶ 110 (quoting additional text of August 8 letter). The Plaintiffs allege that Ahne's statement is false because they had no reason to close "quickly" and that in "presenting a materially false explanation, defendant Ahne effectively admitted that there was no discussion of the 'pros and cons' and certainly no written advisory material because no such steps had been taken." (*Id.*) Further, they contend that on July 22, 2014, the Plaintiffs wrote to Noah and Kim asking that Noah produce "all business records and banking records, including all loans and history documents pertaining to Basic Foods, LLC," but that neither Noah nor Kim responded to that letter. (SAC ¶ 107) (quoting July 22 letter).

The Plaintiffs contend that after the closing, Lee and Park quickly learned that the New York Deli was operating at a loss and that the business could not support the promised $200,000 to $400,000 in yearly profits. (SAC ¶ 93). In an August 2014 letter from the Department of Labor, Lee and Park were informed that Basic Food "may be in violation" of certain provisions of the Labor Law and that, to avoid prosecution, Basic Food could pay a fine totaling $63,502.30. (SAC ¶¶ 94, 95). In July 2014, the NYS Labor Department served Basic Food with an updated notice of certain labor claims. (SAC ¶¶ 93-95).

## **JURISDICTION**

As an initial matter, this Court must determine the scope of its jurisdiction to resolve the claims asserted in the Complaint. "The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300,

307 (1995). Section 1334 of title 28 of the United States Code vests district courts with "original

and exclusive jurisdiction of all cases arising under title 11." 28 U.S.C. § 1334(a). That section

also vests district courts with "original but not exclusive jurisdiction of all civil proceedings

arising under title 11, or arising in or related to cases under title 11." *Id.* at § 1334(b). District

courts may "refer" any or all of these proceedings "to the bankruptcy judges for the district." *Id.*

at § 157(a). The United States District Court for the Southern District of New York has done so.

*See* Amended Standing Order of Reference, No. M10-468, 12 Misc. 32 (S.D.N.Y. Jan. 31, 2012)

(Preska, C.J.).

　　　Once a proceeding has been referred, "[t]he manner in which a bankruptcy judge may

act . . . depends on the type of proceeding involved." *Stern v. Marshall*, 564 U.S. 462, 473

(2011). "To satisfy constitutional limitations on the subject matter jurisdiction of the Article I

bankruptcy courts, bankruptcy jurisdiction is divided into 'core' and 'noncore' jurisdiction." *In*

*re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 674 (S.D.N.Y. 2011). Proceedings "arising under

title 11" and proceedings that "arise in" cases under title 11 are "core" proceedings. *See* 28

U.S.C. § 157(a) – (b). *See also J.T. Moran Fin. Corp. v. Am. Consol. Fin. Corp. (In re J.T.*

*Moran Fin. Corp.)*, 124 B.R. 931, 937 (S.D.N.Y. 1991) (Core jurisdiction encompasses

proceedings which "invoke a substantive right provided by title 11" or that "would have no

existence outside of the bankruptcy case."). Noncore proceedings are those that are "related to" a

bankruptcy case. 28 U.S.C. § 157(c)(1). "[A] civil proceeding is 'related to' a title 11 case if the

action's outcome might have any conceivable effect on the bankrupt estate." *Parmalat Capital*

*Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (internal quotation marks

omitted).

Bankruptcy judges may "hear and determine" core matters and, in doing so, "enter appropriate orders and judgments, subject to [appellate review]." 28 U.S.C. § 157(b)(1). In contrast, without the consent of all parties involved in the matter, a bankruptcy judge cannot enter a final, appealable order in a noncore, "related to" proceeding. *Id*. at § 157(c). *See also Messer v. Bentley Manhattan Inc. (In re Madison Bentley Assocs., LLC)*, 474 B.R. 430, 436 (S.D.N.Y. 2012) ("[A] bankruptcy court may finally adjudicate even non-core claims with the parties' consent."). Rather, the court must "submit proposed findings of fact and conclusions of law to the district court." 28 U.S.C. § 157(c)(1). In those matters, "any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." *Id.*

The RICO Claims do not fall within this Court's core jurisdiction because they arise under title 18, not title 11, and they do not "arise in a case under title 11." That category of proceedings refers to "'administrative' matters that only arise in bankruptcy cases." *In re Wood*, 825 F.2d 90, 96-97 (5th Cir. 1987) ("'[A]rising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy."). However, they do fall within the Court's "related to" jurisdiction as being non-core since that jurisdiction is broad enough to encompass claims, like the RICO Claims, "owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541 . . . ." *Celotex Corp. v. Edwards*, 514 U.S. at 307 n.5. *See also Adelphia Commc'n Corp. Sec. Derivative Litig.*, No. 03 MDL 1529, 2006 WL 337667, at *4 (S.D.N.Y. Feb. 10, 2006) (finding RICO claims to be non-core in reliance on *In re United States Lines, Inc.*, 197 F.3d 631 (2d Cir. 1999)); *Goldsmith v. Massad (In re Fiorillo)*, 494 B.R. 119, 144 (Bankr. D. Mass. 2013) ("[A]s actions

11

with the potential to augment the bankruptcy estates, the adversary proceedings [including RICO

claims] fall within the court's related-to jurisdiction."); *Ifert v. Miller*, Civ. A. No. 90-0758

Misc., 1991 WL 60601, at *3 (E.D. Penn. April 12, 1991). *Accord Breeden v. Bennett (In re*

*Bennett Funding Group, Inc.)*, 367 B.R. 302, 320-22 (Bankr. N.D.N.Y. 2007) (discussing

differences between RICO claims found to be non-core and core depending on whether those

claims arose pre-petition or post-petition and the party being sued, i.e., a bankruptcy trustee as

defendant rather than plaintiff).

