NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
In re:                                                      :         Chapter 11
     Basic Food Group, LLC,                      :
                        Debtor.      :         Case No. 15-10892 (JLG)
------------------------------------------------------------------------x
Jae Ho Lee, Soyoun Park and                                 :
Basic Food Groups, LLC,                                     :
                   Plaintiffs,       :
                                        :
     -against-                                             :         Adv. Pro. No. 15-01119 (JLG)
                                        :
Ahne Law, P.C., Samuel Ahne, Noah Bank,                     :
Edwin Shin, Cheol Min Kim, and                              :
Aspen Market Place Corp.,                                   :
                   Defendants.       :
------------------------------------------------------------------------x

**MEMORANDUM DECISION AND ORDER ON MOTION OF CHEOL MIN KIM
AND ASPEN MARKET PLACE, CORP., FOR SUMMARY JUDGMENT
DISMISSING ALL CLAIMS AGAINST THEM, PURSUANT TO FEDERAL
<u>RULE OF BANKRUPTCY PROCEDURE 7056</u>**

<u>APPEARANCES:</u>

LAW OFFICES OF CHEOL I. KIM
8 Grand Cove Way
Edgewater, NJ 07020
By:    Cheol I. Kim, Esq.

*Attorney for Defendants Cheol M. Kim and Aspen Market Place Corp.*

KIMM LAW FIRM
333 Sylvan Avenue
Suite #106
Englewood Cliffs, New Jersey 07632
By:    Michael Kimm, Esq.

*Attorney for the Plaintiffs*

**JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

<u>INTRODUCTION</u>

Basic Food Group LLC, the debtor herein ("Basic Food" or the "Debtor"), and its sole

members,  Jae Ho Lee ("Lee") and his wife, Soyoun Park ("Park"), are the plaintiffs (the

"Plaintiffs") in this adversary proceeding.[1]  As relevant herein, they seek to recover damages

from Aspen Market Place Corp. ("Aspen"), and Mr. Cheol Min Kim ("Kim," and together with

Aspen, the "Seller Defendants"), occasioned by their alleged wrongdoing in connection with a

transaction in 2012 in which Lee purchased the Basic Food deli/café business from Kim.  Lee

financed the transaction in part with a $1.3 million loan to the Debtor from Noah Bank, N.A.

("Noah Bank"), another defendant herein.

In their Second Amended Complaint (the "Complaint" or "SAC"), the Plaintiffs assert

seven causes of action against various parties involved in the transaction.[2]  The matter before the

Court is the Seller Defendants' joint motion for summary judgment dismissing Counts 4, 5 and 6

of the Complaint (the "Motion").[3]  The Plaintiffs oppose the Motion.[4]  The Complaint identifies

---

[1]   On or about April 30, 2018, Lee passed away and his surviving wife, and plaintiff herein, Park, was substituted as the executrix for Lee's estate.  *See* Notice of Appearance in Adversary Proceeding and Substitution of Plaintiff Jae Ho Lee by Soyoun Park as Administrator of Estate of Jae Ho Lee [ECF No. 113].  Unless indicated otherwise, citations to "ECF No. __" refer to filings on the Court's electronic docket in this Adversary Proceeding (No. 15-01119-JLG).

[2]   *See* ECF No. 1, Doc. 39.

[3]   In support of the Motion, the Seller Defendants submitted: (i) a Local Rule 7056.1 Statement of Uncontested Facts [ECF No. 98]; (ii) the Brief of Cheol Min Kim and Aspen Market Place In Support of Motion for Summary Judgment Dismissing All Claims Lodged Against Them By Plaintiffs, Pursuant to Federal Rule of Bankruptcy Procedure 7056 [ECF No. 98-2] (the "Seller Defendants' MOL"); (iii) the Declaration of Cheol I. Kim in Support of the Motion [ECF No. 98] (the "Kim Declaration"); and (iv) a Reply Memorandum of Law In Further Support of Kim's Motion for Summary Judgment [ECF No. 103] (the "Reply").

[4]   In opposition to the Motion, the Plaintiffs filed the (i) Plaintiffs' Memorandum of Law in Opposition to Cheol Min Kim's Motion for Summary Judgment (the "Plaintiffs' MOL") [ECF No. 101], and the (ii) Plaintiffs' Counter Statement of Material Facts In Opposition to Cheol Min Kim's Defective Motion for Summary Judgment [ECF No.

Aspen as a party, but is otherwise silent as to its involvement in the transaction.  At the hearing

on the Motion, the Plaintiffs stipulated to dismiss Aspen from the Complaint.  They also

stipulated to dismiss Count 4 as moot.  This memorandum decision addresses whether Kim is

entitled to summary judgment dismissing Counts 5 and 6 of the Complaint.  For the reasons and

as set forth below, the Motion is GRANTED in part, and DENIED in part.

<u>JURISDICTION</u>

This Court has subject matter jurisdiction over the Motion pursuant to 28 U.S.C. §§

1334(a) and 157(a) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges

of the United States District Court for the Southern District of New York (M-431), dated January

31, 2102 (Preska, C.J.).  In Counts 5 and 6 of the Complaint, the Plaintiffs seek damages under

state law from Kim based upon his alleged pre-petition (i) breach of contract and the covenant of

good faith and fair dealing implied in all contracts, and (ii) fraud in the inducement, respectively.

Those Counts do not fall within the Court's core jurisdiction because they are state law causes of

action that neither "arise under title 11," nor "arise-in" a case under title 11.  *See* 28 U.S.C. §§

1334(b), 157(b)(1); *see also Stern v. Marshall*, 564 U.S. 462, 476 (2011) ("Under our reading of

the statute, core proceedings are those that arise in a bankruptcy case or title 11."); *J.T. Moran*

*Fin. Corp. v. Am. Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.)*, 124 B.R. 931, 937 (S.D.N.Y.

1991) (stating that core jurisdiction encompasses proceedings which "invoke a substantive right

---

101-1] that "adopts by incorporation the Plaintiffs' Statement of Material Facts presented in opposition to Noah Bank and Edward Shin's motion for summary judgment" (the "Plaintiffs' Incorporated Statement") [ECF No. 94-3].

The Plaintiffs also cite to the exhibits annexed to their opposition to the Bank Defendants' Joint Motion for Summary Judgment [ECF No. 94], as follows:  (i) deposition transcript of Cheol Min Kim; (ii) deposition transcript of Irvin Chai (Vice-President at Noah Bank); (iii) deposition transcript of Jae Ho Lee; (iv) deposition transcript of Samuel Ahne, Esq.; (v) Expert Report of Jordan Yuelys, Esq.; (vi) Declaration of Non-Party Byung Hoon Kim (the "B.H. Kim Declaration"); and (vii) Declaration of Jae Ho Lee in Opposition to Defendants Noah Bank and Edward Shin's Purported Motion for Summary Judgment (the "Lee Declaration").

provided by title 11" or that "would have no existence outside of the bankruptcy case."). Non-core proceedings are those that are not core "but that [are] otherwise related to a case under title 11." *See* 28 U.S.C. § 157(c)(1); *see also Stern v. Marshall*, 564 U.S. at 477 ("The terms 'non-core' and 'related' are synonymous" (quoting *Collier on Bankruptcy* ¶ 3.02[2], p.3-26, n.5 (16th ed. 2010))). The Debtor's claims against Kim in Counts 5 and 6 fall within the scope of the Court's non-core related-to jurisdiction because any recovery by the Debtor from this litigation will impact the value of the estate. *See Robinson v. Daley (In re Daley)*, 224 B.R. 207, 313 (Bankr. S.D.N.Y. 1998) ("Causes of action owned by the debtor prior to its bankruptcy and which become property of the debtor's estate, as well as suits between third parties which have an effect on the bankruptcy estate are bases for related-to jurisdiction." (*citing Celotex v. Edwards*, 514 U.S. 300, 308 n.5 (1995))); *see also Parmalat Capital Fin., Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) ("[A] civil proceeding is 'related to' a title 11 case if the action's outcome might have any conceivable effect on the bankruptcy estate.").

