NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
In re:                                                      :        Chapter 11
      Basic Food Group, LLC,                          :
                          Debtor.        :        Case No. 15-10892 (JLG)
------------------------------------------------------------------------x
Jae Ho Lee, Soyoun Park and                                 :
Basic Food Groups, LLC,                                     :
                   Plaintiffs,             :
                                 :
     -against-                                            :        Adv. Pro. No. 15-01119 (JLG)
                                 :
Ahne Law, P.C., Samuel Ahne, Noah Bank,                     :
Edwin Shin, Cheol Min Kim, and                              :
Aspen Market Place Corp.,                                    :
                   Defendants.             :
------------------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER GRANTING JOINT MOTION OF NOAH BANK AND EDWARD SHIN, FOR SUMMARY JUDGMENT DISMISSING ALL CLAIMS AGAINST THEM, PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 7056

<u>APPEARANCES:</u>

THE BASIL LAW GROUP P.C.
1270 Broadway
Suite #305
New York, New York 10001
By:    Robert J. Basil, Esq.
*Counsel for Defendant Noah Bank*

ROBERT YU LLC
39 Park Place, Suite 204
Englewood, NJ 07631
By:    Robert Ho Yu, Esq.
*Counsel for Defendant Edward Shin*

KIMM LAW FIRM
333 Sylvan Avenue
Suite #106
Englewood Cliffs, New Jersey 07632
By:    Michael Kimm, Esq.
*Counsel for the Plaintiffs*

**JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

<u>INTRODUCTION</u>

In 2013, Jae Ho Lee ("Lee") purchased 100% of the membership units in Basic Food

Group LLC, the debtor herein (the "Debtor" or "Basic Food"), from Cheol Min Kim ("Kim").

At that time, Basic Food's principal asset was a deli/café in New York City that Kim had been

operating since he acquired it in or about 2009.  Noah Bank, N.A. ("Noah Bank") financed a

portion of Lee's acquisition costs with a $1.3 million loan to the Debtor.  Lee and his wife

Soyoun Park ("Park") are guarantors under that loan.  Eventually, the Debtor defaulted under the

loan and filed for bankruptcy herein.

In this adversary proceeding, Lee, Park and the Debtor (collectively, the "Plaintiffs")[1] are

suing Noah Bank and its president and Chief Executive Officer, Edward Shin ("Shin," together

with Noah Bank, the "Bank Defendants"),[2] among others – including Kim and Aspen Market

Place Corp. ("Aspen"), an entity he controls – for damages occasioned by their alleged

wrongdoing in connection with Lee's acquisition of Basic Food.  The Plaintiffs assert five of the

seven causes of action in their Second Amended Complaint (the "Complaint" or "SAC") [ECF

No. 1, Doc. 39][3] against the Bank Defendants.  In July 2016, the Court dismissed two of those

claims -- Counts 1 and 2 -- against all defendants.   The matter before the Court is the Bank

Defendants' joint motion for summary judgment (the "Motion") dismissing Counts 4, 5 and 7 of

---

[1]     On or about April 30, 2018, Mr. Lee passed away and his surviving wife, and plaintiff herein, Ms. Park, was substituted as the executrix for Mr. Lee's estate.  *See* Notice of Appearance in Adversary Proceeding and Substitution of Plaintiff Jae Ho Lee by Soyoun Park as Administrator of Estate of Jae Ho Lee [ECF No. 113].

[2]     Edward Shin is erroneously identified as "Edwin" Shin in the caption of the Second Amended Complaint.

[3]     Except as otherwise indicated, citations to "ECF No. ___" refer to entries on the Court's electronic docket in Adversary Proceeding No. 15-1119.

the Complaint.[4]  The Plaintiffs oppose the Motion.[5]  On the record of the hearing on the Motion,

the Plaintiffs stipulated to dismiss Count 4.  For the reasons explained below, the Court grants

the Bank Defendants summary judgment dismissing Counts 5 and 7.  Accordingly, the Motion is

GRANTED.

<u>JURISDICTION</u>

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334(a) and 157(a)

and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States

District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska,

C.J.).  The relief sought in the Motion is not within the core jurisdiction of the Court because the

claims at issue do not invoke substantive rights provided by title 11 of the United States Code.

*See* 28 U.S.C. §§ 1334(b), 157(b)(1); *see also Stern v. Marshall*, 564 U.S. 462, 472 (2011)

("Under our reading of the statute, core proceedings are those that arise in a bankruptcy case or

title 11."); *J.T. Moran Fin. Corp. v. Am. Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.)*, 124

B.R. 931, 937 (S.D.N.Y. 1991) (stating that core jurisdiction encompasses proceedings which

"invoke a substantive right provided by title 11" or that "would have no existence outside of the

bankruptcy case.").  *See also* 28 U.S.C. § 157(c)(1) (stating that non-core proceedings are those

that are not core, "but [are] otherwise related to a case under title 11.").  Rather, all parties agree

and the Court finds that the claims asserted by the Debtor against the Bank Defendants fall

---

[4]     *See* Joint Motion for Summary Judgment [ECF No. 47]; Joint Reply to Motion for Summary Judgment [ECF No. 96] (the "Reply").  In support of the Motion, Shin and Noah Bank annexed to the Motion a Local Rule 56.1 Statement of Uncontested Facts [ECF No. 47-1] (the "Bank Defendants' 7056 Statement.").

[5]     *See* Declaration of Jae Ho Lee, in Opposition to Defendants Noah Bank and Edward Shin's Purported Motion for Summary Judgment [ECF No. 94] (the "Lee Declaration"); Plaintiffs' Memorandum of Law in Opposition to Defendants Noah Bank and Edward Shin's Motion for Summary Judgment [ECF No. 94-2] (the "Opposition").  In support of their Opposition, the Plaintiffs annexed to the Opposition the Plaintiffs' Statement of Material Facts [ECF No. 94-3] (the "Plaintiffs' 7056 Statement").

within the scope of the Court's non-core related-to jurisdiction because the outcome of this litigation certainly will impact the value of the Debtor's estate. *See Parmalat Capital Fin., Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) ("[A] civil proceeding is 'related to' a title 11 case if the action's outcome might have any conceivable effect on the bankruptcy estate."); *see also Robinson v. Daley (In re Daley)*, 224 B.R. 207, 313 (Bankr. S.D.N.Y. 1998) ("Causes of action owned by the debtor prior to its bankruptcy and which become property of the debtor's estate, as well as suits between third parties which have an effect on the bankruptcy estate are bases for related-to jurisdiction." (*citing Celotex v. Edwards*, 514 U.S. 300, 308 n.5 (1995))).

However, that jurisdiction does not extend to the claims asserted by Lee and Park against the Bank Defendants. The resolution of those claims will have no impact on the Debtor's estate or assets. *See, e.g.*, *In re Johns–Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008) (noting that "a third-party action does not create 'related to' jurisdiction when the asset in question is not property of the estate and the dispute has no effect on the estate. Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy. . .."); *cf. Victory Markets, Inc. v. NYS Unemployment Ins., Unemployment Ins. Div., Dep't of Labor, State of New York (In re Victory Markets Inc.*, 263 B.R. 9, 15 (Bankr. N.D.N.Y. 2000) (noting that "the scope of a bankruptcy court's 'related to' jurisdiction is further limited where non-debtor third parties are involved. Because an endless array of cases would 'relate to' any single bankruptcy administration, the Second Circuit has limited 'related to' jurisdiction to 'significant' relation and not simply a remote connection.") (citations omitted). Although not raised by the parties, the Court considers whether it has jurisdiction over those claims based on principles of supplemental jurisdiction pursuant to 28

U.S.C. § 1367.  Under that section, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a). "Claims are 'part of the same case or controversy' when they 'derive from a common nucleus of operative facts,' and 'are such that [the claimant] would ordinarily be expected to try them all in one judicial proceeding[.]'"  *Picard v. HSBC Bank PLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 561 B.R. 334, 348 (Bankr. S.D.N.Y. 2016) (internal quotations and citations omitted).  The Second Circuit has held that a bankruptcy court may exercise supplemental jurisdiction under 28 U.S.C. § 1367.  *See Lionel Corp. v. Civale & Trovato, Inc. (In re Lionel Corp.)*, 29 F.3d 88, 92 (2d Cir. 1994); *see also Shafferman v. The Queens Borough Public Library (In re JMK Constr. Grp., Ltd.)*, 502 B.R. 396, 403 n.4 (Bankr. S.D.N.Y. 2013); *Gowan v. HSBC Mortg. Corp. (In re Dreier LLP)*, No. 10-5456, 2012 WL 4867376, at *5 (Bankr. S.D.N.Y. 2012).  In the instant case, as discussed below, it is clear that Lee and Park's claims share a common nucleus of operative facts as the claims of the Debtor—i.e., the underlying Acquisition and Loan transactions with the Bank Defendants and seller Kim—and it would not be judicially economical to try these overlapping matters in different proceedings.  As such, the Court concludes that it has supplemental jurisdiction to adjudicate Lee and Park's claims against the Bank Defendants in this action.

For all non-core matters, this Court cannot enter a final judgment without the Plaintiffs' and Bank Defendants' consent.  *See* 28 U.S.C. § 157(c)(2) ("[T]he district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments . . . .").

4

On the record of the hearing on the Motion, the Plaintiffs and Bank Defendants consented to this

Court's entry of a final judgment on these matters.  Accordingly, the Court concludes that it has

the authority to enter final orders in this action.

FACTS[6]

The Debtor is a limited liability company whose sole members are Lee and Park.  It is

also a chapter 7 debtor herein.[7]  Its sole asset is a deli/café (the "NY Deli") located in New York

City.  Lee and Park acquired their membership interests in the Debtor in December 2012, when

Lee purchased 100% of the Debtor's membership units from Kim for the contract price of $1.8

million (the "Acquisition").  *See* Purchase Agreement;[8] Closing Statement.[9]  Noah Bank

financed $1.3 million of the purchase price with a loan (the "Loan") to the Debtor.  *See* Bank

Defendants' 7056 Statement ¶¶ 1-2.  The Loan is secured by a lien on the Debtor's assets, and is

guaranteed by Lee and Park.  Losses from the operation of its business forced the Debtor into

bankruptcy on April 15, 2015.  By that time, the Debtor was in default under the Loan and this

action was on-going.[10]

---

[6]    To put the matters at issue herein in context, the Court includes a discussion of the events leading up to the commencement of this action, including allegations in the Complaint.  Facts that are material to the resolution of the Motion, including those subject to dispute between the parties, are discussed in further detail below, as appropriate.