All parties have consented to this Court's entry of a final judgment in this matter. [BC

AP ECF Doc. #7, 9].[5] As such, the Court is satisfied that it has the authority to enter final orders

and judgments with respect to the RICO Claims. *See* 28 U.S.C. § 157(c)(2) ("[T]he district

court, *with the consent of all the parties to the proceeding*, may refer a proceeding related to a

case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders

and judgments . . . .") (emphasis added).

## **LEGAL STANDARDS**

### A.    **Motions to Dismiss Under Rule 12(b)(6)**

Rule 12(b)(6) provides that a complaint may be dismissed "for failure to state a claim

upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6); *see also* Fed. R. Bankr. P.

7012(b). The purpose of a motion to dismiss is "merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in support thereof."

*Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980); *see also Halebian v. Berv*, 644 F.3d 122,

130 (2d Cir. 2011) (describing purpose of Rule 12(b)(6) motion "is to test, in a streamlined

fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a

---

[5]    Citations to "BC AP ECF" refers to the electronic case filing docket in the Adversary Proceeding (No. 15-
01119-JLG) in this Court.

contest regarding its substantive merits."). Thus, when considering a motion to dismiss, the

Court must liberally construe the complaint, accept the factual allegations set forth in the

complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, "[t]hreadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). *See also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (On a motion to

dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual

allegation."). That is because to defeat a Rule 12(b)(6) motion, a plaintiff must plead sufficient

factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at

570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*,

556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A claim will be dismissed if the plaintiff

does not nudge its claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at

570. "The plausibility standard is not akin to a 'probability requirement,' but it [requires the

plaintiff to plead] more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*,

556 U.S. at 678.

**B.     Pleading Fraud Under Rule 9(b)**

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard for claims

alleging fraud. Those claims must "state with particularity the circumstances constituting fraud."

Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must "allege facts that give rise to a

strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.

1995). Specifically, "the complaint must: (1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

290 (2d Cir. 2006). The particularity requirements of Rule 9(b) are applicable to RICO claims

where, as here, such claims are based on mail fraud under 18 U.S.C. § 1341 or wire fraud under

18 U.S.C. § 1343. *McCoy v. Goldberg*, 748 F. Supp. 146, 156 (S.D.N.Y. 1990) (citing cases);

*see also Plount v. Am. Home Assurance Co.*, 668 F. Supp. 204, 206-07 (S.D.N.Y. 1987) ("[A]ll

of the concerns that dictate that fraud be pleaded with particularity exist with even greater

urgency in civil RICO actions.").

## SCOPE OF THE RECORD FOR REVIEW

On a motion to dismiss, the Court may consider "any written instrument attached to [the

complaint] as an exhibit, materials incorporated in it by reference, and documents that, although

not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67

(2d Cir. 2004) (citations omitted); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir.

2002) (deeming complaint to include any attached exhibits, statements or documents

incorporated in it by reference as well as any documents that are "integral" to the complaint).

For incorporation by reference, a complaint "must make a clear, definite and substantial

reference to the document." *Helprin v. Harcourt*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003).

"A mere passing reference or even references, however, to a document outside of the complaint

does not, on its own" suffice to incorporate it. *Williams v. Time Warner Inc.*, 440 Fed. Appx. 7,

9 (2d Cir. 2011). A document is integral to a complaint "where the complaint relies heavily

upon its terms and effects." *Chambers*, 282 F.3d at 153 (internal quotation marks omitted). *See

also Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (finding

that agreement between defendant and a third party was integral to complaint in evaluating

motion to dismiss complaint alleging Sherman Act violations because terms and effect of

agreement were heavily relied on); *Cortec Indus., Inc.*, 949 F.2d 42, 46-48 (2d Cir. 1991)

14

(allegations of securities fraud, based upon certain documents in plaintiff's possession or within

plaintiff's knowledge and "upon which they relied on in bringing suit," made those documents

integral to the complaint.).  However, that exception is narrow in scope.  *See Williams*, 440 Fed.

Appx. at 9 (recognizing that exception for consideration of document on which complaint solely

relies and which is integral to the complaint is narrow).  Actual reliance on the extraneous

material is required, with the exception not applying based on plaintiff's "mere notice or

possession" of such material.  *Chambers*, 282 F.3d at 153.

Here, both the Defendants and the Plaintiffs attached documents to their respective filings

for consideration by the Court in determining the Motion.  The Defendants submitted (i) copies

of pages from a motion filed by counsel to the Plaintiffs in a pre-petition state court action in

which Noah is suing the Debtor to enforce and collect on the Financing; (ii) a copy of a transcript

of a court scheduling conference held on December 16, 2014 in this proceeding while it was

before the District Court; (iii) pages purported to be a part of a submission to the SBA in

connection with the Financing; and (iv) a copy of the promissory note which is a part of the

Financing.  The Plaintiffs submitted (i) a copy of consent order between the Federal Deposit

Insurance Corporation and Noah, dated October 23, 2014, which pre-dated the Complaint by

several months; and (ii) a copy of a transcript before Magistrate Judge Ellis in the District Court

concerning a discovery conference in this proceeding.  The Court has not considered those

documents in deciding the Motion because (i) none of the documents presented by the parties

hereto were attached to the Complaint; (ii) none were incorporated by reference in the

Complaint; and (iii) none appear to the Court to be so integral to the Complaint that it is heavily

dependent on such documents.  *See Chambers*, 282 F.3d at 152-53.

## DISCUSSION

**I.**     **Section 1962(a)-(c) Claim**

A plaintiff claiming a civil RICO violation must allege "(1) a violation of section 1962;

(2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v.*

*Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990) (listing elements necessary to

establish standing to assert RICO civil liability claims). *See also Bays v. Hunter Savs. Ass'n*, 539

F. Supp. 1020, 1023 (S.D. Ohio 1982) ("RICO has a criminal provision (§ 1962) and a civil

remedies provision (§ 1964) and there can be no recovery of damages under § 1964 unless there

has been a violation of § 1962."). Thus, to state a claim for relief under RICO, the Plaintiffs

must satisfy two pleading burdens. First, they must allege that the Defendants violated 18 U.S.C.