However, that jurisdiction does not extend to Lee and Park's claims against Kim. The resolution of those claims will have no impact on the Debtor's estate or assets. *See, e.g.*, *In re Johns–Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008) (noting that "a third-party action does not create 'related to' jurisdiction when the asset in question is not property of the estate and the dispute has no effect on the estate. Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy. . . ."); *cf. Victory Markets, Inc. v. NYS Unemployment Ins., Unemployment Ins. Div., Dep't of Labor, State of New York (In re Victory Markets Inc.*, 263 B.R. 9, 15 (Bankr. N.D.N.Y. 2000) (noting that "the scope of a bankruptcy court's 'related to' jurisdiction is further limited where non-debtor third parties are involved. Because an endless array of cases would 'relate to'

any single bankruptcy administration, the Second Circuit has limited 'related to' jurisdiction to 'significant' relation and not simply a remote connection.") (citations omitted).  Although not raised by the parties, the Court considers whether it has jurisdiction over those claims based on principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Under that section, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  "Claims are 'part of the same case or controversy' when they 'derive from a common nucleus of operative facts,' and 'are such that [the claimant] would ordinarily be expected to try them all in one judicial proceeding[.]'"  *Picard v. HSBC Bank PLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 561 B.R. 334, 348 (Bankr. S.D.N.Y. 2016) (internal quotations and citations omitted).  There is authority in the Second Circuit that a bankruptcy court may exercise supplemental jurisdiction under 28 U.S.C. § 1367.  *See Lionel Corp. v. Civale & Trovato, Inc. (In re Lionel Corp.)*, 29 F.3d 88, 92 (2d Cir. 1994); *see also Shafferman v. The Queens Borough Public Library (In re JMK Constr. Grp., Ltd.)*, 502 B.R. 396, 403 n.4 (Bankr. S.D.N.Y. 2013); *Gowan v. HSBC Mortg. Corp. (In re Dreier LLP)*, No. 10-5456 (SMB), 2012 WL 4867376, at *5 (Bankr. S.D.N.Y. 2012).  Here, as described below, it is clear that the claims of the Debtor and Lee and Park against Kim derive from a common nucleus of operative facts—namely, the underlying Acquisition and Loan transactions with the Seller Defendants—and it would not be judicially economical to try these overlapping matters in different proceedings.  Accordingly, the Court concludes that it has supplemental jurisdiction to adjudicate Lee and Park's claims against the Seller Defendants in this action.

In non-core "related to" matters, a bankruptcy judge cannot enter a final, appealable order unless the parties consent. *See* 28 U.S.C. § 157(c)(2) ("[T]he district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments . . . ."). On the record of the hearing on the Motion, the Plaintiffs and Seller Defendants consented to this Court's entry of a final judgment on this Motion. As such, the Court is satisfied that it has the authority to enter final orders and judgments with respect to the Plaintiffs' claims against Kim.

<u>FACTS</u>[5]

The Debtor is a limited liability company whose sole members are Lee and Park. It is also a chapter 7 debtor herein.[6] Its sole asset is a deli/café (the "NY Deli") located in New York City. Lee and Park acquired their membership interests in the Debtor from Kim in December 2012 for $1.8 million (the "Acquisition") that was partially financed by a $1.3 million small business loan from Noah Bank to the Debtor (the "Loan"). *See* Purchase Agreement; Loan Agreement.[7] The Loan is backed by the Small Business Association (the "SBA"), and is secured by a lien on the Debtor's assets. It is guaranteed by Lee and Park. *See* Security Agreement,

---

[5]   To put the matters at issue herein in context, the Court includes a discussion of the events leading up to the commencement of this action, including allegations in the Complaint. Facts that are material to the resolution of the Motion, including those subject to dispute, are discussed below in further detail, as appropriate.

[6]   Lee and Park filed the complaint initiating this adversary proceeding on September 30, 2014, in the United States District Court for the Southern District of New York. Basic Food was added as a plaintiff to that action on December 16, 2014. On April 15, 2015, Basic Food filed a voluntary petition under chapter 11 of the Bankruptcy Code. *See* Voluntary Petition, Case No. 15-10892, ECF No. 1. It remained in possession and control of its business and assets as a debtor in possession under § 1107 of the Bankruptcy Code until February 14, 2017, when the Court granted Noah Bank's motion to convert the case to one under chapter 7 of the Bankruptcy Code. *See* Order Granting Motion to Convert Chapter 11 Case to Chapter 7 [Case No. 15-10892, ECF No. 121]. Alan Nisselson is the Court-appointed chapter 7 Trustee of the Debtor's estate. *See* Notice of Appointment of Trustee Alan Nisselson [Case No. 15-10892, ECF No. 122].

[7]   *See* Agreement dated December 13, 2012 between Cheol M. Ki[m] and Si Won Kim (as Sellers) and Jae Ho Lee (as Purchaser) for 100 units of Bas[i]c Food Groups, LLC (the "Purchase Agreement") (Ex. 33.16, Ahne Depo. Tr.) [ECF No. 94-8]. *See* Loan Agreement dated December 13, 2012 by and between Basic Food (as Borrower) and Noah Bank (as Lender) (the "Loan Agreement") (Ex. A, Certification of John Kim) [ECF No. 96-6].

UCC Financing Statement [ECF No. 47-2]; Unconditional Guarantees [ECF No. 24-2]. Losses

from the operation of its business forced the Debtor into bankruptcy on April 15, 2015. By that

time, the Plaintiffs had already commenced this action.