[7]    The Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 15, 2015.  *See* Case No. 15-10892, ECF No. 1.  It remained in possession and control of its business and assets as a debtor in possession under section 1107 of the Bankruptcy Code when the Court granted the motion of Noah Bank to convert the case to one under chapter 7 of the Bankruptcy Code.  *See* Order dated 2/14/17 Granting Motion to Convert Chapter 11 Case to Chapter 7 [Case No. 15-10892, ECF No. 121].  Alan Nisselson is the Court-appointed chapter 7 trustee of the Debtor's estate.  *See* Notice of Appointment of Trustee Alan Nisselson [Case No. 15-10892, ECF No. 122].

[8]    *See* Purchase Agreement between Cheol M. Kim and Si Won Kim, as Sellers, and Jae Ho Lee, as Buyer, dated December 13, 2012 (Ex. 33.16, Ahne Depo. Tr.) [ECF No. 94-8].

[9]    *See* Closing Statement Re: Purchase of All Outstanding (100%) Units of Basic Food Groups, LLC, dated December 13, 2012 (Ex. 33.13, Ahne Depo. Tr.) [ECF No. 94-8].

[10]    Lee and Park filed the complaint commencing this action on September 30, 2014, in the United States District Court for the Southern District of New York.  Basic Food was added as a plaintiff on December 16, 2014.  After Basic Food filed for bankruptcy, the District Court referred the adversary proceeding to this Court.  *See* District Court Order dated 6/29/2015 (Berman, J.) [ECF No. 1, Doc. 138].

In 2012, Kim was indebted to Noah Bank on account of financing from the bank in connection with his acquisition of Basic Food (the "Noah-Kim Loan"), and his acquisition of Aspen, a deli/café operation in Hoboken, New Jersey.[11]  *See* Noah Bank Answer ¶ 57;[12] Kim Depo. Tr. at 8:23-9:20.  The Plaintiffs maintain that in the fall of 2012, Basic Food's business was failing and both Kim and Noah Bank understood that without an infusion of capital into the Basic Food operations, Kim would default under the Noah-Kim Loan.  *Id.* ¶ 56.  The Plaintiffs say that because Aspen was then a "startup" business, it was not generating profits that Kim could use to pay down that loan.  *Id*. ¶ 57.  Kim and Lee were friends, and at that time, Kim was aware that Lee was operating a deli/café in New York City.  The Plaintiffs contend that Kim "targeted" Lee and schemed to sell the Basic Food business to him.  *Id.* ¶ 58.  They say that Kim and the Bank Defendants conspired to unload the Basic Food business on Lee as a "turnkey" transaction in which Lee would step into Kim's shoes as the owner of the business, inject additional capital into the business, and, in doing so, provide the means for Kim to pay off the Noah-Kim Loan, and to fund Aspen's operations.  *See id.* ¶¶ 54, 56, 92, 98-99.  More specifically, the Plaintiffs contend that Kim, with the assistance of Shin, and Samuel Ahne ("Ahne") of Ahne Law P.C. ("Ahne Law"), the attorney who represented Lee and Park in the Acquisition and Loan transactions, duped and defrauded Lee into paying $1.8 million for Kim's interests in Basic Food, and into causing Basic Food to incur $1.3 million of indebtedness from Noah Bank to do so.  *See id.* ¶¶ 12, 59-60.  The Plaintiffs say that at all relevant times, Kim and

---

[11]    In 2009, Kim acquired Basic Food for $2.3 million.  He financed the acquisition, in part, by an SBA-guaranteed loan from Woori America Bank ("Woori").  In December 2011, he refinanced the Woori loan with a loan from Noah Bank in the approximate amount of $1 million.  *See* SAC ¶ 54.

[12]    Noah Bank and Shin filed answers to the Complaint.  *See* Answer, Counterclaims, and Crossclaims of Noah Bank to Second Amended Complaint [ECF No. 24] ("Noah Bank Answer"); Answer and Cross Claims of Edward Shin to Second Amended Complaint [ECF No. 29].

the Bank Defendants knew that the NY Deli was operating at a loss and that the business was

worth far less than $1.8 million, but that, with Ahne's help, they concealed those and other facts

material to the Acquisition and Loan transactions from Lee. *See id.* ¶¶ 93, 99-102.

The closing of the Loan and Acquisition transactions took place at Noah Bank's offices

in Palisades Park, New Jersey, on December 13, 2012. *See* Bank Defendants' 7056 Statement ¶

2. At the closing, Lee and Kim executed the Purchase Agreement and a Buy-Back Agreement[13]

(collectively, the "Acquisition Documents"). The latter gave Kim the option to purchase 100%

of the Basic Food units from Lee on the same terms and conditions as set forth in the Purchase

Agreement.[14] At that time, Lee also executed the Loan Agreement,[15] SBA Note,[16] Security

Agreement,[17] and Unconditional Guarantees[18] (collectively, the "Noah Loan Documents"). In

---

[13]    *See* Buy-Back Agreement between Lee and Kim, dated December 13, 2012 (Ex. D, Kim Declaration) [ECF No. 98-6] (the "Buy-Back Agreement").

[14]    The Buy-Back Agreement states:

Whereas parties have entered into an agreement whereby Cheol M. Kim and Si Won Kim are transferring all their interest in Basic Food Groups, LLC. to Jae Ho Lee;

Whereas Cheol M. Kim (hereinafter "seller") desire to retain the option of buying back all the shares of Basic Food Groups, LLC. for any reason;

WHEREFORE;

Parties Cheol M. Kim and Jae Ho Lee hereby agrees as follows:

1. That Jae Ho Lee hereby grants Cheol M. Kim the option of buying back all the units of Basic Food Groups, LLC. at the same terms and conditions sold to Jae Ho Lee;
2. Cheol M. Kim must provide 30 days written notice to exercise such option.
3. Said option shall remain personal to Cheol M. Kim and is not transferable;
4. This Agreement shall be construed within the Laws of the state of New York and further may not be modified unless in writing.

Buy-Back Agreement.

[15]    *See* Loan Agreement dated December 13, 2012 by and between Basic Food (as Borrower) and Noah Bank (as Lender) (the "Loan Agreement") (Ex. A, Certification of John Kim) [ECF No. 96-6].

[16]    *See* Ex. A, Noah Bank Answer.

[17]    *See* Security Agreement and UCC-1 Financing Statement (Ex. J, Basil Declaration) [ECF No. 47-2].

[18]    *See* Ex. B, Noah Bank Answer. Park also executed a Guarantee.

satisfaction of the $1.8 million purchase price for the Basic Food stock, Lee tendered the

proceeds of the $1.3 million loan, a $300,000 promissory note from Lee in favor of Kim, and

$200,000 in cash.[19]  *See* Closing Statement.  Approximately $900,000 of the loan proceeds went

towards paying off the Noah-Kim Loan.  *See* Bank Defendants' 7056 Statement ¶ 4.

 The Plaintiffs allege that after the transaction closed, Lee learned that the NY Deli was

not profitable.  *See* SAC ¶ 93.  In addition, they say that in or around the summer of 2014, Lee

received notice that Basic Food "may be in violation" of certain provisions of the New York

State Labor Law and was facing potential fines, allegedly stemming from Kim's operation of the

NY Deli.  *See id.* ¶¶ 93-95.  According to the Plaintiffs, Kim and the Bank Defendants actively

concealed the fact of those violations from Lee.  *See id.*

 In their Complaint, the Plaintiffs assert seven claims for relief against some or all of the

following defendants: Noah Bank, Shin, Ahne, Ahne Law, Kim, and Aspen.  Those claims

consist of: (i) claims under the Racketeer Influenced and Corrupt Organizations Act (the "RICO

Claims") against all defendants (Counts 1 and 2), (ii) a claim of breach of fiduciary duty against

Ahne and Ahne Law (Count 3), (iii) a request for a declaratory judgment against all defendants

(Count 4), (iv) a claim of breach of contract and implied covenant of good faith and fair dealing

against all defendants (Count 5), and (v) separate claims for fraud in the inducement against Kim

and Aspen (Count 6), and Shin and Noah Bank (Count 7).  In July 2016, the Court granted the

defendants' joint motion to dismiss the RICO Claims pursuant to Fed. R. Civ. P. 12(b)(6).  *See*

Memorandum Decision on Defendants' Motions to Dismiss dated July 1, 2016 [ECF No. 20];

---

[19]    The parties present varying and contradictory versions of the source and use of this $200,000.  Kim testified at his deposition that he "lent" the $200,000 to Lee, to enable him to acquire Basic Food, by delivering cash to Lee at his home.  *See* Kim Depo. Tr. at 103:19-105:10.  Kim also testified that there was no documentation or other record of this cash loan.  *See id.*  Lee, however, testified that he supplied the $200,000 cash from his other, profitable, deli-business.  *See* Lee Depo. Tr. at 18:20-19:15; 21:17-22:1.

*see also* Order Dismissing RICO Claims in Adversary Proceeding dated July 13, 2017 [ECF No. 23].  As noted previously, the Plaintiffs stipulated to dismiss Count 4.  The remaining claims asserted in the Complaint against the Bank Defendants are Count 5 – Breach of Agreement and Implied Covenant of Good Faith and Fair Dealing, and Count 7 – Fraud in the Inducement.  The Bank Defendants seek summary judgment dismissing those claims.[20]

## LEGAL DISCUSSION

### *Applicable Standards*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions.[21] A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also NML Capital v. Republic of Argentina*, 621 F.3d 230, 236 (2d Cir. 2010) ("Summary judgment is proper only if the record, viewed in the light most favorable to the nonmoving party, reveals no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.") (citations omitted).  An issue of fact is "genuine" if the evidence is such that a trier of fact could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  A fact is "material" if it might affect the outcome of the suit under governing law.  *See id.*; *see also SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) ("An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it

---

[20]   Kim and Aspen jointly filed a summary judgment motion to dismiss the remaining claims in the Complaint asserted against them.  *See* Motion for Summary Judgment [ECF No. 98].

[21]   Rule 56 is made applicable to this adversary proceeding by Fed. R. Bankr. P. 7056.

might affect the outcome of the suit under the governing law.") (internal quotation marks
omitted).

The movant bears the initial burden of proof that the undisputed facts entitle it to
summary judgment as a matter of law. *See Rodriguez v. City of New York*, 72 F.3d 1051 1060-
61 (2d Cir. 1995). Where the nonmoving party bears the burden of persuasion at trial on an
issue, the moving party can satisfy its initial burden on the motion by demonstrating the absence
of factual support for an essential element of the nonmoving party's claim. *See Celotex Corp. v.
Catrett*, 477 U.S. 317, 325 (1986) (noting that "the burden on the moving party may be
discharged by "showing"—that is, pointing out to the district court—that there is an absence of
evidence to support the nonmoving party's case."); *Netherlands Ins. Co. v. United Specialty Ins.
Co.*, 276 F. Supp. 3d 94, 105 (S.D.N.Y. 2017) ("'It is ordinarily sufficient for the movant to point
to a lack of evidence . . . on an essential element of the non-movant's claim.'") (quoting
*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)). If the moving party carries
this initial burden, the nonmoving party must produce "substantial evidence" to defeat the
motion, and the court must evaluate "the evidence presented through the prism of the substantive
evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-54 (1986). To meet
that burden, the non-moving party must set forth "specific facts showing that there is a genuine
issue for trial," (*see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587
(1986)); it cannot rely on "conclusory allegations or unsubstantiated speculation" in its
opposition to summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).
Further, "mere denials or unsupported alternative explanations of its conduct" will not suffice.
*Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing
*SEC v. Grotto*, No. 05 civ. 5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006)).