§ 1962, i.e., "criminal RICO." To do so, the Plaintiffs "must allege the existence of seven

constituent elements: (1) that the defendant (2) through the commission of two or more acts (3)

constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or

maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect

interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)

(summarizing elements of 18 U.S.C. § 1962(a)-(c)). Where, as here, there are multiple

defendants, the Plaintiffs must allege each of these requirements for each individual Defendant.

*DeFalco v. Bernas*, 244 F.3d 286, 306 (2d. Cir. 2001). Further, they must allege that they were

"injured in [their] business or property by reason of a violation of section 1962." 18 U.S.C. §

1964(c).

The Defendants contend that this Court must dismiss the RICO Claims pursuant to

Federal Rules of Civil Procedure 12(b)(6) and 9(b) because assuming, *arguendo*, the truth of the

allegations in the Complaint, the Plaintiffs have failed to allege a violation of section 1962 and

that they have suffered damages compensable under section 1964. *See* Def. Mem. at 9-24. The

Court finds merit to those contentions. As explained below, the Court finds that the Complaint

must be dismissed because the Plaintiffs have failed to plead a viable pattern of predicate acts

with regard to any Defendant or the existence of a RICO enterprise. Moreover, the Court finds

that the Plaintiffs have not alleged compensable RICO injuries. Since the Plaintiffs have failed

to allege a claim under the RICO statute, it follows that the conspiracy claims likewise must be

dismissed.[6]

The Court considers each of those matters below.

## A.   Plaintiffs Have Failed to Plead a Pattern of Racketeering/Predicate Acts

Under section 1961(1), "racketeering activity" consists of certain criminal acts under

state and federal law including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

*See* 18 U.S.C. § 1961(l)(B). A complaint alleging mail and wire fraud, like the one at issue here

(SAC ¶¶ 126, 129-134), must show "(1) the existence of a scheme to defraud, (2) defendant's

knowing and intentional participation in the scheme, and (3) the use of interstate mails or

---

[6]   On January 21, 2015, six days after the filing of the Motion, the parties attended a discovery conference before Magistrate Ellis in the District Court, during which counsel to Noah stated, in the context of informing the Court of the status of discovery, that he believed "this is a summary judgment case and so we're looking to hit the March deadline that this court set." *See* DC ECF Doc. No. 77, Transcript of January 21, 2015 Conference, 4:11-12. The Plaintiffs have argued that such statement "is tantamount to a judicial admission" that Noah was conceding that its Motion lacked merit, and cited to *United States v. Mckeon*, 738 F.2d 26, 30-31 (2d Cir. 1984), as support. *See* Pl. Opp. Mem. at 1. The Plaintiffs misapprehend the holding of *Mckeon*. The primary issue in *Mckeon* was whether a district court erred in permitting prosecutors to admit as evidence in a third trial an opening statement to the jury by defendant's counsel in the second trial that contained facts that were materially inconsistent with the counsel's opening statement in the third trial. *Mckeon*, 738 F.2d at 28. After analogizing the situation to "the admissibility of superseded pleadings in civil litigation" (where earlier pleadings with one set of facts is admissible in a subsequent litigation involving that party as an admission of a party-opponent), the Second Circuit concluded that the District Court's admission into evidence of the opening statement was allowable, but under restrictive parameters— including that the inconsistency must be clear and "the equivalent of testimonial statements by the defendant." *Id.* at 33. *Mckeon* is clearly distinguishable from the case at bar. First, the statement was made by Noah's counsel at a discovery conference, not at a hearing or conference on the Motion. Second, the statement reflected counsel's view of the entire case (in the context of discovery on all claims asserted in the Complaint), not of the Motion to Dismiss, which seeks to dismiss only the RICO Claims. Third, the statement did not involve any presentation of a factual nature and did not rise to the level of testimonial statements by any of the Defendants. Thus, we find no merit to the Plaintiffs' argument.

transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). "Proof of a fraudulent scheme requires evidence showing a specific intent to defraud." *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir. 1983) (citations omitted). "[C]onclusory and speculative allegations pertaining to the alleged fraudulent schemes" are inadequate to "plead a plausible fraudulent scheme." *Curtis v. Law Offices of David M. Bushman, Esq.*, 443 Fed. Appx. 582, 585 (2d Cir. 2011).

To plead a "pattern of racketeering activity," the Plaintiffs must allege "at least two acts of racketeering activity" committed in a ten year period. 18 U.S.C. § 1961(5). *See also H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238 (1989) ("Section 1961(5) concerns only the minimum *number* of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts included."). The Plaintiffs must also show that the racketeering predicates are "related," i.e., connected to one another, and that they "amount to or pose a threat of continued criminal activity." *Id.* at 239. *See also Cofacrèdit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999) ("To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are related *and* that they amount to or pose a threat of continued criminal activity." (quoting *H.J. Inc.*, 492 U.S. at 239)) (internal quotation marks omitted). Accordingly, to determine whether the Plaintiffs have adequately pleaded a pattern of racketeering activity, the Court must determine whether there is both "relationship" and "continuity" among the predicate acts of racketeering activity alleged in the SAC. *See Vild v. Visconsi*, 956 F.2d 560, 566 (6th Cir. 1992) ("Continuity and relationship constitute two analytically distinct prongs of the pattern requirement.").

18

### i.   <u>Relatedness</u>

"Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) (quoting *H.J. Inc.*, 492 U.S. at 240); *see also Vild*, 956 F.2d at 566 (affirming dismissal of third amended complaint after examining relatedness issue first before addressing continuity prong). In the Second Circuit, predicate acts must be both "horizontally related" (i.e., the acts must be related to one another), and "vertically related" (i.e., the acts must be related to the enterprise). *United States. v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016). The "thrust" of the vertical and horizontal inquires is that "[t]o form a pattern of racketeering activity, predicate acts must be related to each other and the enterprise." *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006). "[T]he overall pattern requirement, of which relatedness is one component, is a bulwark against the application of RICO to the perpetrators of isolated or sporadic criminal acts." *Id.* at 376 (internal quotation marks omitted).