The Plaintiffs contend that in 2012, Kim was indebted to Noah Bank on account of

financing from the bank in connection with his acquisition of Basic Food (the "Noah-Kim

Loan"), and his acquisition of Aspen, a deli/café operation in Hoboken, New Jersey.[8] *See* SAC ¶

57. The Plaintiffs maintain that in the fall of 2012, Basic Food's business was failing and both

Kim and Noah Bank understood that without an infusion of capital into the Basic Food

operations, Kim would default under the Noah-Kim Loan. *See* SAC ¶ 56. The Plaintiffs say that

because Aspen was then a "startup" business, it was not generating profits that Kim could use to

pay down that loan. *Id.* ¶ 57. Kim and Lee were friends, and at that time, Kim was aware that

Lee was operating a deli/café in New York City. The Plaintiffs contend that Kim "targeted" Lee

and schemed to sell the Basic Food business to him. *Id.* ¶ 58. They say that Kim sought to

unload the NY Deli on Lee as a "turnkey" transaction in which Lee would step into Kim's shoes

as the owner of the business, inject additional capital into the business, and, in doing so, provide

the means for Kim to pay off the Noah-Kim Loan, and to fund Aspen's operations. *See id.* ¶¶ 54,

56, 92, 98-99. The Plaintiffs contend that Kim, with the assistance of Noah Bank and Edward

Shin – its President and CEO ("Shin," and together with Noah Bank, the "Bank Defendants") -

and Samuel Ahne ("Ahne") of Ahne Law P.C. ("Ahne Law"), the attorney who represented Lee

and Park in the Acquisition and Loan transactions, duped and defrauded Lee into paying $1.8

million for the stock of Basic Food and into causing Basic Food to incur $1.3 million of

---

[8]   In 2009, Kim acquired Basic Food for $2.3 million. He financed the acquisition, in part, by an SBA-guaranteed
loan from Woori America Bank ("Woori"). In December 2011, he refinanced the Woori loan with a loan from Noah
Bank in the approximate amount of $1 million. *See* SAC ¶ 54.

indebtedness from Noah Bank to do so. *See id.* ¶¶ 12, 59-60. The Plaintiffs assert that at all

relevant times, Kim, Noah Bank and Shin knew that the NY Deli was operating at a loss and that

the business was worth far less than $1.8 million, but that, with Ahne's help, they concealed

those and other facts material to the Acquisition and Loan transactions from Lee. *See id.* ¶¶ 93,

99-102. Further, they contend that during their negotiations relating to Lee's acquisition of Basic

Food, Kim misrepresented to Lee that Basic Food was "profitable," and that it yielded between

$200,000 to $400,000 per year" for the owner. *See id.* ¶¶ 12, 59, 62, 100. Kim also allegedly

provided Lee with false tax returns for Basic Food for the years 2009 through 2011, which

inflated Basic Food's profitability by underreporting Basic Food's actual wage expenses. *See*

Plaintiffs' MOL at 8.

The closing of the Loan and Acquisition transactions took place at Noah Bank's offices

in Palisades Park, New Jersey, on December 13, 2012. At that time, Lee and Kim executed the

Purchase Agreement and Buy-Back Agreement.[9] The latter gave Kim the option to purchase

100% of the Basic Food units from Lee on the same terms and conditions as set forth in the

Purchase Agreement. In satisfaction of the $1.8 million "purchase price" for the Basic Food

shares, Lee delivered his $300,000 promissory note in favor of Kim, $200,000 in cash,[10] and the

proceeds of the $1.3 million Loan, of which approximately $900,000 went towards paying off

the Noah-Kim Loan. *See* Closing Statement (Ex 33.13, Ahne Depo. Tr.) [ECF No. 94-8].

---

[9]    *See* Buy-Back Agreement between Lee and Kim, dated December 13, 2012 (Ex. D, Kim Declaration) [ECF No. 98-6] (the "Buy-Back Agreement").

[10]    The parties present varying and contradictory versions of the source and use of this $200,000. Kim testified at his deposition that he "lent" the $200,000 to Lee, for Lee to be able to acquire Basic Food, by bringing cash to Lee's house. *See* Kim Depo. Tr. at 103:19-105:10. Kim also testified that there was no documentation or other record of this cash loan. *See id.* Lee, however, testified that he obtained the $200,000 cash from his other, profitable, deli-business—Hudson. *See* Lee Depo. Tr. at 18:20-19:15; 21:17-22:1.

The Plaintiffs allege that after the transactions closed, Lee and Park learned that the NY Deli was not profitable.  *See* SAC ¶ 93.  In addition, they say that in or around the summer of 2014, Lee and Park received notice that Basic Food "may be in violation" of certain provisions of the New York State Labor Law and was facing potential fines, allegedly stemming from Kim's operation of the NY Deli.  *See id.* ¶¶ 93-95.  According to the Plaintiffs, Kim and the Bank Defendants actively concealed the fact of those violations from Lee.  *See id.*

In their Complaint, the Plaintiffs assert seven claims for relief against some or all of the following defendants: Noah Bank, Shin, Ahne, Ahne Law, Kim, and Aspen.  Those claims consist of: (i) claims under the Racketeer Influenced and Corrupt Organizations Act (the "RICO Claims") against all defendants (Counts 1 and 2), (ii) a claim of breach of fiduciary duty against Ahne and Ahne Law (Count 3), (iii) a request for a declaratory judgment against all defendants (Count 4), (iv) a claim of breach of contract and implied covenant of good faith and fair dealing against all defendants (Count 5), and (v) separate claims for fraud in the inducement against Kim and Aspen (Count 6), and Shin and Noah Bank (Count 7).

In July 2016, the Court granted the defendants' joint motion to dismiss the RICO Claims pursuant to Fed. R. Civ. P. 12(b)(6).  *See* Memorandum Decision on Defendants' Motions to Dismiss dated July 1, 2016 [ECF No. 20]; *see also* Order Dismissing RICO Claims in Adversary Proceeding dated July 13, 2017 [ECF No. 23].  Thereafter, the Seller Defendants filed a joint answer to the Complaint.  *See* Answer, Counterclaims, and Crossclaims of Cheol Min Kim and Aspen Market Place, Corp. to Second Amended Complaint After Dismissal of RICO Claims, Counts One and Two [ECF No. 36].  On the record of the hearing on the Motion, the Plaintiffs confirmed that the declaratory relief they seek in Count 4 is moot, and that they are not asserting any claims against Aspen.  Accordingly, Aspen is dismissed from the Complaint and Count 4 is

dismissed as moot.  Defendant Kim now seeks summary judgment dismissing the remaining

claims in the Complaint asserted against him – i.e., Count 5 (Breach of Agreement and Implied

Covenant of Good Faith and Fair Dealing) and Count 6 (Fraud in the Inducement).[11]

DISCUSSION

## Rule 56 Standards

Federal Rule of Civil Procedure 56, made applicable to this case under Federal Rule of

Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56.  Summary judgment is appropriate "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the [movant]

is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant bears the initial burden of proof that the undisputed facts entitle it to summary

judgment as a matter of law.  *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir.

1995); *see also Hellstrom v. U.S. Dep't of Veterans Affairs*, 46 F. App'x 651, 654 (2d Cir. 2002)

("The moving party bears the initial burden of informing the . . . court of the basis for its motion,

and identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a

genuine issue of material fact.") (internal quotation marks omitted).  Where the nonmoving party

bears the burden of persuasion at trial on an issue, the moving party can satisfy its initial burden

on the motion by demonstrating the absence of factual support for an essential element of the

---

[11]   The Bank Defendants have filed a motion for summary judgment to dismiss Counts 4, 5, and 7 of the
Complaint.  *See* Joint Motion for Summary Judgment [ECF No. 47].

nonmoving party's claim.  *See Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

If the movant meets that standard, the burden shifts to the non-moving party to produce

"sufficient specific facts to establish that there is a genuine issue of material fact for trial."

*Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (citation omitted).  The court must view

the facts in the light most favorable to the non-moving party, and must resolve all ambiguities

and draw all inferences against the moving party.  *See NetJets Aviation, Inc. v. LHC Commc'ns,

LLC*, 537 F.3d 168, 178 (2d Cir. 2008) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986)).  However, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment[.]"  *Liberty

Lobby, Inc.*, 477 U.S. at 247-48.  "An issue of fact is 'genuine' if the evidence is such that a [trier

of fact] could return a verdict for the non-moving party," *Senno v. Elmsford Union Free School

Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*,

559 F.3d 133, 137 (2d Cir. 2009)), and a fact is only "material" if it might affect the outcome of

the litigation under the relevant law.  *Id.* (citation omitted); *see also Scotto v. Almenas*, 143 F.3d

105, 114 (2d Cir. 1998) (noting that opposition to a summary judgment motion cannot be based

on "conclusory allegations or unsubstantiated speculation."); *Senno*, 812 F. Supp. 2d at 467

(stating "mere denials or unsupported alternative explanations of its conduct" will not suffice in

opposing summary judgment) (citing *SEC v. Grotto*, 05 Civ. 5880, 2006 WL 3025878, at *7

(S.D.N.Y. Oct. 24, 2006)).  Rather, the non-moving party must still come forward with "specific

facts showing that there is a genuine issue for trial" in order to defeat a properly supported

summary judgment motion.  *Liberty Lobby,* 477 U.S. at 256.

Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York is

applicable herein.  Like Local Civil Rule 56.1, its counterpart in the district court, the rule is

"intended to streamline the consideration of summary judgment motions by freeing the [bankruptcy] courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). To that end, the rule mandates that all summary judgment motions include "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." LBR 7056-1(b). In turn, the party opposing summary judgment must include in its papers "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." LBR 7056-1(c). If necessary and appropriate, that party can include "additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried." *Id.* The statements in support of, or in opposition to, a summary judgment motion "shall be followed by citation to evidence which would be admissible." LBR 7056-1(e).[12]

---

[12]   As relevant, the rule states, as follows:

> (b)      Upon any motion for summary judgment pursuant to Bankruptcy Rule 7056, there shall be annexed to the motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit the statement shall constitute grounds for denial of the motion.

> (c)      Papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried.

> (d)      Each numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

> (e)      Each statement by the movant or opponent pursuant to subdivisions (b) or (c) of this rule, including each statement controverting any statement of material fact by a movant or opponent, shall be followed by citation to evidence which would be admissible.

LBR 7056-1(b)-(e).

In support of the Motion, the Seller Defendants submitted a statement of uncontested

facts supported by admissible evidence (the "Seller Defendants' 7056 Statement"). *See supra*

n.3. Although the Plaintiffs oppose the Motion, they failed to respond to that statement.

Evidently, they overlooked the statement, as they mistakenly contend that the Seller Defendants

"totally failed to submit any Statement of Material Fact in compliance with Local Rule 56.1

[sic]." *See* Plaintiffs' MOL at 2. Nonetheless, in an apparent effort to comply with LBR 7056-1

(even as they erroneously assert that the Seller Defendants are in breach of that rule), the

Plaintiffs purport to "adopt by incorporation" the Statement of Material Facts that they filed in

opposition to the Bank Defendants' motion for summary judgment. *See supra* nn. 4, 11. The

Seller Defendants contend that the Court would be "justified" in deeming the Plaintiffs to admit

the truth of the facts asserted in the Seller Defendants' 7056 Statement, and to find that those

facts establish grounds for granting summary judgment in their favor. To be sure, by application

of the local rule, the Plaintiffs are deemed to admit the material facts asserted in the Seller

Defendants' 7056 Statement. *See* LBR Rule 7056-1(d) (stating that "[e]ach numbered paragraph

in the statement of material facts required to be served by the moving party shall be deemed

admitted for purposes of the motion unless specifically controverted by a correspondingly

numbered paragraph in the statement required to be served by the opposing party."). However, it

does not follow that the Plaintiffs' breach of the local rule, in and of itself, is grounds for

granting Kim summary judgment dismissing Counts 5 and 6 of the Complaint. Application of

the local rule "does not absolve the party seeking summary judgement of the burden of showing

that it is entitled to judgment as a matter of law[.]" *In re Haimil Realty Corp.*, No. 14-11779,

2015 WL 1396610 at *4 (Bankr. S.D.N.Y. March 24, 2015); *see also Zanghi v. Incorporated*

*Village of Old Brookville*, 752 F.2d 42, 47 (2d Cir. 1985) ("The proponent of a summary

judgment motion has the initial burden under Rule 56 to show the absence of a genuine issue

concerning any material fact. . . . If the movant fails to meet that burden, the opponent will

prevail even if the opponent submits no evidentiary matter to establish that there is indeed a

genuine issue for trial.").  The Seller Defendants do not object to the Court's consideration of the

Plaintiffs' Incorporated Statement, except that they contend that the statement fails to comply

with LBR 7056-1 because it is "far from short and concise and [the facts cited therein] are not

supported by citation or admissible evidence."  Reply at 2.  The Court will assess the adequacy

of the facts alleged in that statement as necessary.  In this light, the Plaintiffs' failure to comply

with LBR-7056-1 is a "matter of form rather than substance," as their papers (including the

Plaintiffs' Incorporated Statement) clearly address evidentiary matters relevant to Counts 5 and 6

of the Complaint.  *See, e.g.*, *In re Haimil Realty Corp.*, 2015 WL 1396610 at *4 (finding that

plaintiff's failure to submit statement in response to defendant's LBR 7056-1 statement in

support of summary judgment motion was not fatal to the defense of the motion, as the plaintiff

clearly identified the facts in dispute).

### Analysis

#### *Count 5: Breach of Contract, and Breach of the Duty of Good Faith and Fair Dealing*

As relevant to this Motion, in Count 5 of the Complaint, the Plaintiffs seek to recover

damages from Kim for his alleged breach of contract and breach of the covenant of good faith

and fair dealing that is implied in every contract.  They allege that the "covenant of good faith

and fair dealing" is implied in the contracts between the Plaintiffs and Kim.  *See* SAC ¶ 147.

They contend that by his "acts, omissions and breaches[,]" Kim breached his agreements with

the Plaintiffs, as well as the implied covenant of good faith and fair dealing.  *Id.* ¶ 148.  The

13

Complaint identifies two documents executed by Kim: (i) the Purchase Agreement; and (ii) the
Buy-Back Agreement.

Under New York law,[13] the elements of a claim for breach of contract are the (i)
formation of an agreement; (ii) performance by one party; (iii) breach of the agreement by the
other party; and (iv) damages.  *See Furia v. Furia*, 498 N.Y.S.2d 12 (2d Dept 1986); *see also
Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (noting that under New
York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of
the contract by one party; (3) breach by the other party; and (4) damages.") (citation omitted).
There is a covenant of good faith and fair dealing implied in all contracts governed by New York
law.  *See 511 W 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002); *Carvel
Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230 (2d Cir. 1991) ("Under New York law,
every contract contains an implied covenant of good faith and fair dealing.").  The covenant is
"an implied undertaking on the part of each party that he will not intentionally and purposely do
anything to prevent the other party from carrying out the agreement on his part."  *Grad v.
Roberts*, 14 N.Y.2d 70, 75 (1964).  Thus, "the covenant is breached when a party to a contract
acts in a manner that, although not expressly forbidden by any contractual provision, would
deprive the other party of the right to receive the benefits under their agreement[.]"  *P.T. & L.
Contr. Corp. v. Trataros Constr., Inc.*, 816 N.Y.S.2d 508 (2d Dept 2016) (quoting *Aventine Inc.
Mgmt. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514 (2d Dept 1999)); *see also
1357 Tarrytown Rd. Auto., LLC v. Granite Props., LLC*, 142 A.D.3d 976, 977 (2d Dept 2016)
("The implied covenant of good faith and fair dealing is breached when a party acts in a manner
that would deprive the other party of the right to receive the benefits of their agreement.")