In evaluating a motion for summary judgment, "the court should not weigh the evidence or determine the truth of the matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party." *In re Pali Holdings, Inc.*, 488 B.R. 841, 845 (Bankr. S.D.N.Y. 2013) (citations omitted); *see also Liberty Lobby*, 477 U.S. at 249 ("[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."). Accordingly, "[s]ummary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. at 322). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Further, the court "need consider only the cited materials, but it may [also] consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## *Analysis*

Pursuant to this Court's Local Bankruptcy Rule 7056-1, a summary judgment motion must be accompanied by "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." LBR 7056-1(b). In turn, any opposing papers must include a "correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried." LBR 7056-

1(c).  In both cases, the statements must be supported by citations to evidence which would be

admissible at trial.  LBR 7065-1(e).  A movant's failure to submit a Rule 7056 statement is

grounds to deny the Motion.  LBR 7056-1(b).  However, if the movant submits such a statement,

each numbered paragraph in that statement will be deemed admitted for purposes of the motion,

unless specifically controverted by a correspondingly numbered paragraph in the statement

required to be served by the opposing party.  LBR 7056-1(d).[22]

In support of the Motion, the Bank Defendants submitted the Bank Defendants' 7056

Statement.  In response, the Plaintiffs submitted the Plaintiffs' 7056 Statement.  That statement

purports to respond to each numbered paragraph in the Bank Defendants' 7056 Statement.  *See*

Plaintiffs' 7056 Statement ¶¶ 1-29 (pp. 1-5) (such portion, the "Plaintiffs' 7056 Response").  It

also includes the Plaintiffs' Counter-Statement of Material Facts.  *Id.* ¶¶ 1-39 (including ¶¶ 38.1-

38.39) (pp. 5-27) (such sections, the "Plaintiffs' Counter-Statement").

---

[22]  As relevant, Rule 7056 states, as follows:

> (b)      Upon any motion for summary judgment pursuant to Bankruptcy Rule 7056, there shall be
> annexed to the motion a separate, short, and concise statement, in numbered paragraphs, of the
> material facts as to which the moving party contends there is no genuine issue to be tried.  Failure
> to submit the statement shall constitute grounds for denial of the motion.

> (c)      Papers opposing a motion for summary judgment shall include a correspondingly
> numbered paragraph responding to each numbered paragraph in the statement of the moving party,
> and if necessary, additional paragraphs containing a separate, short, and concise statement of
> additional material facts as to which it is contended that there is a genuine issue to be tried.

> (d)      Each numbered paragraph in the statement of material facts required to be served by the
> moving party shall be deemed admitted for purposes of the motion unless specifically controverted
> by a correspondingly numbered paragraph in the statement required to be served by the opposing
> party.

> (e)      Each statement by the movant or opponent pursuant to subdivisions (b) or (c) of this rule,
> including each statement controverting any statement of material fact by a movant or opponent, shall
> be followed by citation to evidence which would be admissible.

LBR 7056-1(b)-(e).

The Plaintiffs contend that the Court should strike the Bank Defendants' 7056 Statement as a "nullity" because they failed to sign it. *See* Opposition at 1.  There is no merit to that assertion since the Bank Defendants signed the Motion and Notice of Motion (to which their statement was attached).  In any event, even if the Bank Defendants were required to execute the document, their failure to do so is harmless error.

The Bank Defendants contend that the Plaintiffs' 7056 Statement runs afoul of LBR 7056-1(e) because in purporting to controvert the Bank Defendants' 7056 Statement, the Plaintiffs have: (i) not cited to evidence, (ii) cited to their prior unsupported statements, which are not competent evidence, or (iii) cited to evidence that does not support the proposition advanced.  *See* Reply at 3; *see generally* Plaintiffs' 7056 Statement.  They say that the Court would be justified in deeming all of the statements in the Bank Defendants' 7056 Statement to be admitted on that basis, thereby establishing grounds for granting summary judgment in their favor.  *Id.*  The Bank Defendants are correct that the Plaintiffs' 7056 Response is defective.  In several instances, in purporting to controvert the defendants' statement, the Plaintiffs cite to the "Jae Ho Lee Declaration" and the "Plaintiffs' Counter-Statement" without identifying particular paragraphs or sections of those documents.  *See, e.g.*, Plaintiffs' 7056 Response ¶¶ 2, 3, 4, 7, 8, 10, 3, 14, 17.  In challenging other statements, the Plaintiffs do not cite to any evidence.  *See, e.g.*, *id.* ¶¶ 21-25, 27.  In analyzing the Motion, the Court will deem those paragraphs in the Bank Defendants' 7056 Statement that the Plaintiffs have not controverted with admissible evidence, as admitted for purposes of the Motion.  *See* LBR 7056-1(d); *see also Shepard v. Frontier Commc'ns Servs., Inc.*, 92 F. Supp. 2d 279, 284 (S.D.N.Y. 2000) (applying district court rule 56.1 and deeming opponent's statements of disputed facts not supported by citation to evidence that would be admissible as true); *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 445 n.1

(S.D.N.Y. 1998) (same).[23]  The Bank Defendants argue that the Court should reject the

Plaintiffs' Counter-Statement, because it is neither short nor concise, and, more significantly,

because the Plaintiffs have not supported that statement with citations to admissible evidence as

required by Local Rule 7056-1(d).  The Plaintiffs' Counter-Statement is 77 paragraphs long and

in those paragraphs, the Plaintiffs frequently join statements of fact (some of which are not

supported by evidence) with legal argument.  The latter is plainly outside the scope of Rule

7056-1(d).  In ruling on this Motion, the Court will not consider those arguments or counter-

statements of fact that are not supported by citations to admissible evidence.  *See, e.g.*, *Shkrelli v.*

*JPMorgan Chase Bank, N.A.*, 13 Civ. 5647, 2015 WL 1408840 (S.D.N.Y. 2015) (declining to

consider paragraphs from plaintiffs' 56.1 statement that did not cite to admissible evidence in the

record.).  The Court notes that the defects in the Plaintiffs' 7056 Statement are not, *per se*,

grounds for granting the Motion.  Rule 56 is clear that even in the absence of a proper opposition

to the motion, the Court must determine whether the admitted facts that have been offered by the

movant are sufficient by themselves to warrant summary judgment.  *See Holtz v. Rockefeller &*

*Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001).

The Court turns to the merits of the Motion.

### <u>Count 5 – Breach of Agreement and Covenant of Good Faith and Fair Dealing</u>

In Count 5 of the Complaint, the Plaintiffs seek to recover damages from the Bank

Defendants based upon their alleged breach of contract and breach of the covenant of good faith

and fair dealing that is implied in every contract.  As support for that claim, they allege that the

covenant of good faith and fair dealing is "implied in the purported contracts between plaintiffs

and … defendant Noah Bank[,]" and that "Defendants and each of them breached the express

---

[23]    The Court will identify the particular statement(s) as necessary and relevant to the resolution of the Motion.

agreement with plaintiffs and also breached the implied covenant of good faith and fair dealing

by their acts, omissions, and breaches." SAC ¶¶ 147-148. The Complaint contains no additional

allegations relevant to Count 5 regarding Noah Bank and Shin.

The elements of a breach of contract claim are: (1) the existence of a contract, (2)

performance by the party seeking recovery, (3) non-performance by the other party, and (4)

damages attributable to the breach. *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*, 156 F.

App'x 349, 350-51 (2d Cir. 2005) (citing *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88

(S.D.N.Y. 1999)). It is settled that under New York law,[24] "all contracts imply a covenant of

good faith and fair dealing in the course of performance [of a contract]." *Forman v. Guardian*

*Life Ins. Co. of Am.*, 908 N.Y.S.2d 27, 30 (1st Dept 2010); *see also Travellers Int'l, A.G. v. Trans*

*World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) ("Under New York law, the implied

covenant of good faith and fair dealing inheres in every contract."). "This covenant embraces a

pledge that neither party shall do anything which will have the effect of destroying or injuring

the right of the other party to receive the fruits of the contract." *511 W 232nd Owners Corp. v.*

*Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002); *see also Thyroff v. Nationwide Mut. Ins. Co.*,

460 F.3d 400, 407 (2d Cir. 2006) ("New York law implies a covenant of good faith and fair

dealing 'pursuant to which neither party to a contract shall do anything which has the effect of

destroying or injuring the right of the other party to receive the fruits of the contracts.'") (citation

omitted). It also includes "an implied undertaking on the part of each party that he will not

intentionally and purposely do anything to prevent the other party from carrying out the

agreement on his part." *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230 (2d Cir.

1991) (*quoting Grad v. Roberts*, 14 N.Y.2d 70, 75 (1964)). A breach of the covenant of good

---

[24]   The parties agree that New York law is applicable to the claims in the Complaint.

faith and fair dealing is considered to be a breach of the underlying contract and, as such, does not give rise to a cause of action separate from a breach of contract claim. *See Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) ("[P]arties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." (citing *Fasolino Foods Co., Inc., v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992))); *see also Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 334 (S.D.N.Y. 2010) ("A claim for breach of the implied covenant [of good faith and fair dealing] will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of a covenant of an express provision of the underlying contract.") (internal quotations and citations omitted).  To establish a claim for breach of the implied covenant, the plaintiff must demonstrate that the defendant was party to a contract and that the defendant sought to prevent performance of the contract or to withhold benefits under the contract from the plaintiff. *See Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130 (2d Dept 1999) ("For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff[.]") (citation omitted); *see also Lee Dodge, Inc. v. Sovereign Bank, N.A.*, 51 N.Y.S.3d 531, 533 (2d Dept 2017) (affirming dismissal of cause of action alleging breach of the implied covenant of good faith and fair dealing where complaint failed to "allege any facts tending to show that the [defendants] sought to prevent performance of a contract or to withhold benefits from the plaintiffs.") (citation omitted).