The Plaintiffs contend that they have alleged two groups of predicate acts in satisfaction of RICO's pattern of racketeering activity requirement. The first involves acts directed at the Plaintiffs by the Defendants in furtherance of the Acquisition and Financing (the "**Basic Food Acts**"). The Plaintiffs claim that they are victims of six predicate acts of mail and/or wire fraud designed to induce them to enter into the "turn-key" acquisition transaction with Kim and to borrow funds from Noah to finance that transaction allegedly occurring over the period of November, 2012 to December, 2012, that they label as a "Pattern of Racketeering Activities" under 18 U.S.C. §§ 1961(1) and 1961(5). *See* SAC ¶¶ 126-134. Thus, the gravamen of the Complaint is that the Defendants defrauded Lee and Park and duped them into overpaying for

the membership interests in Basic Food using financing provided by Noah. *See, e.g.*, SAC ¶¶ 12-13. The Plaintiffs say that Kim and Noah benefited from that transaction because: (i) Basic Food's debt to Noah (obtained by Kim) was satisfied; (ii) Noah moved a poorly performing loan off its books and in doing so, protected its status as an SBA lender; and (iii) Kim got cash that he needed and could use to operate the Hoboken Deli. *See* SAC ¶ 90.

The second grouping of predicate acts, however, involves alleged criminal wrongdoing by Shin directed at individuals who are not plaintiffs herein, in connection with three other, separate transactions that pre-date and are unrelated in form and substance to each other and to the Basic Food transactions (the "**Other Acts**"). Those are (i) Shin's alleged wrongdoing in connection with SBA guaranteed financing provided by Noah to 32 Madison Farm Inc. ("**Madison Farm**"), a New York corporation that operates a Korean/American delicatessen at 148 Madison Avenue, New York, New York (s*ee generally*, SAC ¶¶ 31-36) involving alleged wire fraud (SAC § 32); (ii) Shin's alleged wrongdoing in connection with a construction loan made to C&Y Management ("**C&Y**") by Noah's predecessor, Royal Asian Bank ("**RAB**") (*see generally*, SAC ¶¶ 37-43) involving alleged money laundering, violations of the U.S. Department of Treasury currency reporting requirements, and extortion (SAC ¶¶ 40, 43); and (iii) matters relating to a $100,000 loan by Mr. Dong Lee ("**D. Lee**") to Shin personally, and Shin's alleged misrepresentations and false promises to D. Lee that D. Lee would be afforded the opportunity to participate in an Initial Public Offering ("**IPO**") of RAB's stock that never took place and allegedly was never contemplated (*see generally*, SAC ¶¶ 44-51) involving alleged securities fraud and wire fraud (SAC ¶¶ 44, 47, 49). The Plaintiffs allege that the goal of the "enterprise" (discussed below) was to "saddle third-parties [i.e., the Plaintiffs] with the business that had become belly-up in fall 2012 so that their SBA fraud scheme of obtaining loans;

20

financially benefitting from their access to the SBA loan flow and their individual gains and prestige in the community could be maintained . . . ." *Id.* at 22.

The Plaintiffs allege that the Other Acts are "related to" the Basic Food Acts since they demonstrate the illegitimate purpose of the enterprise. First, they argue that the scheme by Shin and Noah to underwrite the loan to Madison Farm is similar to the Basic Food transaction in that Shin enlisted the services of another businessman and co-conspirator (Mr. Kim) to effectuate the scheme and, as in the Basic Food transaction, the core acts were the filing of a false application to the SBA and Shin's use of false and misleading information to obtain the loan. *Id*. The Plaintiffs contend that the allegations relating to C&Y provide "another example of the illegitimate and inherently unlawful nature of the enterprise." *Id*. They say that the situation with C&Y involved another Korean businessman (Mr. Kang) whose business was involved in money laundering, that Shin should have known that Mr. Kang was engaged in money laundering, and that Shin violated currency reporting rules in order to extort money from Mr. Kang. *Id*. Finally, they contend that the alleged sham IPO supports allegations of "the illegitimate nature of Shin, Noah Bank and co-conspirators." *Id*. at 16.

Although the Plaintiffs contend that the Basic Food Acts and Other Acts include related predicate acts satisfying the RICO pattern requirement, such acts are not related to each other and, thus, do not satisfy the horizontal relationship test. As alleged in the Complaint, none of the conduct directed at Madison Farm, C&Y and D. Lee by Shin involved the Plaintiffs in any respect and all of it had separate purposes unrelated to the Plaintiffs. For instance, the alleged extortion of D. Lee by Shin bears no relation to the alleged wire and/or mail fraud alleged to have occurred in the Basic Food Acts. Even the allegations of wire fraud alleged in at least one of the Other Acts is unrelated to the wire fraud alleged in the Basic Food Acts. Indeed, as noted

21

previously, the Plaintiffs do not contend that the alleged crimes recited in Complaint (at

paragraphs 31-51) are predicate acts or form any part of the "pattern of racketeering." *Cf.* SAC

¶¶ 126–134.  Rather, they allege that the Other Acts are among the "Means and Methods of the

Enterprise," noting that "the defendants have conducted schemes against other victims which are

very similar to the scheme perpetrated on the Plaintiffs."  SAC ¶ 125(A).  All those alleged

crimes were calculated to enrich Shin personally, at the expense of others.  Moreover, none of

that conduct is alleged to have had a similar or related purpose of inducing the Plaintiffs to

acquire 100% of the Basic Food ownership interests from Kim.  To be sure, all of the

wrongdoing alleged in the Complaint may be interrelated in the sense that it is all calculated to

enhance Shin's wealth, but the Other Acts are unrelated to the six predicate acts that allegedly

injured the Plaintiffs.  Furthermore, the Plaintiffs allegation that their injury—the damages

allegedly occasioned from being duped into the Basic Food transaction—was caused only by the

Defendants' alleged fraud in connection with the Basic Food transaction (SAC ¶ 119), reflects a

lack of relationship between the predicate acts underlying the Basic Food Acts and the Other

Acts.