---

[13]   The parties agree that New York law governs the claims in the Complaint.

(quoting *Franklin v. Landmark Constr. of Yonder, Inc.,* 91 A.D.3d 593, 595 (2d Dept 2012)).   A

breach of the covenant of good faith and fair dealing is considered to be a breach of the

underlying contract and, as such, does not give rise to a cause of action separate from a breach of

contract claim.  *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("Under

New York law, parties to an express contract are bound by an implied duty of good faith, but

breach of that duty is merely a breach of the underlying contract." (quoting *Harris v. Provident

Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)); *see also ICD Holdings S.A. v. Frankel*,

976 F. Supp. 234, 243–44 (S.D.N.Y. 1997) ("A claim for breach of the implied covenant 'will be

dismissed as redundant where the conduct allegedly violating the implied covenant is also the

predicate for breach of covenant of an express provision of the underlying contract.'") (citation

omitted).

An indispensable element of the Plaintiffs' claims against Kim in Count 5 is that they are

parties to a contract with him.  The record indisputably shows that no such agreement exists

between Park or Basic Food on the one hand, and Kim on the other.  As such, as a matter of law,

they cannot demonstrate grounds for relief under Count 5 against Kim.  *See, e.g.*, *Johnson v.

Chesebrough-Ponds, Inc.*, 104 F.3d 355, at *2 (2d Cir. 1996) ("As the contracts do not exist,

Chesebrough could not have violated implied covenants in them."); *Village on Canon v. Bankers

Trust Co.*, 920 F. Supp. 520, 534 (S.D.N.Y. 1996) ("[T]here was no contract between [the

defendant] and [the plaintiff] so there was no implied covenant for [the defendant] to have

breached."); *Frutico S.A. de C.V. v. Bankers Trust Co.,* 833 F. Supp. 288, 301 (S.D.N.Y. 1993)

("No agreement was reached, and the parties did not owe each other this alleged duty [of good

faith and fair dealing.]"); *Snipes v. City of New York*, 990 N.Y.S.2d 440, at *4 (N.Y. Sup. Ct.

2014) (dismissing plaintiff's claim for breach of implied covenant of good faith and fair dealing

15

because "it is well settled that a cause of action based upon a breach of a covenant of good faith and fair dealing requires a contractual obligation between the parties," and there was no such relationship) (internal quotation marks and citations omitted).

In support of Count 5, Lee asserts that Kim breached the Buy-Back Agreement when he refused to take back the Basic Food units after Lee discovered that the business was failing and that he had purchased it in reliance upon financial statements that Lee says are fraudulent. *See* Plaintiffs' MOL at 12; *see also* Lee Depo. Tr. at 75:13-76:3 (stating that he had a conversation with Kim around April 2013 about buying back Basic Food, but that in the end, Kim only wanted to manage the NY Deli, not to buy it back). Nonetheless, Kim says that, as a matter of law, he is entitled to summary judgment dismissing Lee's breach of contract claim because the Buy-Back Agreement gave him the option of buying back Basic Food's interests from Lee. It did not give Lee the right to put those interests to him.[14] Kim's interpretation of his obligations under the agreement is supported by the plain language of the agreement. Thus, as a matter of law, the Plaintiffs cannot sustain a claim that, in refusing to buy back the Basic Food business,

---

[14] The agreement states:

> Whereas parties have entered into an agreement whereby Cheol M' Kim and Si Won Kim are transferring all their interest in Basic Food Groups, LLC. to Jae Ho Lee;
>
> Whereas Cheol M. Kim (hereinafter "seller") desire to retain the option of buying back all the shares of Basic Food Groups, LLC. for any reason;
>
> WHEREFORE;
>
> Parties Cheol M. Kim and Jae Ho Lee hereby agrees as follows:
>
> 1. That Jae Ho Lee hereby grants Cheol M. Kim the option of buying back all the units of Basic Food Groups, LLC at the same terms and conditions sold to Jae Ho Lee;
> 2. Cheol M. Kim must provide 30 days written notice to exercise such option.
> 3. Said option shall remain personal to Cheol M. Kim and is not transferable;
> 4. This Agreement shall be construed within the Laws of the state of New York and further may not be modified unless in writing.

Kim breached an express term of the Buy-Back Agreement. *See, e.g.*, *Keiler v. Harlequin Enter. Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014) (noting that under New York contract law, "a written agreement that is complete, clear, and unambiguous must be enforced according to its terms." (citing *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002))).

Lee next contends that the Buy-Back Agreement should have been drafted to vest Lee with the option to put the Basic Food interests back to Kim.  In that regard, Lee maintains that Kim was aware of the purported drafting error in the document and breached his covenant of good faith and fair dealing under that agreement by not alerting Lee of the error.  *See* Plaintiffs' MOL at 12, 14, 17.  However, there is no evidence in the record to support that claim.  Neither Kim nor Lee testified that either of them had intended for the Buy-Back Agreement to be drafted to vest Lee with a put option.  To that end, neither of them testified that they had ever discussed the idea of a buy-back or negotiated the terms of the Buy-Back Agreement, let alone agreed that it should inure to Lee's benefit.[15]  To the contrary, the testimony from Ahne, Lee's attorney on the Loan and Acquisition transactions, was that the parties (i.e., Lee and Kim) had told him that it should be drafted on those terms—i.e., with the option going to Kim, not Lee.[16]  Moreover, the

---

[15]    Lee asserts that Kim had "admitted in his deposition [] that the Buyback Agreement was intended for [the] benefit of Mr. Lee." Plaintiffs' MOL at 12, citing Kim Depo. Tr. at 123-124.  Kim's testimony admitted no such thing.  Relevant portions of Kim's testimony at those pages are as follows:

> Q.  Number three of this buyback agreement say "Said option as to cause the buyback shall remain personal to Cheol Min Kim and is not transferrable." This is obviously incorrect, right?
> A.  I don't even know what that means.
> Q.  This is the result if the buyback concept was that the bank wanted you to be responsible for buying the business back, if there was any problem, that was the whole arrangement, right?
> A.  Right.
> Q.  So whoever created this, if it was Mr. Ahne or whoever it is with the bank, they created an incorrect form?
> Ms. Kim:  Objection to the form.
> A.  I don't know.

[16]    *See* Ahne Depo. Tr. at 141:191-144:1.

To the extent that Lee relies on the testimony of Irvin Chai (of Noah Bank) as support for the contention that the Buy-Back Agreement should have given Lee a put option to force Kim to buy back the business, such reliance is

language of the Buy-Back Agreement, as drafted, is consistent with the buy-back provision in the

Purchase Agreement, which was executed by both Lee and Kim.[17]  Notably, Lee has not

challenged that provision as being incorrect or not reflective of the parties' agreement.