16

A.     _Edward Shin_

Shin says he is entitled to summary judgment dismissing Count 5 because he is not party

to a contract with the Plaintiffs or any one of them.  The Plaintiffs do not dispute that assertion

and the record supports it.  Accordingly, as a matter of law, the Plaintiffs cannot establish

grounds for relief against Shin under Count 5 of the Complaint.  _See, e.g._, _Johnson v._

_Chesebrough-Ponds, Inc._, 104 F.3d 355, at *2 (2d Cir. 1996) ("As the contracts do not exist,

Chesebrough could not have violated implied covenants in them."); _Village on Canon v. Bankers_

_Trust Co_., 920 F. Supp. 520, 534 (S.D.N.Y. 1996) ("[T]here was no contract between [the

defendant] and [the plaintiff] so there was no implied covenant for [the defendant] to have

breached.); _Frutico S.A. de C.V. v. Bankers Trust Co.,_ 833 F. Supp. 288, 301 (S.D.N.Y. 1993)

("No agreement was reached, and the parties did not owe each other this alleged duty [of good

faith and fair dealing.]"); _Snipes v. City of New York_, 990 N.Y.S.2d 440, at *4 (N.Y. Sup. Ct.

2014) (dismissing plaintiff's claim for breach of implied covenant of good faith and fair dealing

because "it is well settled that a cause of action based upon a breach of a covenant of good faith

and fair dealing requires a contractual obligation between the parties," and there was no such

relationship) (internal quotation marks and citations omitted).

B.     _Noah Bank_

The Loan Agreement is the only agreement among the Debtor and Noah Bank that is

relevant to this Motion.  The bank contends that it is entitled to summary judgment dismissing

Count 5 because it funded the Loan and otherwise fully performed under the agreement.  The

Plaintiffs do not deny that Noah Bank fully performed under the Loan.  In opposing the Motion,

they maintain that the bank breached a covenant of good faith and fair dealing by (i) failing to

advise Lee of an alleged error in the Buy-Back Agreement; and (ii) engaging in an alleged

"kickback" scheme with Kim.  The Court addresses each of these contentions below.

(i)    *The Buy-Back Agreement*

As drafted, the Buy-Back Agreement gave Kim the option of buying back Basic Food's

shares, on 30 days' written notice, and on the same terms and conditions governing the sale of

the shares to Lee.  *See* Buy-Back Agreement ¶¶ 1-2, *supra* n.14.  The Plaintiffs contend that the

Buy-Back Agreement should have been drafted to give Lee the option of putting back the Basic

Food shares to Kim, because buy-back agreements are generally understood as granting a buyer

the option of undoing a transaction and placing the parties back to the original status quo.  *See,*

*e.g.*, SAC ¶ 72 ("At the 'closing' of title, the single most important means of protecting plaintiffs

was a 'buy-back option,' whereby, if plaintiffs deemed the business was not, in fact, performing

satisfactorily and profitability, plaintiffs could exercise a unilateral option, vested in them, to

compel a buyback by defendant Cheol M. Kim so as to effectively undo the transaction on the

same terms as plaintiffs' acquisition."); Opposition at 12 ("The Buyback Agreement was to

enable Mr. Lee the option to force a buy-back of the business, back to the seller. The language

was flipped so that the right became vested in Cheol Min Kim even as he admitted … that the

Buyback Agreement was intended for [the] benefit of Mr. Lee.").  They also contend that Noah

Bank personnel knew that the Buy-Back Agreement, as drafted, was defective because it granted

the buy-back option to Kim (instead of Lee), and that Noah Bank breached its implied covenant

of good faith and fair dealing under the Loan Agreement by not advising Lee of this error.  *See*

Opposition at 12. ("Both parties were aware of the error in the language of the Buyback

agreement and yet made no attempt to let the buyer know and thus breached the covenant of

'good faith and fair dealing'[.]").[25]

The Plaintiffs' contention that Noah Bank had a hand in drafting the Buy-Back

Agreement finds no support in the record.  Ahne's uncontroverted testimony is that he drafted

the Buy-Back Agreement based on input from Lee and Kim, not from Noah Bank.  *See* Ahne

Depo. Tr. at 141:19-146:24; *see also* Chai Depo. Tr. at 143:5-15, 148:13-14 (indicating that

Chai, a Noah Bank employee, expected the Buy-Back Agreement to be provided by Lee's

attorney, Ahne).  The evidence submitted by the Plaintiffs is not to the contrary.  *See, e.g.*,

Plaintiffs' 7056 Response ¶ 24 ("In an email dated December 10, 2012, Ahne told Irvin Chai that

he had difficulty locating a sample Buyback agreement, but that he was going to keep looking.");

¶ 28 ("In a December 13, 2012 email, Samuel Ahne provided the draft of the Buyback agreement

for Irvin Chai to review on Dec 13, 2012, the day of the closing.").

The duty of good faith and fair dealing "arises only to control how the parties carry out

the rights and duties they have undertaken under the contract; it does not give rise to independent

obligations by itself."  *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 97 CIV. 4914,

---

[25]    The Plaintiffs also seem to say that not only did Noah Bank (and Shin) fail to "facilitate" Lee in effectuating a
buy-back by Kim, but that Noah Bank blocked Kim from buying back the Basic Food stock from Lee.  *See*
Plaintiffs' Counter-Statement ¶ 38.33 ("Impliedly, Cheol Min Kim is saying that the Bank Defendants prevented
him from a buy-back."); ¶ 38.36 ("It is undisputed that Noah Bank, Samuel Ahne, Esq., and Cheol Min Kim – each
of them and all of them combined – never facilitated Jae Ho Lee's request for a buy back even though Cheol Min
Kim admits the topic came up.").  However, those statements are not supported by citations to admissible evidence
in the record.  Moreover, the record of Kim's deposition is clear that Kim did not testify to those facts.  The Court
does not credit those allegations as facts, and will not consider them in resolving the Motion.  *See Sheet Metal
Workers' Nat'l Pension Fund v. Kern (In re Kern)*, 542 B.R. 87, 90 n.1 (Bankr. E.D.N.Y. 2015) ("This Court has not
considered any fact alleged by Plaintiffs and Defendants which is not properly sourced or supported."); *Pavarini
McGovern, LLC v. Waterscape Resort LLC (In re Waterscape Resort LLC)*, 483 B.R. 601, 610 (Bankr. S.D.N.Y.
2012) (disregarding parties' LBR 7056-1 statements because they failed to support statements with citations to any
evidence submitted with the motion); *cf. Barrie House Coffee Co., Inc. v. Teampac, LLC*, 12 CV 8283, 2016 WL
3645199, at *1 n.1 (S.D.N.Y. June 30, 2016) ("Because defendants have the burden to show no material disputes of
fact exist, the Court credits plaintiff's version of events where it is supported by citations to admissible record
evidence.").

1997 WL 685334 at *6 (S.D.N.Y. Nov. 4, 1997); *see also Murphy v. Am. Home Prods. Corp.,* 58

N.Y.2d 293, 304 (1983) ("[T]he implied obligation is in aid and furtherance of other terms of the

agreement of the parties.").  Accordingly, "courts employ the good faith performance doctrine to

effectuate the intentions of the parties, or to protect their reasonable expectations."  *M/A-COM*

*Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quotation omitted); *see also CIBC Bank*

*and Trust Co., Ltd. (Cayman) v. Banco Cent. Do Brasil,* 886 F. Supp. 1105, 1118 (S.D.N.Y.

1995) ("although the obligation of good faith is implied in the contract, it is the terms of the

contract which govern the rights and obligations of the parties.").

Insofar as the Plaintiffs contend that the Buy-Back Agreement is the predicate contract

that gives rise to Noah Bank's breach of the implied covenant of good faith and fair dealing, such

argument fails as a matter of law because Noah Bank is not a party to the Buy-Back Agreement.

Any covenant of good faith and fair dealing implicit in a contract necessarily runs with that

contract.  *See Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d

Cir. 1992) (stating that the "breach of [the implied duty of good faith] is merely a breach of the

underlying contract." (quoting *Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215

(S.D.N.Y.1991))); *see also Murphy v. Am. Home Products Corp.*, 461 N.Y.S.2d 232, 237 (1983)

(noting that "the implied obligation [of good faith and fair dealing] is in aid and furtherance of

other terms of the agreement of the parties. No obligation can be implied, however, which would

be inconsistent with other terms of the contractual relationship.").  Since Noah Bank is not party

to the Buy-Back Agreement, it could not have breached any implied covenant of good faith and

fair dealing under that contract.

To the extent that the Plaintiffs contend that Noah Bank breached the covenant under the

Loan Agreement by failing to advise Lee of the buy-back language, such argument likewise fails

as a matter of law. The covenant of good faith and fair dealing does not create obligations

beyond those expressly set forth in the contract. *See Granite Partners, L.P. v. Bear Stearns &*

*Co. Inc.*, 17 F. Supp. 2d 275, 306 (S.D.N.Y. 1998) ("While an implied covenant of good faith

and fair dealing is recognized in most contracts under New York law, the duty cannot be used to

create independent obligations beyond those agreed upon and stated in the express language of

the contract.") (citation omitted). Rather, the covenant "can only impose an obligation consistent

with other mutually agreed upon terms in the contract. It does not add to the contract a

substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d

187, 198-99 (2d Cir. 2005). *See also Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497

(S.D.N.Y. 2002) ("[T]he obligation of good faith does not create obligations that go beyond

those intended and stated in the language of the contract.") (citation omitted). However, it does

encompass "any promises which a reasonable person in the position of the promisee would be

justified in understanding were included [in the agreement]." *Rowe v. Great Atl. & Pac. Tea*

*Co., Inc.*, 46 N.Y.2d 62, 69 (1978) (quoting 5 *Williston on Contracts* § 1293 at 3682 [rev. 1937]).

To find a breach of the implied covenant of good faith and fair dealing, "a party's action must

directly violate an obligation that may be presumed to have been intended by the parties." *Gaia*

*House Mezz LLC v. State Street Bank & Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (internal

quotation marks omitted). Thus, where, as here, the operative agreement is a loan agreement, "a

contract claim asserting a breach of an implied covenant of good faith by the debtor firm must

relate to an explicit contractual provision of the loan." *U.S. v. Jolly*, 102 F.3d 46, 48 (2d Cir.

1996) (citing *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1521-22 (S.D.N.Y.

1989)). The Loan Agreement does not mention any buy-back arrangement, let alone explicitly

require Noah Bank to ensure that the Buy-Back Agreement is drafted to the benefit of Lee. *See,*

21

*e.g.*, *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d at 497 (dismissing claim for breach of covenant

of good faith and fair dealing where plaintiffs' allegations did not support the existence of an

obligation for defendant to provide third parties with a particular opinion because such obligation

went beyond the parties' contract terms).   Moreover, the Loan Agreement cannot reasonably be

read to impose any duties or covenants on Noah Bank beyond its obligations as a lender.  *See,*

*e.g.*, *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.