     Based on the plain language in the Complaint, it is clear that the Other Acts fall outside

the "pattern of racketeering activity" alleged in the Complaint because they have no horizontal

relationship to the Basic Food Acts.  *See Burdick v. American Express Co.*, 865 F.2d 527, 529

(2d Cir. 1989) (finding the RICO claim fails because plaintiff's injury from termination by

defendant-employer as result of plaintiff's complaints about fraud on customers was too remotely

related to the customers' injuries from the fraud itself); *Vild*, 956 F.2d at 566 (affirming

dismissal of RICO complaint, in part, because relatedness requirement for RICO pattern not met

where plaintiff's injury from fraudulent inducement to enter marketing agreement unrelated to

injuries to purchasers from misrepresentation regarding defendant business entities); *Bernstein v. Misk*, 948 F. Supp. 228, 237 (E.D.N.Y. 1996) (finding bank fraud bore "almost no relation" to predicate acts which allegedly injured plaintiffs and could not be considered as part of "pattern" of racketeering activity) (collecting cases); *Ray Larsen Assocs., Inc. v. Nikko America, Inc.*, No. 89 Civ. 2809, 1996 WL 442799, at * 6–7 (S.D.N.Y. Aug.6, 1996) (finding no relationship between allegations that defendants siphoned funds to defraud IRS and allegations that defendants made fraudulent misrepresentations to plaintiff). *Cf. Cosmos Forms Ltd. v. The Guardian Life Ins. Co. of Am.*, 113 F.3d 308, 310 (2d Cir. 1997) (determining that purpose, result, participants and method of commission of alleged acts the same where employee of purchaser and employee of supplier repeatedly falsified invoices in order to skim money from orders placed between employers for extended period of time).

### ii.   <u>Continuity</u>

Mail fraud and wire fraud, which are the predicate acts pled by the Plaintiffs in furtherance of the Defendants' alleged scheme, involve at their core "an intent to defraud." *Econ. Opportunity Comm'n of Nassau County v. County of Nassau*, 47 F. Supp. 2d 353, 363 (E.D.N.Y. 1999) (quoting *United States v. Bouyea*, 152 F.3d 192, 194 (2d Cir. 1998)). "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc.*, 492 U.S. at 240. In this Circuit, "a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.*, past criminal conduct 'extending over a substantial period of time')." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir. 1995). *See also H. J. Inc.*, 492 U.S. at 241 ("Continuity" of criminal activity in this context encompasses "both a closed- and open-ended concept, referring either to a closed period

23

of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.").

Open-ended continuity is characterized by "past criminal conduct coupled with the threat of future criminal conduct." *GICC Capital*, 67 F.3d at 466.  In pleading open-ended continuity, the plaintiff is not required to allege that the predicate acts extended over a period of time. Rather, a plaintiff must assert facts demonstrating that there is a "threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit*, 187 F.3d at 242; *Heinrich v. Waiting Angels Adoption Servs. Inc.*, 668 F.3d 393, 410 (6th Cir. 2012). That threat is presumed when the enterprise is engaged primarily in criminal racketeering activity. *H.J. Inc.*, 492 U.S. at 242.  No such presumption applies in cases where the enterprise conducts a legitimate business.  In such cases, the plaintiffs must adduce "some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacrèdit*, 187 F.3d at 243; *see also Albunio v. Int'l Safety Group, Inc.*, 2016 WL 1267795, at *7 (S.D.N.Y. Mar. 30, 2016) (stating that a claim of open-ended continuity can be pled only "[i]f the nature of the predicate acts themselves impl[y] a threat of continued criminal activity."). Such theory involving the implied nature of the predicate acts, however, "only applies to 'inherently unlawful' criminal activities in pursuit of 'inherently unlawful goals." *Id.*  Mail fraud and wire fraud are not "inherently unlawful."  *Id.* (citing *Econ Opportunity Comm'n*, 47 F. Supp. 2d at 366-67).

In contrast to open-ended continuity, close-ended continuity involves "a series of related predicates extending over a substantial period of time."  *Cofacrèdit*, 187 F.3d at 242 (quoting *H.J. Inc.*, 492 U.S. at 242).  It "is primarily a temporal concept," although factors like "the

number and variety of the predicate acts and the number of participants may be germane" to

establishing closed ended continuity. *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178,

184 (2d Cir. 2008) (citation omitted).   The time during which the RICO predicate activities

occurred is the relevant time period, not the time during which the underlying scheme operated

or the underlying dispute took place. *Id*.   But, "[p]redicate acts extending over a few weeks or

months . . . do not satisfy this requirement." *Cofacrèdit*, 187 F.3d at 242 (quoting *H.J. Inc.*, 492

U.S. at 242).

Here, the Plaintiffs contend that the "association-of-fact" among the Defendants "and

certain others" conducted a legitimate business "in an 'inherently unlawful' manner, in violation

of SBA rules and laws, similar to a clearly illegitimate association–in-fact enterprise." Pl. Opp.

Mem. at 14-15.   The Plaintiffs maintain that Kim, Shin, Noah Bank, Ahne Law and Samuel

Ahne, and certain unidentified "loan brokers," comprise an enterprise that conducted a legitimate

business—Noah's banking business—in an inherently unlawful manner by writing SBA loans

that did not satisfy SBA standards, all to the detriment of the taxpayers who foot the bill when

the loans default and the SBA makes good on the guarantees.   (SAC ¶¶ 29-36, 43, 121, 124).