However, even assuming that Lee could show that a disputed issue of fact exists as to

whether the Buy-Back Agreement should have been drafted to enable Lee to force Kim to buy

back the Basic Food business, and could point to evidence that Kim had knowledge of the

drafting error but deliberately did not advise Lee of that error, the claim nonetheless fails as a

matter of law.  The implied covenant of good faith and fair dealing cannot be used to impose on

Kim obligations that are inconsistent with, or contrary to, those in the Buy-Back Agreement.  *See*

*1357 Tarrytown Road Auto, LLC v. Granite Props., LLC*, 37 N.Y.S.2d 341, 343 (2d Dept 2016)

("[N]o obligation may be implied that would be inconsistent with other terms of the contractual

relationship.").  Here, a finding that Kim breached the covenant would contradict the explicit and

unambiguous terms of the Buy-Back Agreement, and create obligations on Kim not contained

therein.  If true, Kim's alleged failure to ensure that the agreement was drafted for Lee's benefit

might be relevant in considering whether Kim fraudulently induced Lee to enter into the

Acquisition transaction.  It does not support a claim for breach of the covenant of good faith and

---

unavailing.  It is true that Chai testified that he understood that a buy-back agreement would "protect the buyer."  *See, e.g.*, Chai Depo. Tr. at 146:12-16.  However, Chai also repeatedly testified that the purpose of a buy-back agreement was also to protect the lender—i.e., Noah Bank—by keeping the seller obligated on the business loan.  Thus, even under Chai's understanding, a buy-back is not a put option exercisable at the buyer's discretion, but triggered only upon a default of the business loan.  *See, e.g., id.* at 143:14-18; 144:4 ("If the buyer defaults, we would think that the seller would be obligated to repay the loan."); 145:20-25.  In any event, Chai's "understanding" of the purpose of the buy-back agreement has no evidentiary bearing on whether Kim agreed that the Buy-Back should have been drafted in Lee's favor, whether Kim knew it was drafted incorrectly, or whether Kim had breached a covenant of good faith in his dealings with Lee.  Indeed, Chai did not (and could not) testify as to how Kim had understood the Buy-Back Agreement or what negotiations Kim had with Lee on the terms of the Buy-Back Agreement.

[17]   That clause of the Purchase Agreement states:  "At any time while buyer is in business Seller shall have the option of buying back all the units of the Company by providing 60 days written notice at the following price:"  The remainder of that clause is incomplete.  *See* Purchase Agreement.

fair dealing.  *See East Point Sys., Inc. v. Maxim*, 13-CV-00215, 2014 WL 523632 at *5 (D.

Conn. Feb. 7, 2014) (finding that allegations of misrepresentations not tied to specific terms of

contract may support a claim for fraudulent inducement to enter agreement, but does not support

a claim of breach of the covenant of good faith and fair dealing under that agreement).

Lee also argues that Kim is not entitled to summary judgment dismissing Count 5

because he violated the covenant of good faith and fair dealing in the Buy-Back Agreement by

engaging in a so-called "kickback" scheme with Shin.  He bases that claim on the facts alleged in

the declaration of Byung Hoon Kim ("B.H. Kim").[18]  Between 2006 and 2015, B.H. Kim was a

loan broker for Noah Bank, as well as the principal at a company known as "Bada Realty."  *See*

B.H. Kim Declaration ¶¶ 2, 3.  In substance, he contends that, in 2012, at the behest of Shin, he

paid Cheol Kim $30,000.  *See id.* ¶ 4, Ex. 1.  B.H. Kim says that Shin advised him at that time

that the payment was a "rebate" to Cheol Kim on account of a loan that Noah Bank had made to

Basic Food.  *See id.* ¶ 6.  Shin allegedly explained to B.H. Kim that because Cheol Kim arranged

the loan without the services of a loan broker, Shin was "arranging for Noah Bank to pay a

$30,000 broker fee to Cheol Min Kim for having his business take a loan from Noah Bank."  *Id.*

The Court finds no merit to this argument.  The implied covenant of good faith and fair dealing

"embraces a pledge that 'neither party shall do anything which will have the effect of destroying

or injuring the right of the other party to receive the fruits of the contract.'"  *511 W. 232nd*

*Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153 (2002) (quoting *Dalton Educ. Testing*

*Serv.,* 87 N.Y.2d 384, 389, 639 N.Y.S. 2d 977, 663 N.E.2d 289 (1995)); *see also Duration Mun.*

*Fund, L.P. v. J.P. Morgan Sec. Inc.*, No. 603486-2008, 2009 WL 2999201 at *6 (N.Y. Sup. Ct.

2009) (stating that a party that "exercises a contractual right as part of a scheme to . . . deprive

---

[18]   *See* B.H. Kim Declaration (Ex. 6, Kimm Declaration) [ECF No. 94-9].

the other party of the fruit of its bargain[,]" may be in breach of that covenant . . . .").  Even

assuming, *arguendo*, that B.H. Kim's allegations are true, the so-called kickback payment has no

bearing on the enforceability of, or the parties' rights under, the Buy-Back Agreement, and the

Plaintiffs neither alleged nor demonstrated otherwise.

### Count 6: Fraud in the Inducement

In Count 6, Lee seeks damages from Kim based on his alleged fraud in inducing Lee to

purchase Basic Food.  Fraud in the inducement consists of material misrepresentations by one

party to induce the other party to enter into a transaction or agreement.  *See Revak v. SEC Realty*

*Corp.*, 18 F.3d 81, 91 (2d Cir. 1994); *see also Gen'l Media, Inc. v. Shooker*, No. 97 Civ. 510,

1998 WL 401530, at *6 n.6 (S.D.N.Y. July 16, 1998) ("Fraud in the 'inducement' indicates a

misrepresentation that goes to the subject matter underlying the transaction but does not

challenge the fact that an agreement of some kind was reached.").  To prevail on this claim, Lee

must prove (1) that Kim made a representation, (2) as to a material fact, (3) which was false, (4)

and known by him to be false, (5) that the representation was made for the purpose of inducing

Lee to rely upon it, (6) and that Lee rightfully did so rely, (7) in ignorance of its falsity (8) to his

injury.  *See Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986)

(citation omitted).  In addition, "[u]nder New York law, fraud must be proved by clear and

convincing evidence."  *Id.* (citing *Accusystems, Inc. v. Honeywell Info. Sys., Inc.*, 580 F. Supp.

474, 482 (S.D.N.Y. 1984)).  *See also Urstadt Biddle Prop., Inc. v. Excelsior Realty Corp.*, 885

N.Y.S.2d 510, 512 (2d Dept 2009) (stating that the elements of a cause of action for fraud in the

inducement are "representation of a material existing fact, falsity, scienter, reliance, and

injury.").  Kim contends that he is entitled to summary judgment dismissing Count 6 because

Lee has not demonstrated that he misrepresented any material facts to Lee with respect to the

Acquisition and Loan transactions.  Kim also asserts that Lee could not have reasonably relied on any representation that he made with respect to the transactions because Lee conducted no due diligence in connection with his acquisition of Basic Food, notwithstanding that he had access to all of Basic Food's books and records.  *See id.* at 12; *see also* Reply at 3 of 5.