1992) (dismissing plaintiff's breach of duty of good faith and fair dealing claim against lender

bank, and noting that under the New York Uniform Commercial Code, "[a]n issuer's obligation

to its customer includes good faith and observance of any general banking usage…" but that

"[t]he extent of the issuer's obligation to its customer is based upon the agreement between the

two.").   Accordingly, as a matter of law, the Plaintiffs have failed to demonstrate that the alleged

defect in the Buy-Back Agreement supports their claim that Noah Bank has breached a covenant

of good faith and fair dealing under the Loan Agreement.[26]

      (ii)    *The Kick-Back Scheme*

      The Plaintiffs argue that summary judgment dismissing Count 5 against Noah Bank

should be denied because the undisputed facts demonstrate that Noah Bank violated the covenant

of good faith and fair dealing under the Loan Agreement by engaging in a so-called "kick back"

---

[26]   Noah Bank argues that it is entitled to summary judgment dismissing Count 5 because Kim offered to buy back the NY Deli from Lee, irrespective of the fact that the agreement made no provision for Kim to do so.  *See* Reply at 16 ("Thus, even if the buy-back agreement could have been drafted differently to Jae Ho Lee's benefit, Jae Ho Lee was offered exactly what he now claims he should have received. Cheol M. Kim offered the buy-back Basic Food [*sic*] just as Jae Ho Lee has claimed he deserved on multiple occasions and was repeatedly turned down by Jae ho Lee.").  However, Lee denies that Kim made that offer.  *See* Lee Depo. Tr. at 75:19-76:25 (stating that Kim only offered to manage the NY Deli, not buy it back).  Thus, whether Kim offered to buy back the NY Deli is subject to dispute, and the Court must draw all inferences in favor of the non-movant on a motion for summary judgment.  *See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 54 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolv[e] all ambiguities and draw[ ] all permissible factual inferences in favor of the party against whom summary judgment is sought.'" (quoting *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010))).

scheme with Kim. As support for that contention, they rely on the facts alleged in a declaration by Byung Hoon Kim ("B.H. Kim").[27] Between 2006 and 2015, B.H. Kim was a loan broker for Noah Bank and was also the principal at a company known as "Bada Realty." *See* B.H. Kim Declaration ¶¶ 2, 3. In 2014, he became a minority shareholder of Noah Bank. *See id.* ¶ 3. In substance, B.H. Kim contends that in 2012, at the behest of Shin, he paid Cheol Kim $30,000, as evidenced by a $30,000 check drawn on Bada Realty's account made payable to "Cheol Min Kim." *See id.* ¶ 4. B.H. Kim says that Shin advised him at that time that the payment was a "rebate" to Cheol Kim because Cheol Kim arranged the "Basic Food loan" without the services of a loan broker, and thus, Shin was "arranging for Noah Bank to pay a $30,000 broker fee to Cheol Min Kim for having his business take a loan from Noah Bank." *Id.* Kim's bank statements show that a $30,000 check, written on a Bada Realty account and dated April 30, 2012, was deposited into his personal checking account at Woori. *See* Bada Realty checks (Ex. 6, Kimm Declaration) [ECF No. 94-9]. The Plaintiffs assert that Noah Bank paid the $30,000 "antecedent kickback" to Kim in consideration for organizing the sale of Basic Food to Lee. *See* Opposition at 14. They say that Noah Bank's failure to disclose the "kickback" to Lee when he executed the Loan Agreement (on behalf of the Debtor) is a *per se* violation of the covenant of good faith and fair dealing under that agreement. Thus, they assert that the Court cannot grant Noah Bank summary judgment dismissing Count 5.

The Plaintiffs overstate the substance of the evidence and misplace their reliance on inapplicable case law. They have failed to meet their burden of demonstrating that there is a genuine issue for trial on this matter. The evidence of record shows that Kim did not approach

---

[27]   *See* Declaration of Non-Party Byun Hoon Kim (Ex. 6, Kimm Declaration) [ECF No. 94-9] (the "B.H. Kim Declaration") ¶ 2.

Lee about purchasing Basic Food until October or November 2012. That is at least six months

after B.H. Kim issued the Bada Realty check to Cheol Kim. *See, e.g.*, Lee Depo. Tr. 18:4-7.

Significantly, B.H. Kim's testimony is that Shin paid Cheol Kim the $30,000 on account of

"Kim having his business take a loan from Noah Bank," not the loan that Lee arranged in

December 2012. Thus, the facts cited by the Plaintiffs do not show that the so-called "kickback"

had any connection to the Loan Agreement. In any event, contrary to the Plaintiffs' assertions,

the fact of such a payment, without more, does not support a claim for breach of the implied

covenant of good faith and fair dealing under the Loan Agreement. To that end, the Plaintiffs

misplace their reliance on *Lane v. Wells Fargo Bank N.A.*, No. C 12-04026-WHA, 2013 U.S.

Dist. LEXIS 9874 (N.D.Ca. Jan. 24, 2013) (hereinafter, "*Lane*"). There, the plaintiffs in the

putative class action owned residential real property located in a special flood hazard area in

Arkansas. *See id.* at *2. The property was encumbered by a mortgage in the principal amount of

approximately $41,000, held by Wells Fargo Bank, N.A. ("Wells Fargo"). When the plaintiffs

entered the mortgage, they were required to maintain flood insurance. *See id.* The mortgage

agreement provided that the lender could obtain "forced placement" flood and hazard insurance,

at the expense of the borrower, in the event that the borrower did not do so. Over time, Wells

Fargo required the plaintiffs to maintain increasing amounts of flood and hazard insurance and in

September 2011, it purchased $52,000 of flood insurance and $52,000 of hazard insurance

policies for the property, and passed the cost of those policies on to the plaintiffs. At that time,

the plaintiffs' mortgage balance was $28,000. *See id.* at *2-3. The plaintiffs sued Wells Fargo

for damages occasioned by, among other things, Wells Fargo's alleged breach of contract,

including the implied covenant of good faith and fair dealing, unjust enrichment, conversion and

violations of the Truth in Lending Act. In support of their complaint, the plaintiffs contended,

among other things, that (i) Wells Fargo had an exclusive agreement with QBE Americas, Inc.,

an insurer ("QBE") to purchase all of its flood insurance policies from QBE, and that the

agreement called for QBE to pay Wells Fargo a kickback, or unwarranted commission, equal to

10% to 20% of the premium for every policy Wells Fargo purchased; (ii) Wells Fargo charged

the plaintiffs, and similarly situated parties, exorbitant rates reflecting the full cost of the

insurance policies (including the alleged kickbacks), that were not arrived at on a competitive

basis and which were well in excess of the rates Wells Fargo could have obtained in the open

market; (iii) QBE's policies were two to ten times the market rate for insurance; and (iv) because

Wells Fargo's commission was tied to the cost of the force placed insurance as a percentage of

the policy premium, Wells Fargo was incentivized to purchase excessively-priced insurance

policies from QBE at the highest possible rates.  As such, the plaintiffs contended that Wells

Fargo had "overcharged them for the flood and hazard insurance procured for plaintiffs'

property" by, *inter alia*, charging for kickbacks for those insurance policies, in breach of

plaintiffs' mortgage agreement.  *Id.* at *25-27.

Wells Fargo moved to dismiss the complaint for failure to state a claim pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure.  As relevant to this Motion, the *Lane* court held

that the plaintiffs had sufficiently alleged a claim for breach of contract (and the implied

covenant of good faith and fair dealing) to survive defendant's motion to dismiss.  The court

explained that although Wells Fargo had the right to procure forced placed insurance on the

plaintiffs' property where the plaintiffs failed to procure their own insurance, its procurement of

the excessive insurance and passing along false and unjustified commissions may have exceeded

Wells Fargo's discretion under the mortgage agreement.  *See id.* at *5-28.  However, the court

noted that because Arkansas law did not recognize a claim for relief for breach of the implied

covenant of good faith and fair dealing, the plaintiffs' kickback allegations sufficiently stated a

claim for breach of contract. *Id.* at *27-28 (citing *Amerifactors Fin. Grp., LLC v. Winstream

Supply LLC*, No. 12-202, 2012 U.S. Dist. LEXIS 93609, at *2 (E.D. Ark. July 6, 2012)).

 *Lane* is inapposite. The Plaintiffs' assertions to the contrary notwithstanding, in denying

the Rule 12(b)(6) motion, the *Lane* court did not find that the fact of the "kickback" agreement

between Wells Fargo and QBE, *per se*, gave rise to a claim for breach of contract. Instead, the

court found that the claim, if any, arose when Wells Fargo passed on the kickback charges to its

borrowers, through the exorbitantly priced insurance policies. *See id.* at *27 ("Self dealing by

Wells Fargo in the procurement of the insurance and passing along false or unjustified charges

may exceed the authorization and discretion provided by the parties' agreement."). Here, the

Plaintiffs do not allege that Noah Bank charged the alleged $30,000 rebate to the Plaintiffs, and,

in any event, there is no evidence in the record that could support such an allegation.

 The implied covenant of good faith and fair dealing "embraces a pledge that 'neither

party shall do anything which will have the effect of destroying or injuring the right of the other

party to receive the fruits of the contract.'" *511 W. 232nd Owners Corp. v. Jennifer Realty Co.,*

98 N.Y.2d 144, 153 (2002) (quoting *Dalton Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995));

*see also Duration Mun. Fund, L.P. v. J.P. Morgan Sec. Inc.,* No. 603486-2008, 2009 WL

2999201 at *6 (N.Y. Sup. Ct. 2009) (stating that a party that "exercises a contractual right as part

of a scheme to . . . deprive the other party of the fruit of its bargain[,]" may be in breach of that

covenant . . . ."). The "fruits" of the Loan Agreement are the loan proceeds that Noah Bank paid

to the Debtor. None of the alleged wrongdoing by Noah Bank, even if proved, deprived the

Plaintiffs of those proceeds. The Plaintiffs have not met their burden of demonstrating that there

is substantial evidence in support of their claim against the bank.

C.    _Breach of Fiduciary Duties_

The Plaintiffs also argue that the Bank Defendants should be denied summary judgment dismissing Count 5, because the Bank Defendants breached their fiduciary duties to the Plaintiffs when they failed to "protect" Lee from the Buy-Back Agreement, and failed to disclose Basic Food's true financial condition.  _See, e.g._, Opposition at 11 ("Defendants' actions can also be couched in terms of tortious, rising to the level of a breach of fiduciary relationship with plaintiffs because they controlled the facts, and did not merely process loan documents relying upon third-party facts.").  However, the Complaint is devoid of any claim premised on the Bank Defendants' alleged breach of fiduciary duties that they owed to the Plaintiffs, or any one of them.  Thus, at this late date, the Plaintiffs are introducing a tort claim in opposing the motion for summary judgment dismissing their contract claims.  In resolving the Motion, the Court will not consider those assertions.  It is well settled that "[a] complaint cannot be amended merely by raising new facts and theories in plaintiffs' [summary judgment] opposition papers, and hence such new allegations and claims should not be considered in resolving the [summary judgment] motion."  _Southwick Clothing LLC v. GFT (USA) Corp_., No. Civ. 10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004); _see also Beckman v. U.S. Postal Serv.,_ 79 F. Supp. 2d 394, 408 (S.D.N.Y. 2000) (noting that in resolving a motion for summary judgment, "the Court will not consider claims not pleaded in the Complaint."); _Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,_ 170 F.R.D. 111, 119 (S.D.N.Y. 1997) (noting that "it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.").