They say that the "pattern of racketeering activity" includes wire fraud in connection with

Madison Farm (SAC ¶ 32) and the IPO (SAC ¶ 49), and wire fraud committed by the Defendants

in connection with the Basic Food loans and required SBA servicing reports.   (SAC ¶¶ 69-70, 97,

103, 110, 129-134).   They maintain that because Noah's business is ongoing and there is a threat

of future fraud, the racketeering pattern is "open ended."   (SAC ¶ 127).

The Court finds no merit to those assertions.   The Court has already found that none of

the Other Acts are related to the Basic Food Acts. *See* discussion *supra* pp. 19-23.   Five of the

six acts of wire fraud alleged as the predicate acts for the Basic Food Acts as underlying the

RICO pattern are pled as having occurred only between November 2012 and December 2012. (*See* SAC ¶¶ 129-133).[7]  Thus, there is a clear start date and end date for those predicate acts. However, "'inherently terminable' scheme[s] cannot establish open-ended continuity for RICO purposes." *Albunio*, 2016 WL 1267795, at *6.  Moreover, because the Plaintiffs concede that Noah has a legitimate business, there is no presumed threat of "continuing criminal activity" into the future.  Thus, the allegations of wire fraud involving the Plaintiffs are insufficient to establish a threat of continued criminal activity because that predicate act is not an inherently unlawful criminal activity in pursuit of inherently unlawful goals for purposes of determining open-ended continuity.  As a result, the Plaintiff's allegations of wire fraud are insufficient because they do not allege that Noah could not operate without the alleged enterprise engaging in the predicate acts of wire fraud and/or mail fraud.  *See SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) (finding open-ended continuity of a non-criminal business where "the predicate acts are the only way in which the business operated.").  Finally, the sixth alleged act of wire fraud, that Noah and Shin "caused their [unnamed] Chief Credit Officer (COO) . . . to provide materially false reporting that painted a perfectly healthy status and outlook for loans by omitting material facts relating to known financial distress and other factors," is conclusory and entirely speculative in nature because they do not allege any actual post-December 2012 instances of wire fraud.  *Cf. GICC Capital Corp.*, 67 F.3d at 466 (finding that continuation of alleged predicate act would have continued "but for the commencement of litigation was entirely speculative.").  Thus, the Court concludes that the alleged criminal conduct cannot constitute open ended continuity.

---

[7]    As an alleged sixth predicate act, he Plaintiffs assert generally that Shin and Noah caused the Chief Credit Officer on a regular basis to submit false reports to the SBA.  There is no supporting allegations pled concerning this sixth predicate act.  The Court is not obligated to assume the truth of an unsupported and conclusory allegation.

To plead closed-ended continuity, a plaintiff must allege "a series of related predicate acts extending over a substantial period of time." *Cofacrèdit*, 187 F.3d at 242 (quoting *H.J., Inc.* 492 U.S.at 242). Predicate acts extending over a few weeks or months do not satisfy the "continuity" requirement. *H.J., Inc.*, 492 U.S. at 242. Since the Supreme Court's decision in *H.J. Inc.*, the Second Circuit has never held a period of less than two years to constitute a substantial period of time. *See Cofacrèdit*, 187 F.3d at 243 (discussing district court's finding that "predicates span[ning] well over two years" constituted close-ended continuity); *Spool*, 520 F.3d at 184 (finding a sixteen-month period to be insufficient to establish close-ended continuity); *DeFalco*, 244 F.3d at 321–22 (determining predicate acts occurring within an approximately year and a half period insufficient to demonstrate closed-ended continuity). Where, like here, the conduct alleged in the complaint "involves a limited number of perpetrators, a limited number of victims, and a limited goal, the conduct is lacking in closed continuity." *Ray Larsen Assocs.*, 1996 WL 442799 at *9 (finding that a single victim of one group's acts attempting to defraud that victim out of commissions due under a single contract insufficient to show closed continuity). *See also Continental Realty Corp. v. J.C. Penny Co., Inc.*, 729 F. Supp. 1452, 1455 (S.D.N.Y. 1990) (holding a claim alleging fraud and breach of contract in one real estate transaction involving one victim, one group of perpetrators and a single goal as insufficient for closed continuity); *Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396, 411 (E.D.N.Y. 2013) (finding that plaintiff's evidence "go[ing] only to a purported scheme involving one victim ([plaintiff] and his wife), the servicing of a single mortgage, and limited perpetrators, with a single and finite goal . . . is insufficient to demonstrate the presence of closed ended continuity.").

As the remaining alleged predicate acts all occurred within the span of a month, the

Plaintiffs have not demonstrated closed ended continuity either.

Based on the foregoing, the Court finds that the Complaint fails to plead a "pattern of racketeering activity" since it fails to allege either open or closed ended continuity.

**B.**     <u>**Plaintiffs Have Failed to Allege that an "Enterprise" Existed**</u>

To state a claim under RICO, "a complaint must identify the enterprise." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (quoting *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995). A RICO "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). *See also United States* v. *Turkette*, 452 U.S. 576, 583 (1981) (defining enterprise as encompassing "a group of persons associated together for a common purpose of engaging in a course of conduct."). The enterprise must be an entity separate and apart from the pattern of activity in which it engages." *First Capital Asset Mgmt, Inc. v. Satinwood Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (citing *Turkette*, 452 U.S. at 583). *See also City of New York* v. *Chavez*, 944 F. Supp. 2d 260, 270 (S.D.N.Y. 2013) ("The enterprise must also have some element of existence beyond the predicate acts committed.")

"[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *Turkette*, 452 U.S. at 583). It does not need to have established rules and regulations, a hierarchical structure or a "chain of command" and its members need not have fixed roles. *Id.* However it "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* Accordingly, the "conclusory naming of a string of entities

does not adequately allege an enterprise." *Satinwood*, 385 F.3d at 175 (citation omitted).