Lee asserts that Kim induced him to acquire Basic Food by intentionally and fraudulently overstating the profitability of its business both verbally and through the Basic Food tax returns, which Lee says intentionally overstated the level of Basic Food's income.  *See, e.g.*, Plaintiffs' MOL at 8, 10; SAC ¶¶ 59-60.  As to the former, Lee alleges that on several occasions in the course of the discussions leading up to the sale, Kim falsely told him that Basic Food was "profitable" and "doing great," and that its owners could expect to realize annual compensation/distributions in the "low six figures"—i.e., between $200,000 and $400,000.  *See, e.g.*, Lee Depo. Tr. at 10:4-7 (stating that in October or November of 2012, Kim represented to Lee that the store was profitable); *id.* at 94:21-23 (stating that Kim represented that the store "produces about 300 to 400, 350 to 400 in profit per year[.]").  As to the latter, Lee contends that Kim knew that he was going to finance his acquisition of Basic Food with an SBA guaranteed loan from Noah Bank, and that as part of the loan request he would be required to submit Basic Food's tax returns for the years 2009, 2010 and 2011.  *See* Plaintiffs' MOL at 6.  Lee says that those tax returns, and the 2012 tax return, overstated Basic Food's income because in each of those returns, Kim intentionally under-reported the amount of "wages and salaries" that Basic Food paid its employees during those years by approximately $800,000 a year.  *See id.* at 8.  Lee contends that Kim did so in order to mislead him into believing that Basic Food's business was profitable, when it was actually losing money.

Lee's reliance on the tax returns in opposing the Motion and in support of Count 6 is misplaced because he has not demonstrated that there is evidence in the record supporting his contentions.  First, the 2009 and 2010 tax returns are not part of the record of this Motion, and the Plaintiffs have not elicited testimony from any witness with respect to those returns.  The 2012 tax return is in the record of this Motion.  *See* Ex. 1, Kimm Declaration (Kim Depo. Tr., Ex. CMK-5) [ECF No. 94-1].  However, it was not filed until March 23, 2013 – well after the December 2012 closing.  It is irrelevant to the matters at issue herein.  Finally, the Plaintiffs have cited no evidence to support their assertion that Basic Food under-reported its "wages and salaries" on its 2011 and 2012 tax returns, let alone in the sum of $800,000 per year.  At his deposition, Kim testified that he recalled that Basic Food's monthly payroll in 2009 was $80,000.  *See* Kim Depo. Tr. at 46:3-20.  He did not testify that Basic Food's payroll was $1 million in 2010 and 2011 – or any other amount – and there is no evidence in the record to support such a contention.  Instead, Plaintiffs' counsel used the $80,000/month rate to arrive at the approximately $1 million figure for each year.[19]  At his deposition, Kim also testified on matters relating to the 2011 and 2012 tax returns.  He did not state that Basic Food under-reported its "salaries and wages" on those returns.  Rather, the Plaintiffs' counsel came to that conclusion merely by comparing the "wages and salaries" reported on line 9 of Basic Food's 2011 and 2012 returns (i.e., $141,000 and $132,616, respectively) with the approximately $1 million wage expense that he contends Basic Food paid to its employees in each of those years.  *See* Kim Depo. Tr. at 63:22-64:1.  But even assuming, *arguendo*, that the Plaintiffs could establish that Kim intentionally under-reported the "wages and salaries" on Basic Food's 2009-

---

[19]   Lee acknowledged that all of the Basic Food's books and records, including payroll records and employee time cards were maintained, and left to him, at the Basic Food store.  *See* Lee Depo. Tr. at 16:13-17:15.  Thus, the Debtor had access to its 2010 and 2011 payroll records, but apparently did not include them in the Opposition.

2012 tax returns, those misrepresentations could not support the Plaintiffs' claim for fraud in the inducement because Lee did not rely on those documents in agreeing to purchase the NY Deli business.  Lee testified that he neither reviewed nor relied on the tax returns in deciding to purchase Basic Food's interests.  *See* Lee Depo. Tr. 10:12-15.  Thus, as a matter of law, Kim's alleged manipulation of the tax returns, even if true, lends no support to Plaintiffs' claims for relief in Count 6.

In considering whether to acquire the Basic Food stock, Lee did not merely turn a blind eye to the tax returns.  He concedes that he "did not do any diligence at all" in connection with the transaction.  *Id.* at 93:17-94:5.  Although Lee testified that he visited the store four or five times before purchasing it (*see id.* at 13:11), he explained that in each instance, he merely "stopped by" and did not spend a meaningful amount of time at the store.  *Id.* at 93:23.[20]  In addition, he acknowledged that prior to entering into the Purchase Agreement, he did not review records of Basic Food's: (i) accounts receivables; (ii) accounts payables; (iii) payroll (including employee time cards); or (v) sales receipts.  *See id.* at 94:3-18 (testifying that he "did not review [] one single piece of document regarding [the] store.").  Lee says that he did not review the documents because he relied on Kim's assurances that the business generated $300,000 to $400,000 in profits annually.[21]  Further, he says that when he arrived at the closing, he did not

---

[20]   Lee testified as follows:

> Q: You did say you visited the store. How many hours in total did you visit that store?
> A: No, just I stopped by.
> Q: How many minutes, hours, days in total would you say you spent at Basic Food Group prior to the date of the closing?
> A: I did not do any due diligence at all.

Lee Depo. Tr. at 93:21–94:2.

[21]   Lee testified as follows:

> Q: Did you ask Mr. Kim to show you any of [the Basic Food] documents?

know the purchase price for the business but "trusted Cheol Min Kim to give [him] a cheap price, so roughly about 1.4, 1.5[.]"  *Id.* at 95:10-16; *see also id.* at 20:11- 22 ("About the price until the day of that closing, I did not even ask, Cheol Min Kim did not even tell me . On the day of the closing, I learned that the price was set at $1.8 million, that's when I learned it. I never even asked anyone such as real estate agents or anybody like that in purchasing Basic Food Group because Cheol Min Kim told me that he was going to give me the store at a cheaper price than the market price, so I expected him to give me the store at the lower price than the expected price. So I did not even know that the price of $1.8 million was cheap or expensive.").

In New York, the well-established rule is "if the facts represented are not matters peculiarly with the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary due diligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."  *Schumaker v. Mather*, 133 N.Y. 590, 596 (1892).  *See also Gray v. Wackenhut Servs., Inc.*, 721 F. Supp. 2d 282, 292 (S.D.N.Y. 2010), *aff'd*, 446 F. App'x 352 (2d Cir. 2011) ("The law has long required plaintiffs to make full use of the facts known to them, and their ordinary intelligence, before asserting a cause of action for misrepresentation.").  That rule "rejects the claims of plaintiffs who have been so lax in protecting themselves that they cannot fairly ask for the law's protection."  *DDJ Mgmt.*

---

A: Yes, but Cheol Min Kim said oh you know about that too. In one year, this store produces about 300 to 400, 350 to $400,000 in profit per year, so you know that, so we don't have to waste time, because he said that I just did not look at anything.
Q: How many times did you request for documents regarding Basic Food -- Basic Food Group?
A: One time.
Q: And were you satisfied with his response?
A: It's not that I was satisfied or not, I just laughed it off because I trusted him.

Lee Depo. Tr. at 94:19-95:8.

*LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (2010). That is because in those cases, "the plaintiff 'may truly be said to have willingly assumed the business risk that the facts may not be as represented.'" *Id.* (quoting *Rodas v. Manitaras*, 59 A.D.2d 341, 343 (1st Dept 1990)). At issue in this Motion is whether Lee's admitted failure to do any diligence in advance of the Loan and Acquisition transactions renders his reliance on Kim's statements as to Basic Food's profitability unreasonable as a matter of law. *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2013 WL 1845588, at *5 (N.Y. Sup. Ct. 2013). In evaluating whether Lee's alleged reliance on Kim was reasonable, this Court will consider the "entire context" of the Loan and Acquisition transaction, including its complexity and magnitude, the sophistication of the parties, and the content of any agreement between them. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (citations omitted). Lee was an experienced deli/café owner who had been running a successful business for more than a year when he elected to purchase Basic Food. In March of 2011, he purchased Hudson Produce, Inc. ("Hudson"), a similar a deli/café business in New York City, for $1.5 million. *See* Lee Depo. Tr. at 86:1-18. He operated the business as a 24-hour business and employed 15-16 people. *See id.* at 84:23; 91:19-22. He was familiar with the risks associated with a "turnkey" transaction, and issues relating to financing such a transaction, because Lee purchased the equity of Hudson and financed the purchase with a loan from Noah Bank. *See id.* at 90:20-23. Prior to acquiring Hudson, Lee conducted extensive diligence. *See id.* at 87:21-89:4. To that end, he observed store operations for close to 7 days, both during the day and night, even when the seller was not present. In addition, he met with Hudson's accountant, twice, and reviewed Hudson's books and records including: sales receipts, tax returns, time cards, payroll records, and sales reports. *See id.*

In this light, the Loan and Acquisition transaction was neither large nor complex.  It was well within the scope of Lee's business experience, as it virtually mirrored his acquisition of Hudson.  Lee does not contend otherwise.  However, although Lee had relevant experience at the time of the transaction, in assessing the reasonableness of his alleged reliance on Kim, the Court must consider the extent of Lee and Kim's personal relationship.  *See generally Aloi v. Nat'l Staffing, Inc.*, 74 A.D.3d 436, 436 (1st Dept 2010) (declining to find reliance unreasonable as a matter of law where transaction was not arms-length between strangers and plaintiff relied on representations made by his niece); *Braddock v. Braddock*, 60 A.D.3d 84, 88 (1st Dept 2009) (noting that where the plaintiff and defendant were cousins, plaintiff's reliance on defendant's good faith "may be found to be reasonable even where it might not be reasonable in the context of an arms' length transaction with a stranger.").  *Cf. Lance v. Tillman (In re Tillman)*, 197 B.R. 165, 171 (Bankr. D.C. 1996) (stating, in the context of evaluating "justifiable reliance" under the standards for a non-dischargeability determination based on fraud pursuant to section 523(a)(2)(A), that "there are numerous cases finding that evidence of friendship or a close personal relationship weighs heavily in favor of finding at least justifiable reliance if not the higher level of reasonable reliance.").

Lee testified that he and Kim had known one another since Lee immigrated to the United States in 2002, and that over the course of their relationship they had become "the closest people" who had friends in common and socialized frequently.  *See* Lee Depo. Tr. at 12:4-12; *see also* Kim Depo. Tr. at 72:19-74:10.  He asserts that he relied on Kim for all aspects of the Basic Food Acquisition – that Kim would help him secure financing with Noah Bank (*see* Lee Depo. Tr. at 18:8-19), that Kim would sell Basic Food to him at "a cheap price" (*see* Lee Depo. Tr. at 20:9-22; 95:20-96:1), and that Kim was telling him the truth as to Basic Food's

profitability.  Beyond their friendship, Lee also says that he trusted Kim's representations as to

Basic Food's profitability because at that time, Kim was acquiring another deli business in New

Jersey (i.e., Aspen) for approximately $13 million (*see* Kim Depo. Tr. at 49:9-50:8), and thus,

Lee believed that Kim was making significant profits from Basic Food's operations.  *See* Lee

Depo. Tr. at 10:25-11:19; 13:3-6.

To establish "reasonable reliance," Lee must demonstrate that he was justified both in

believing Kim's representations about the profitability of the Basic Food business and in

foregoing all diligence in response to those representations.  *See Lanzi v. Brooks*, 388 N.Y.S.2d

946 (3d Dept 1976) ("[I]n order to be actually deceived by a false representation, a party must

not only reasonably believe that the representation is true, but he must also be justified in taking

action in reliance thereon."), *aff'd* 402 N.Y.S.2d 384 (1977).  "The question of what constitutes

reasonable reliance is always nettlesome because it is so fact intensive."  *Schlaifer Nance & Co.*

*v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).  For that reason, "whether or not reliance is

reasonable under any particular set of circumstances is generally not resolved as a matter of law,

but is a question of fact."  *Maltz v. Union Carbide Chemicals & Plastics Co., Inc.*, 992 F. Supp.

286, 306 (S.D.N.Y. 1998) (collecting cases).  That is the case here.  Contrary to Kim's

assertions, there are genuine issues of material fact that must be resolved in determining whether

Lee reasonably relied on Kim's alleged misrepresentations.  Kim is not entitled to dismiss Count

6 as a matter of law.[22]

---

[22]   Kim also argues that he is entitled to summary judgment dismissing Count 6 because Lee cannot establish that
he has been damaged by Kim's alleged misrepresentations.  *See* Seller Defendants' MOL at 14-15.  Under New
York law, the measure of damages for fraud in the inducement

> is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known
> as the out-of-pocket rule. Under this rule, the loss is computed by ascertaining the difference
> between the value of the bargain which a plaintiff was induced by fraud to make and the amount or
> value of the consideration exacted as the price of the bargain. Damages are to be calculated to
> compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they

<u>CONCLUSION</u>

Based on the foregoing, and for the reasons stated, the Motion is GRANTED in part and

DENIED in part, as follows:

1.      By stipulation, the Complaint is dismissed as against Defendant Aspen.

2.      By stipulation, Count 4 is dismissed as against the Seller Defendants.

3.      Summary judgment dismissing Count 5 of the Complaint (breach of contract and

        the implied covenant of good faith and fair dealing) is granted as to Defendant

        Kim.

4.      Summary judgment dismissing Count 6 of the Complaint (fraud in the

        inducement) is denied as to Defendant Kim.


Counsel are directed to appear at a pre-trial conference in this matter on November 27,

2018, at 2:00 p.m., in Room 601, United States Bankruptcy Court, One Bowling Green, New

York, New York 10004.

IT IS SO ORDERED.

Dated:  New York, New York
        October 31, 2018                             /s/ *James L. Garrity, Jr.*
                                                     United States Bankruptcy Judge


---

might have gained.  Under the out-of-pocket rule, there can be no recovery of profits which would
have been realized in the absence of fraud.

*Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421 (1996) (internal quotation marks and citations omitted).
Thus, here, Lee's pecuniary loss will be calculated as the difference between the amount he paid for the stock, and
the value of that stock.  *See Rather v. CBS Corp.*, 68 A.D.3d 49, 58 (1st Dept 2009) ("Rather was required to plead
that he had something of value, was defrauded by CBS into relinquishing it for something of lesser value, and that
the difference between the two constituted Rather's pecuniary loss.").  Accordingly, Kim is not entitled to summary
judgment on the basis that Lee cannot prove damages, because a material fact in dispute among the parties is
whether Lee paid $200,000 in cash at the closing.