But even if the Court considered those claims, the Bank Defendants are nonetheless entitled to summary judgment dismissing Count 5.  "The elements of a cause of action to recover damages for breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2)

misconduct by the defendant, and (3) damages directly caused by defendant's misconduct." *Rut v. Young Adult Inst., Inc.*, 74 A.D.3d 776, 901 (2d Dept 2010) (citation omitted). "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Penato v. George*, 52 A.D. 2d 939, 942 (2d Dept 1976); *see also Restatement [Second] of Torts* § 874, Comment a ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."). The relationship "spring[s] from the parties themselves, who agree to and accept the responsibilities that flow from such a contractual fiduciary bond." *Northeast Gen'l Corp. v. Wellington Advert.*, 82 N.Y.2d 158, 160 (1993). As such, the relationship is "necessarily fact specific [and] is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions." *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (2005). Thus, in assessing whether a fiduciary relationship exists among parties, "[c]ourts look to the parties' agreements to discover, not generate, the nexus of relationship and the particular contractual expression establishing the parties' interdependency." *Northeast Gen'l Corp. v. Wellington Advert.*, 82 N.Y.2d at 160.

It is well settled in New York that a lender does not owe any fiduciary duties to a borrower because "[t]he legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors." *Bank Leumi Tr. Co. of New York v. Block 3102 Corp.*, 580 N.Y.S.2d 299, 301 (1st Dept 1992); *see also Baumann v. Hanover Cmty. Bank*, 957 N.Y.S.2d 111, 114 (2012) ("Generally, the relationship between a borrower and a bank is contractual in nature and does not create a fiduciary relationship between them.") (citations omitted); *Mfrs. Hanover Tr.*

28

*Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993) ("Under New York law, the usual relationship of

bank and customer is that of debtor and creditor . . . and does not create a fiduciary relationship

between the bank and its borrower or its guarantors.") (internal quotations and citations omitted).

None of the Loan Documents contain fiduciary terms or relationships. Thus, where, as here, the

parties to the agreements "do not create their own relationship of higher trust[,]" this Court

"should not ordinarily transport [the parties] to the higher realm of relationship and fashion the

stricter duty for them." *Northeast Gen'l Corp. v. Wellington Advert.*, 82 N.Y.2d at 162.

Still, "it is fundamental that fiduciary liability is not dependent solely upon an agreement

or contractual relation between the fiduciary and the beneficiary, but results from the relation."

*EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 20 (2005) (internal quotation marks omitted).

Thus, "in unusual circumstances, a fiduciary relationship may arise even between a bank and a

customer if there is either 'a confidence reposed which invests the person trusted with an

advantage in treating with the person so confiding,' or an assumption of control and

responsibility[.]" *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d at 318 (internal quotation marks

omitted). Courts find that a fiduciary relationship between a lender and its borrower exists where

the lender takes actions that exceed that of a regular lender-borrower. For example, in *Fleet

Bank v. Pine Knoll Corp.*, 736 N.Y.S.2d 737, 741-42 (3d Dept 2002), the court found that a

special relationship existed between the bank and its customer where bank representatives acted

as relationship managers who provided their small business customers with advice and financial

solutions. In *Picini v. Chase Home Finance LLC*, 854 F. Supp. 2d 266 (E.D.N.Y. 2012), the

plaintiffs/mortgagors sued their mortgagee and mortgage loan services for damages allegedly

occasioned by their actions in preventing them from securing a permanent loan modification. In

denying defendants' motion to dismiss plaintiffs' claim for negligent misrepresentation, the court

found that the plaintiffs' allegations that the defendants had "special expertise," a "sophisticated understanding of servicing loans and of available loss mitigation options," and that they had assigned them a manager to guide them through the loan modification process" were sufficient to allege a special relationship between the mortgagee and defendants, beyond that of a borrower-lender. *Id.* at 277. Likewise, in *Smith v. Ameriquest Mortg. Co.*, 876 N.Y.S.2d 447 (2d Dept 2009), the court denied a motion to dismiss a claim of negligent misrepresentation on the grounds that plaintiff's allegations that defendant's representative visited plaintiff in her home twice to provide her with information about the refinancing transaction in an effort to convince her that the transaction was in her best interests.

The record here does not support the Plaintiffs' assertion that the Loan transaction gave rise to a fiduciary relationship between Noah Bank and the Plaintiffs. The record is devoid of facts demonstrating that the Plaintiffs reposed any confidence or trust in Noah Bank to justify imposing fiduciary duties on the bank. There is no evidence that Noah Bank possessed special expertise that the Plaintiffs relied upon or that Noah Bank took any actions that exceeded its role as lender, such as providing advice or financial solutions to Lee with respect to the Loan and Acquisition transactions. To the contrary, the evidence in the record shows that the Plaintiffs were represented by attorney Ahne in an ordinary, commercial, arms' length loan with Noah Bank. *See, e.g.*, *J&L Am. Enter., Ltd. v. DSA Direct, LLC*, 814 N.Y.S.2d 890, at *6 (N.Y. Sup. Ct. 2006) ("[W]hen parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." (quoting *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994))). In sum, there is no evidence to show that the Plaintiffs and Noah Bank intended "to instill a special relationship apart from the ordinary debtor/creditor relationship."

*Bauer v. Mellon Mortg. Co.*, 680 N.Y.S.2d 397, 401 (N.Y. Sup. 1998).  For those and other

reasons, the Plaintiffs misplace their reliance on *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114

(1st Dept 1998) and *Scott v. Dime Sav. Bank of New York, FSB*, 886 F. Supp. 1073 (1995).[28]

---

[28]   In *Wiener*, the plaintiffs were partners in a partnership that owned a building subject to a $75 million mortgage held by "Crossland" Bank.  241 A.D.2d at 117.  The partnership defaulted on the mortgage and filed for chapter 11 bankruptcy. The debtor's reorganization plan called for the building to be transferred to Crossland or its designee in exchange for releasing the plaintiffs from their limited personal guarantees of the mortgage.  However, prior to, and even after, defaulting on the mortgage, the plaintiffs were working on raising sufficient funds to settle with Crossland for $40 - $60 million and retain the building.  *See id.*  To that end, the plaintiffs reached an agreement for a $55 million loan from defendant Lazard Freres to refinance the Crossland mortgage.  In connection with that proposed transaction, the plaintiffs provided Lazard with highly confidential information concerning the building and its operations.  *See id.* at 118.  The Lazard loan did not proceed because Crossland would not agree to the transaction at the proposed price.  Crossland also insisted that any agreement be made within the context of the pending bankruptcy proceeding.  The plaintiffs and Lazard then agreed that Anthony Meyer, an executive at Lazard, would take over negotiations with Crossland on behalf of the plaintiffs while the plaintiffs focused on finalizing the partnership's reorganization plan.  *See id.*  However, unbeknownst to the plaintiffs, instead of negotiating for the plaintiffs to retain the building, Lazard proceeded with a transaction with defendant Zapco to acquire the building for $55 million from Crossland based on financing provided largely by Lazard on terms similar to those agreed to with the plaintiffs.  The plaintiffs sued Lazard, alleging claims for unfair competition, unjust enrichment and breach of fiduciary duties.  As relevant here, the trial court dismissed the breach of fiduciary duty claim because it determined that "the relationship between the plaintiffs and Lazard was 'more analogous' to that of a lender-borrower[.]"  *Id.* at 122.  The appellate division reversed, explaining that "it is not mandatory that a fiduciary relationship be formalized in writing, and any inquiry into whether such obligation exists is necessarily fact-specific to the particular case[,]" and that "a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge."  The appellate court then concluded that the plaintiffs had set forth sufficient facts to support the existence of an agency relationship where the complaint alleged that "Meyer had acted on [the plaintiffs'] behalf in assuming negotiations with Crossland, that they had relied upon him specifically because of Lazard's expertise and reputation, because of Lazard's 'inside connection' with a highly placed Crossland executive and because Crossland apparently preferred to deal with plaintiffs through Lazard[.]"  *Id.* at 123.

There is nothing in the record demonstrating Noah Bank agreed to negotiate the terms of the Buy-Back Agreement or Loan transaction on Lee's behalf, as his agent.  There is also no evidence on which a trier of fact could conclude that Lee had relied on Noah Bank's "superior expertise or knowledge" with respect to the Acquisition or the Loan.  To the contrary, the Plaintiffs' contentions have always been that they had relied on their own attorney, Mr. Ahne, to protect their interests via the Buy-Back Agreement, but that Ahne had failed to do so.  *See, e.g.*, SAC ¶ 78 ("Defendant Ahne not only failed to provide any affirmative advice, on one specific matter he deliberately provided false information to plaintiffs, relating to the 'buy back agreement.'"); ¶ 140 (Ahne "intentionally created a buy-back agreement that favored the wrong party").  Further, as to Basic Food's financial condition, the undisputed facts in the record show that Lee performed no due diligence of Basic Food prior to the Acquisition, and did not ask to review Basic Food's financial statements.  *See, e.g.*, Lee Depo. Tr. at 93:17-97:1 (Q: So you did not review one single piece of document regarding that store? A: I did not do any due diligence at all.); *see also* SAC ¶¶ 67, 68, 70, 71 ("Within a time frame of less than a month, with no due diligence, no review of business records, no review of sales journals, no review of tax filings, no review of any material financial or corporate records, no search of title, lien or judgment, no investigation into debts and obligations, common legal issues such as labor and wage and hour issues, defendant Ahne scheduled a closing of title on December 13, 2012, at which time various documents were presented to plaintiffs for the first time.").  Thus, even if Basic Food's (allegedly false) financial statements had been prepared by Noah Bank, there are no allegations that Lee had relied on those documents—indeed, any documents—in his decision to acquire Basic Food.