Instead, an association-in-fact "is proved by evidence of an ongoing organization, formal or

informal, and by evidence that the various associates function as a continuing unit." *Boyle*, 556

U.S. at 945 (quoting *Turkette*, 452 U.S. at 583).

     In *City of New York v. Chavez*, the court identified the following characteristics for

defining an "enterprise":

> [A]n "enterprise" must have "ongoing organization"; the enterprise must
> "function as a continuing unit"; it must "have a common purpose of engaging in a
> course of conduct"; its members must be in certain ways "dependent" on one
> another; its members must be in certain ways "joined together as a group"; its
> members must act in certain ways "to benefit" one another; its members must
> contribute to the association's goals and purposes in some "necessary and
> symbiotic" manner; [and] its members' activities must in some manner "rely" on
> other members' activities.

944 F. Supp. 2d at 275 (citations omitted).  The *Chavez* court reduced these requirements to "a

simply-stated distinction: If each act of fraud is equally effective without the perpetration of any

other act of fraud—even if perhaps effective to a far lesser or different magnitude—then there is

no RICO enterprise.  If each act of fraud is not effective without the other acts of fraud, then a

RICO enterprise exists." *Id.*  Thus, it follows that while the enterprise must be separate from the

pattern of racketeering activity alleged, "the evidence used to prove the pattern of racketeering

activity and the evidence establishing an enterprise may in particular cases coalesce." *Boyle*, 556

U.S. at 947 (internal quotation marks omitted).  In other words, the enterprise "is oftentimes

more readily proven by what it does, rather than by abstract analysis of its structure." *Id.* at 951.

The enterprise may be formed "solely for the purpose of carrying out a pattern of racketeering

acts," so long as it embodies the requisite structure to make it an enterprise.  *Boyle*, 556 U.S. at

942.

     Paragraphs 120-125 contain the Complaint's allegations relating to the Defendants'

alleged "enterprise".  The Plaintiffs characterize the RICO enterprise as consisting of an

"association-in-fact" consisting of Noah, Ahne P.C., Samuel Ahne, Shin, Kim "and certain other

individuals and/or entities . . . operating under the auspices of 'loan makers' in the Korean-

American communities of New York and New Jersey and other related business association

names which engaged in mail fraud, wire fraud, and other racketeering activities in this District

and elsewhere, to further their self-interests."  SAC ¶ 120; *see also* SAC ¶ 122 (same).  The

Plaintiffs allege that the purpose of the enterprise included:

- Investing income derived from racketeering activity to expand Shin's undisclosed business wealth in the form of silent ownership of deli/cafes in the New York metropolitan area.

- Investing income derived from racketeering activity to expand defendant Kim's deli/café ownership at other locations.

- Promoting and enhancing the enterprise and the activities of its participants, including each defendant, through financial benefits and SBA loans-related prestige in the Korean-American community that would otherwise not be available.

- Promoting and enhancing the enterprise and the activities of its participants, including each defendant, through social recognition and prestige in the Korean-American community that would not otherwise be available.

SAC ¶ 124(A)-(D).  They assert that "[t]his enterprise was engaged in, and its activities affected,

interstate commerce in that the Defendants obtained commercial loans using false and fraudulent

applications which were filed with the SBA to secure U.S. government guaranty [sic] on multiple

occasions."  SAC ¶ 121; SAC ¶ 123 (same).  They allege that the "association of fact" conducted

a legitimate business "in an 'inherently unlawful' manner, in violation of SBA rules and laws."

Plaintiff's Opp. at 14-15.  The Plaintiffs further contend that the goal of the enterprise was to

"saddle third-parties [i.e., the Plaintiffs] with the business that had become belly-up in fall 2012

so that their SBA fraud scheme of obtaining loans financially benefitting from their access to the

SBA loan flow and their individual gains and prestige in the community could be maintained…." *Id.* at 22.

Even assuming that the facts alleged in the Complaint are true, the Plaintiffs have failed to allege that an "enterprise" existed. First, the Complaint fails to (i) define the roles of the named alleged members of the enterprise; and (ii) allege why the diverse individuals are associated or to identify their common purpose. Second, the Complaint contains no support for the Plaintiffs' assertion that the Defendants used "false and fraudulent applications which were filed with the SBA to secure U.S. government guarantys [sic] on multiple occasions." The Complaint contains no allegations in support of the alleged fraud. For example, it fails to identify the commercial "loans" in substance, time or parties involved, and does not allege that the loans are in default, that the SBA was damaged, or that the borrowers were victimized. Further, as alleged in the Complaint, each of the Other Acts was independently effective; the success of one did not turn on the success of the others. Third, all but one of the Other Acts did not include the SBA at all (*see* SAC ¶¶ 37-51). None of the alleged crimes alleged in the Other Acts involve an enterprise member other than Noah and Shin. Indeed, Kim, Ahne P.C. and Samuel Ahne are not alleged to have had any role in those crimes or to have benefitted from them.

In short, the Plaintiffs have failed to allege facts demonstrating that the "association-in-fact" worked together as a cohesive unit or coordinated their alleged racketeering activities. For all of these reasons, the Plaintiffs have failed to satisfy the "enterprise" element of their RICO claim.

**C.**     **Plaintiffs Have Not Alleged Compensable RICO Damages**

As noted, in a RICO action, standing is conferred upon "any person injured in his business or property by reason of a violation of section 1962 of this chapter . . . ." 18 U.S.C. §

31

1964(c). Thus, under § 1964(c), a RICO plaintiff must establish (i) that plaintiff suffered an

injury to business or property and (ii) that plaintiff's injury was proximately caused by

defendants' violation of § 1962. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763,

767 (2d Cir. 1994). *See also Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985) (a

RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured

in his business or property by the conduct constituting the violation.")  To that end, "[a] plaintiff

asserting a claim under 18 U.S.C. § 1964(c) must allege *actual*, quantifiable injury."