The Plaintiffs also misplace their reliance on *Sterling Nat'l Bank v. Israel Discount Bank of N.Y.*, 305 A.D.2d 184 (2003) in asserting the Noah Bank's failure to explain "the error in the language" of the Buy-Back Agreement breached Noah Bank's duty to disclose (to the extent Noah Bank even knew of the supposedly erroneous language of the Buy-Back Agreement, and had a duty to disclose). In *Sterling,* plaintiff Sterling Bank sued defendants Israel Discount Bank and Merchants Bank for contribution and indemnification in connection with loans that Sterling made to non-party David Schick. *See id.* at 185. Each defendant had purchased a 100% participation interest in these loans and counter-claimed against Sterling for breach of fiduciary duties under the participation agreements. As relevant here, the appellate court found that whether Sterling had a duty to disclose Schick's financial status was a question of fact "inappropriate for summary judgment." The *Sterling* court then stated, *in dicta,*

---

In *Scott*, the plaintiffs, Leon Scott ("Mr. Scott"), and his 87-year old mother Evelyn Scott ("Mrs. Scott") went to The Dime Savings Bank ("Dime") to apply for a $5,000 loan. 886 F. Supp. at 1075. However, at the encouragement of Dime, the Scotts borrowed $100,000, secured by a mortgage on Mrs. Scott's home. Both before and after the loan, certain employees at Dime, who were also "dual employees" of an investment company called "Invest" encouraged Mr. Scott to invest the loan proceeds with Invest. *See id.* at 1075-76. Two weeks after the loan closed, Mr. Scott opened a trading account with Invest. Ultimately, he invested $52,000 of his mother's money in the stock market. Eventually, his investments began losing money, but Invest continued to assure him that the market "was really booming." *Id.* at 1076. When the stock market crashed in October 1987, Mr. Scott's account with Invest was "wiped out." The plaintiffs sued Dime and Invest, asserting claims for, among others, fraud, negligence and breach of fiduciary duties. *Id.* at 1077. Following a trial, the jury found, in part, for the Scotts on the breach of fiduciary claims, and Dime moved for judgment as a matter of law dismissing the fiduciary duty claim. In denying Dime's motion, the court explained that although a bank generally does not owe a fiduciary duty to a borrower, a fiduciary relation could arise when "one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Id.* at 1078. The court found that "there was evidence in the record to support a finding that the relationship between the Dime and the Scotts [] was not the usual relationship between a bank and borrower, but that a fiduciary relationship developed between them[,]" such that "the jury reasonably could have found that the Scotts 'reposed trust or confidence' in the Dime[.]" Specifically, the record showed that Dime (i) encouraged the Scotts to borrow $100,000 when they wanted a $5,000 loan, (ii) induced the Scotts to invest a substantial part of that money through its affiliate, Invest, and (iii) participated in Mr. Scott's stock purchases. *See id.*

Unlike *Scott*, there is no evidence in the record here that could lead a finder of fact to conclude that the Plaintiffs had reposed confidence or trust in Noah Bank as to the Acquisition and Loan transactions. As noted above, Lee's own deposition testimony reveals that he had little contact with Noah Bank prior to the closing in December. Beyond the limited contacts between the Plaintiffs and Noah Bank, there are also no allegations (or facts showing) that Noah Bank exerted any influence over the Plaintiffs as to the terms of the Loan or the Acquisition. *Scott* is plainly inapposite.

> We note in this connection "a tendency in New York to apply the rule of 'superior knowledge' in an array of contexts in which silence would at one time have escaped criticism [citations omitted]. It is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumption when . . . he would reasonably expect a disclosure [citations omitted]. New York has joined other jurisdictions in limiting the privilege to take advantage of ignorance" (*Brass v. American Film Techs., Inc.*, 987 F.2d 142, 151-52 [2nd Cir. 1993] [internal quotation marks omitted]).

*Id.* at 186. *Brass*, in turn, contains a discussion of the duty to disclose in the context of a claim for fraud in a securities law action that was predicated on the plaintiff's purchase of 65,000 shares of warrants from the defendant, which warrants, unbeknownst and undisclosed to the plaintiff, had a two-year holding period, prohibiting public trading. 987 F.2d at 144. In reversing the lower court's grant of dismissal of the plaintiffs' fraud claim, the Second Circuit explained the duty to disclose as follows:

> A duty to speak cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of caveat emptor is still alive and well. New York recognizes a duty by a party to a business transaction in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Id.* at 150 (internal citations omitted).

The court in *Brass* went on to note that "[s]uperior knowledge, standing alone, […] imposes no duty to speak; such knowledge must also not have been readily available." *Id.* at 151 (citing *Aaron Ferer & Sons Ltd. v. Chase Manhattan bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984)). Nevertheless, the Second Circuit found that based on the totality of the facts alleged in the complaint—allegations that the underwriter had met with the plaintiff to entice him to purchase a large quantity of the defendant's (restricted) securities by emphasizing the favorable

33

prospects of the defendant's business and technology and stating that the warrants would appreciate in value; and that over the course of the next two years, the defendant continued to solicit the plaintiff's purchase by sending general literature and specific documentation regarding the warrants (none of which disclosed any restrictions)—the defendant had a duty to disclose the warrants' transferability restrictions, based on the superior knowledge rule. *See id.* at 152.

Here, as discussed above, there are no allegations or evidence that Noah Bank possessed information about Basic Food that was not readily available to the Plaintiffs. Noah Bank had the same access to Basic Food's financial information as Lee; but Lee did not seek or review such information, and conceded that he did not rely on any information or documents prepared by Noah Bank in deciding to acquire Basic Food's shares. *See* Lee Depo. Tr. at 94:3-4. Moreover, there are neither allegations nor evidence demonstrating that anyone at Noah Bank knew that Lee was acting on the basis of mistaken knowledge as to the Buy-Back Agreement or Basic Food's financial condition. Indeed, Lee's deposition testimony shows that he had minimal contacts with anyone at Noah Bank before the Loan and Acquisition transactions, and did not see any of the Noah Loan Documents, Basic Food's financial statements, or the Acquisition Documents until the day of the closing. *See* Lee Depo. Tr. at 96:11-14; 51:12-52:24; 53:5-56:19; 27:9-20; 32:22-33:1. *See also* Chai Depo. Tr. at 56:1-10; Plaintiffs' Counter Statement ¶ 32.

The Plaintiffs have failed to demonstrate that Noah Bank owed fiduciary duties to them in connection with the Loan and Acquisition transactions. As such, as a matter of law, they have failed to demonstrate that they can sustain a claim for breach of fiduciary duties against Noah Bank.

### *Count 7 – Fraud in the Inducement*

In Count 7 of the Complaint, the Plaintiffs allege that Shin and Noah Bank fraudulently induced Lee to purchase the stock of Basic Food by intentionally overstating the value of the business, including falsely stating that it was profitable, even as they knew Basic Food could not cover its operating expenses and was losing money.  *See* SAC ¶¶ 154-155 ("the non-lawyer defendants made affirmative, false representations which were false and material at the time they were used to induce plaintiffs, and plaintiffs have been injured.").

The elements of a claim for fraud in the inducement are: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation; and (iv) resulting damages.  *See Ipcon Collections LLC v. Costco Wholesale Corp.,* 698 F.3d 58, 62 (2d Cir. 2012); *see also Urstadt Biddle Prop., Inc. v. Excelsior Realty Corp.*, 885 N.Y.S.2d 510, 512 (2d Dept 2009) ("The elements of a cause of action alleging fraud in the inducement are representation of a material existing fact, falsity, scienter, reliance, and injury.").  A party to a contract may claim fraud in the inducement when it has been misled into entering a contract.  The alleged "fraud" is a misrepresentation "that goes to the subject matter underlying the transaction, but does not challenge the fact that an agreement of some kind was reached."  *Gen'l Media, Inc. v. Shooker*, No. 97 Civ. 510, 1998 WL 401530, at *6 n.6 (S.D.N.Y. July 16, 1998).  The claim must be proven by clear and convincing evidence.  *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986); *see also Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330 (1999); *Hutt v. Lumbermens Mut. Casualty Co.*, 466 N.Y.S.2d 28 (1983).

A party that is induced by fraud or misrepresentation to execute a contract may either (i) rescind the contract and sue to recover the consideration paid thereunder; or (ii) affirm the

contract, retain the benefits thereunder, and sue to recover the damages it sustained as a result of the fraud. *See Goldsmith v. Nat'l Container Corp.*, 287 N.Y. 438, 442-43 (1942); *duPont v. Perot*, 59 F.R.D. 404, 410 (S.D.N.Y. 1973). The Plaintiffs do not seek to rescind the operative agreements. Rather, they seek damages occasioned by the defendants' alleged fraud in inducing them to enter into those agreements. The measure of damages is the actual pecuniary loss that the Plaintiffs sustained as a direct result of the alleged fraud. *See, e.g.*, *Maisano v. Beckoff*, 767 N.Y.S.2d 790, 791 (2d Dept 2003). That is to say, that the "[d]amages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained." *Lama Holding Co. v. Smith Barney,* 88 N.Y.2d 423, 421 (1996); *see also Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) (noting that "[t]he measure of damages recoverable for being fraudulently induced to enter into a contract which otherwise would not have been made is indemnity for the loss suffered through that inducement") (internal quotation marks omitted). Out-of-pocket loss is generally calculated by "ascertaining the difference between the consideration paid for the property and its actual value as affected by the consequences of the fraud." *Clearview Concrete Prod. Corp. v. S. Charles Gherardi, Inc.*, 453 N.Y.S.2d 750, 755 (1982). *See also Kumiva Grp., LLC v. Garda USA Inc.*, 146 A.D. 504, 506 (1st Dept 2017) ("[T]he difference between the value of the received consideration and the delivered consideration constitutes "out of pocket" damages.").

### *Edward Shin*

The Plaintiffs allege that the Bank Defendants "made affirmative, false representations which were false and material at the time they were used to induce plaintiffs, and plaintiffs have been injured." *See* SAC ¶ 155. In particular, they say Shin, on behalf of Noah Bank, told Lee on multiple occasions in and after November 2012, that Basic Food was "profitable," "doing great,"

and would net "low six figures" which could be paid as salary and year end draw for its "owner,"

and that those representations were materially false and fraudulent. *Id.* ¶¶ 59-60.

Shin contends that he is entitled to summary judgment dismissing Count 7 because he did

not have any substantive conversations with Park or Lee or make any misrepresentations with

regard to the Acquisition or Loan transaction. *See* Reply at 7.  The Plaintiffs have adduced no

evidence to the contrary.  Indeed, the Plaintiffs do not allege that Shin had any contact with Park

at all, and the record is devoid of such evidence.  The substance of Lee's deposition testimony is

that he had limited contacts with Shin regarding those transactions and that the contact he had

did not include the alleged misrepresentations.  In particular, Lee testified that:

- He met and spoke with Shin on only two occasions, with the second occurring *after* the closing of the Loan and Acquisition.  *See* Lee Depo. Tr. at 32-33.

- On the first happenstance meeting with Shin, Lee only exchanged greetings with Shin.  *See id.*

- He named Shin as a defendant in this case because he believed that Shin, as Noah Bank's President and CEO, must have been responsible for the Basic Food Loan. *See id.* at 36.

- He had no reason or basis to believe that Shin was a dishonest person, and didn't "really know that much about [Shin]."  *Id.*

The Plaintiffs have not cited evidence demonstrating that Shin made false statements to induce

Lee to acquire the interests of Basic Food.  The Plaintiffs note only that Shin was copied on an

email dated December 11, 2012, from a bank employee, alerting other employees that the Loan

was approved and that the closing would take place two days later.  *See* Plaintiffs' 7056

Response ¶ 25.  Based upon the undisputed facts in the record, the Plaintiffs cannot show at trial,

by clear and convincing evidence, or otherwise, that Shin made materially false representations

to Lee.  Accordingly, the Plaintiffs cannot establish grounds for relief against Shin under Count 7

of the Complaint.  *See, e.g.*, *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)

("Where, as here, the complaint does not state the specific promises or omissions of material

facts allegedly made by the insurer . . . it does not allege a cause of action for fraud in the

inducement.").

### Noah Bank

Noah Bank contends that it is entitled to summary judgment dismissing Count 7 because

it did not misrepresent the value of Basic Food to Lee.  As support, it relies on an appraisal

performed by Reliant Business Valuation LLC ("Reliant"), an independent business appraiser,

that valued Basic Food at $1,4500,000, as of October 31, 2012.  *See* Reliant Appraisal (Ex. C,

Basil Declaration) [ECF No. 47-2].  In vetting the Loan transaction, Noah Bank retained Reliant

to assess Basic Food's fair market value, and that is the value that the bank attributed to Basic

Food in approving the Loan.  Noah Bank contends that since it obtained the Reliant Appraisal

before the Loan issued, absent evidence that it did not credit the appraisal (there is none), it

cannot be found to have misrepresented the value of Basic Food.[29]

The Plaintiffs have not challenged the accuracy of the Reliant appraisal or offered any

evidence of a competing or alternative value of Basic Food.[30]  On or about January 31, 2013,

approximately six weeks after the December 2012 closing of the Loan and Acquisition

---

[29]   Without limitation, Noah Bank also argues that it should be awarded summary judgment dismissing Count 7 because Noah Bank's actions were not the proximate cause of any injury suffered by the Plaintiffs.  *See* Reply at 14-15.  Noah Bank says that the chain of causation between its alleged fraud in inducing the Plaintiffs to borrow $1.3 million and the unquantified damages that the Plaintiff allegedly suffered was severed by reason of Lee's own deception in misrepresenting that he was advancing $200,000 of his own money as a capital injection into Basic Food, which was a requirement under the SBA for guaranteeing the Loan.  However, as previously discussed, there is a genuine dispute of material fact as to the source and use of the $200,000, which Lee asserts was his own money (not a loan from Kim).  Further, from the Closing Statement and the proration of the $1.8 million purchase price for Basic Food, it is not clear whether the $200,000 was paid to Kim, as seller, or injected into Basic Food's capital as a contribution.  As such, there are triable issues of fact as to what damages the Plaintiffs suffered, and whether such injuries were proximately caused by Noah Bank.

[30]   In his declaration, Lee merely states that "it is my understanding that the 'Loan Request' forms [of Noah Bank] were adjusted so as to provide the appraiser with a basis for drawing a good appraisal report, so here Noah Bank was doing the document fixing to fit its objective."  Lee Declaration ¶ 16.

transaction, Lee represented in an SBA personal financial statement that Basic Food had a

market value of $1,450,000.  *See* Jae Ho Lee Personal Financial Statement, dated January 31,

2013.[31]  Although Lee testified that he did not know how he reached that value (*see* Lee Depo.

63:25-64:10), it is clear that he did not rely on the Reliant appraisal in doing so, as he did not

learn of the existence of that document until Noah Bank produced it in response to a discovery

request in this action.  *See* Lee Declaration filed in Case No. 1:14-cv-07908-RMB, dated March

2, 2015 (Ex. F, Basil Declaration) [ECF No. 97-2].  Noah contends that, in this light, it has met

its burden of demonstrating that it is entitled to summary judgment dismissing Count 7 since the

Plaintiffs cannot demonstrate that the bank misrepresented material facts in connection with the

Loan transaction.

　　　In opposing the Motion, the Plaintiffs ignore the Reliant appraisal and focus on the

process Noah Bank undertook in approving the Loan.  The Plaintiffs contend that at that time,

Basic Food was a failing business that was losing money.  They say that although Noah Bank

was aware that Basic Food's expenses outstripped its revenue, during its loan approval process,

the bank created a cash flow statement and two "Loan Request" worksheets that falsely

overstated Basic Food's Net Operating Income in 2009, 2010 and 2011, by excluding from that

calculus a deduction for "wages and salaries" paid by Basic Food that they say totaled at least

$800,000 a year.  *See* Opposition at 5-6.  They contend that Noah Bank knew that if it properly

accounted for the "wages and salaries," it could not approve the $1.3 million loan to Lee/Basic

Food, because it would run afoul of the bank's loan parameters.  The Plaintiffs say that Noah

Bank intentionally inflated Basic Food's profitability in order to push the Loan through, with the

goal of "dumping" the failing Basic Food business on Lee, so that Noah Bank could issue a loan

---

[31]　*See* Ex. E, Basil Declaration [ECF No. 47-2].

for Kim in connection with his Aspen business. *See* Opposition at 6, 14.[32] As support for their

contention that Noah Bank was manipulating Basic Food's financials, the Plaintiffs point to a

chain of emails and two "Loan Request" forms that they say Noah Bank utilized in evaluating

the Loan. *See* Noah Bank emails between Irvin Chai and Chris Broderick (Ex. 2, Lee

Declaration) [ECF No. 94-4]; Noah Bank Loan Requests (Exs. 3, 4, Lee Declaration) [ECF No.

94-4]. However, these documents do not support Lee's unsubstantiated conclusions:[33]

- Internal Noah Bank email chain (Ex. 2) shows that in August 2012, Irving Chai (of Noah Bank) corresponded with Chris Broderick (of Noah Bank) regarding a buyer interested in purchasing Basic Food, and in obtaining Noah Bank financing of $1.5 million - $1.7 million to do so. Lee contends that the emails "clearly state that [Chai] and the bank's lending department were manipulating the purchase price – to – loan ratio so that the price [for Basic Food] would be adjusted higher, loan amount adjusted relatively lower, so as to ensure the loan can be issued within the 75% range." Lee Declaration ¶ 9. However, there is nothing in those emails or in any other evidence cited to by Lee showing that Noah Bank's employees were manipulating the purchase price. To the contrary, Chai's testimony about this email chain is that the purchase price is determined by agreement between the seller and buyer to a transaction. *See* Chai Depo. Tr. at 80:19-81:3.

- Loan Request (MLC: 11/23/2012[34]) (Ex. 3). Lee claims that the document shows that "Noah Bank was already manipulating the numbers internally." Lee Declaration ¶ 10. He asserts that the document includes a "sham" Cash Flow Analysis (which appears to be predicated on Basic Food's 2009 – 2011 tax returns) because it "omitted wage and labor." *Id.* ¶ 11. He contends that Noah Bank "omitted any reference to labor because the business would be showing a shortfall of close to $1 million by doing so." *Id.* However, it is clear from the face of the Cash Flow Analysis that Basic Food's wage expenses *are* included in the line item "Operating Expense" of $1,248,649, as evidenced

---

[32]   A number of the Plaintiffs' assertions are also found in the Plaintiffs' Counter Statement. *See, e.g.*, Plaintiffs' 7056 Response ¶ 17; Plaintiffs' Counter-Statement ¶¶ 38.25; 38.26.

[33]   The two Loan Requests are both dated "MLC: November 23, 2012" and are virtually identical, except Exhibit 3 contains a cash flow statement (p. 5) showing an "Annual Debt Req." based on a $1.5MM SBA loan, and Exhibit 4 contains a cash flow statement (p. 5) showing an "Annual Debt Req." based on a $1.3MM SBA loan.

[34]   "MLC 11/23/12" is understood to mean "Meeting of the Loan Committee on November 23, 2012." Lee Declaration ¶ 10. This understanding is confirmed by Chai. *See* Chai Depo. Tr. at 87:5-20 (explaining that the Loan Request document is dated based on the date that it will presented to the Management Loan Committee for review).

from Basic Food's 2011 tax return, which shows the same amount of $1,248,649 as "Total Deductions," which includes Basic Food's reported wage expenses of $141,062.

- Loan Request (MLC: 11/23/2012) (Ex. 4). Lee asserts that this document shows "that the annual debt req. was lowered from $1.5 million to $1.3 million." *Id.* ¶ 12. Lee points out that in the last two pages of this document, Noah Bank cited "Declined Sales in 2011 & competitive business." Lee speculates that because of the cutthroat nature of competition, once a deli declines in gross revenue it has no serious prospects of changing the profitability because the most expensive components (1) rent, (2) labor, and (3) cost of goods sold, only rise and do not decrease. He then states, without explanation, that "for this reason, in trying to "dump" Basic Food, Noah Bank made internal adjustments based upon a manipulation of numbers." *Id.* These self-serving and conclusory statements, without any support in the record, cannot serve as evidence of Noah Bank's alleged manipulation of Basic Food's financials.

Lee's contentions notwithstanding, none of these documents demonstrate that Noah Bank was manipulating or falsifying Basic Food's profitability, or that Noah Bank knew that the financials it was preparing were inaccurate or based on inaccurate tax returns. *See Petrello v. White*, 344 F. App'x 651, 652–53 (2d Cir. 2009) (explaining that the misrepresentation requirement in a fraudulent inducement claim must be "known to be false by the defendant") (citations omitted); *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (stating that the basic elements of fraud require "a representation of material fact, the falsity of that representation, *knowledge by the party who made the representation that it was false when made*, justifiable reliance by the plaintiff, and resulting injury") (emphasis added and citation omitted). *Cf. Platinum Partners Value Arbitrage Fund LP v. Kroll Assocs., Inc.*, 957 N.Y.S.2d 336, 337 (2013) ("[E]rrors or simple oversight on defendant's part [] do not give rise to an inference of fraudulent intent.") (citation omitted). The Plaintiffs have not met their burden of demonstrating that there are issues of fact for trial because they have submitted no evidence to substantiate any of those allegations.

## **CONCLUSION**

Based on the foregoing, the Motion is GRANTED, as follows:

41

1.      By stipulation, Count 4 of the Complaint is dismissed as to the Bank Defendants.

2.      Summary judgment is granted in favor of Shin dismissing Counts 5 and 7 of the

Complaint.

3.      Summary judgment is granted in favor of Noah Bank dismissing Counts 5 and 7

of the Complaint.


IT IS SO ORDERED.

Dated: New York, New York

October 31, 2018                                    /s/ *James L. Garrity, Jr.*

United States Bankruptcy Judge