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008), *abrogated on other grounds

by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008).  *See also Gelt Funding*, 27

F.3d at 768 ("[A]s a general rule, a cause of action does not accrue under RICO until the amount

of damages becomes clear and definite." (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096,

1106 (2d Cir. 1988))).

The Plaintiffs have failed to meet the pleading requirement since they have not alleged

clear and definite damages.  Although they claim to "have suffered direct injury to their business

interests in Basic Food Group, LLC, and have incurred concrete monetary and financial loss as a

result of being fraudulently induced to enter into the stock transfer for Basic Food Groups, LLC,

(*see* SAC ¶ 119), the Complaint fails to quantify the loss, or even suggest a methodology for

doing so.  Rather, the Plaintiffs baldly say that Basic Food was not worth the "purchase price"

(SAC ¶¶ 88, 93), that Lee's expectation of earning on average $300,000 per year was not met

(SAC ¶ 93), and that eighteen months after the closing, Lee was contacted by the New York

Department of Labor regarding allegations of wage and hour violations, which Plaintiffs contend

occurred prior to the closing. (SAC ¶ 93-95).  In essence, the Plaintiffs allege that their injury

> consists of (A) paying $1.8 million for a business that was operating at a loss and
> financial turmoil; (B) rolling over the prior loan of "Basic Food Group, LLC,"

32

into a new loan and thereby undertaking bank obligations not only in the name of
Basic Food Groups, LLC, but also "guaranteed" by them individually and by their
unrelated business known as Hudson Produce, Inc.; and (C) incurring legal fees
and expenses to address the injury; and (D) in having not been protected at all
against claims, future claims, and indeed the overall loss scenario.

SAC ¶ 155. *See also* SAC ¶ 101 ("Plaintiff relied reasonably upon . . . defendants'

representations and inducements, and believed and relied upon their representations, plaintiff's

belief and reliance were reasonable and justifiable, and plaintiff suffered injury directly and

proximately caused by defendants, for which plaintiff is entitled to damages.").

Notwithstanding such contentions, the Plaintiffs have failed to allege that they have

actually been harmed by the transaction.  The Plaintiffs continue to own Basic Food and operate

the New York Deli.  They do not allege that Basic Food is in default under the Noah loan or that

their guarantees have been called upon.  Although they alleged that they paid $3,000 in fees to

Samuel Ahne (SAC ¶ 71), their assertion that they have "not been protected at all against claims,

future claims, and indeed the overall loss scenario" is plainly speculative.  In short, the Plaintiffs

have failed to allege "concrete financial loss" for which relief can be granted.  *See Maio v. Aetna,

Inc.*, 221 F.3d 472, 483 (3d Cir. 2000).

The Second Circuit's decision in *Gelt Funding* is also instructive on this point.  27 F.3d

763.  There, the plaintiff bank claimed that the defendants had fraudulently induced it to make

non-recourse loans by misrepresenting the value of the properties pledged as collateral. *Id.* at

766.  The bank alleged that it was injured because (i) it had lent more funds than it would have

had it known the true value of the collateral and was thus undersecured for the excess amounts;

and (ii) it had to increase its reserves to cover the potential risk of the borrowers' default.  *Id.* at

766-67.  However, it did not contend that the fraudulently induced loans were in default or that it

had to foreclose on the insufficient collateral.  *Id.* at 767-68.  The court in *Gelt Funding* rejected

those contention, noting that, under the bank's theory, it would have been injured even if the

loans were ultimately repaid in full with interest. *Id.* Nevertheless, the plaintiff there argued that

it suffered an "immediate quantifiable injury when the loans were made because ... [it] assumed

additional risk of loss, and '[f]or all practical purposes the [ ] additional funds were lost the

moment the loans were made.'" *Id.* at 768. Such argument did not persuade the Second Circuit,

which stated:

> [W]e reject FNB's novel theory that it was damaged simply by being undersecured
> when, with respect to those loans not yet foreclosed, the actual damages it will
> suffer, if any, are yet to be determined.

*Id.* at 768. Likewise, the Plaintiffs' nearly identical argument here, that they sustained a

monetary injury as soon as they purchased the allegedly undervalued business, does not persuade

this Court.

## II.    <u>Section 1962(d) Conspiracy Claim</u>

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate

any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To state

a RICO conspiracy claim, the Plaintiffs must allege that Defendants "agreed to form and

associate themselves with a RICO enterprise and that they agreed to commit two predicate acts

in furtherance of a pattern of racketeering activity in connection with the enterprise." *Conte v.*

*Newsday, Inc.*, 703 F. Supp. 2d 126, 133 (E.D.N.Y. 2010) (quoting *Cofacrèdit*, 187 F.3d at 244).

Because a substantive violation of RICO has not been adequately pled, the conspiracy claim

must necessarily fail. *See, e.g.*, *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996)

("Any claim under § 1962(d) based on a conspiracy to violate the other subsections of § 1962

necessarily must fail if the substantive claims are themselves deficient." (quoting *Lightning*

*Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993))), *vacated on other grounds*, 525

U.S. 128 (1998); *Bernstein*, 948 F. Supp. at 241 n.4 (stating that "dismissal of the substantive RICO claims mandates dismissal of plaintiffs' RICO conspiracy claim as well" (citing *Purgess v. Sharrock*, 806 F. Supp. 1102, 1110 n.9 (S.D.N.Y. 1992))).  Thus, the Plaintiffs' conspiracy claims under §1962(d) must also be dismissed.

## **CONCLUSION**

Based on the foregoing, the Motion is GRANTED, and the RICO Claims are dismissed without leave to replead.  The Movants are directed to settle an order consistent with this decision on five days' notice.

Dated: New York, New York
       July 1, 2016

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge