UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re Basic Food Group, LLC,                                      Chapter 11

                                      Debtor.                     Case No.: 15-10892 (JPM)
-------------------------------------------------------------x

Jae Ho Lee, Soyoun Park and Basic Food Groups,
LLC,
                                                                 Adv. Pro. No. 15-01119 (JPM)
                                      Plaintiffs,

          – v –

Ahne Law, P.C., Samuel Ahne, and Cheol Min
Kim,

                                      Defendants.
-------------------------------------------------------------x

<u>**Memorandum Opinion and Order**</u>


*A P E A R A N C E S:*

**KIMM LAW FIRM**
*Counsel for Jae Ho Lee, Soyoun Park and Basic Food Groups, LLC*
333 Sylvan Avenue, Suite 106
Englewood Cliffs, New Jersey 07632
By:    Michael S. Kimm

**THE BASIL LAW GROUP, P.C.**
*Counsel for Ahne Law, P.C., Samuel Ahne, and Cheol Min Kim*
125 West 31st Street
Suite 19-B
New York, New York 10001
By:    Robert J. Basil
          David A. Cohen

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**[1]

This is an adversary proceeding related to the bankruptcy case *In re: Basic Food Group, LLC*, Case No. 15-10892 (July 1, 2015). Before the Court is a claim for fraud in the inducement asserted by Plaintiffs Basic Food Groups, LLC (the "Debtor"), Jae Ho Lee ("Mr. Lee"), and Soyoun Park ("Ms. Park," and collectively with Mr. Lee and the Debtor, "Plaintiffs") against Defendant Cheol Min Kim ("Mr. Kim" or "Defendant"). *See* [Doc. 1-38, pp. 77–78] (Plaintiffs' "Second Amended Complaint"). The Court held a bench trial with respect to Plaintiffs' fraud in the inducement claim on Wednesday, December 13, 2023. *See generally* [Doc. 285] (the transcript from the bench trial, hereinafter "Trial Transcript").

After careful consideration, and for the reasons set forth below, the Court finds that Plaintiffs have failed to carry their burden of proof. Accordingly, the Court will enter judgment in favor of Defendant, and Plaintiffs' fraud in the inducement claim will be dismissed.

### BACKGROUND

The Debtor is a limited liability corporation organized under the laws of New York. [Second Amended Complaint, Doc. 1-38, p. 2]. The Debtor was originally owned by Mr. Kim, who operated the Debtor as a deli and café business in midtown Manhattan. [Doc. 200-1, p. 1] (Mr. Kim's *Local Rule 56.1 Statement of Uncontested Facts*, hereinafter "Def. 56.1 Statement"); [Doc. 204-1, p. 1] (Plaintiffs' *Response to Defendant's Alleged Statements of Material, Undisputed Facts*, hereinafter "Pls. 56.1 Response"). Mr. Kim owned a similar business in Hoboken, New

---

[1]    Unless otherwise specified, references to "[Doc. __]" are to filings entered in the adversary proceeding *Jae Ho Lee, et al. v. Ahne Law, P.C., et al.*, Case No. 15-01119 (July 1, 2015). References to "[Ch. 11 Dkt., Doc. __] are to filings entered in the bankruptcy case *In re: Basic Food Group, LLC*, Case No. 15-10892 (April 10, 2015).

References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York.

Jersey.  [Def. 56.1 Statement, Doc. 200-1, p. 1]; [Pls. 56.1 Response, Doc. 204-1, p. 1].  After operating the Debtor for roughly two-and-a-half years (from 2009 to 2012), Mr. Kim decided to sell the Debtor, ostensibly to dedicate more time towards his Hoboken business.  *See* [Doc. 98-4, p. 13] (Mr. Kim's deposition testimony, hereinafter "Kim Deposition," where Mr. Kim describes the Hoboken business as a "chance to further [his] career"); *see also* [Trial Transcript, Doc. 285, pp. 106, 107, 116, 157] (where Mr. Kim testifies that, at the time of the sale, he wanted to "stay in touch [with] Jersey more than New York" because he resided in New Jersey with his four children).

Mr. Kim began searching for a buyer for the Debtor in the fall of 2012.  [Def. 56.1 Statement, Doc. 200-1, p. 2]; [Pls. 56.1 Response, Doc. 204-1, p. 1].  Mr. Lee, a years-long friend of Mr. Kim, agreed to purchase the Debtor sometime in late 2012, and the parties closed the deal that December.[2]  [Doc. 239, p. 2] (*Opinion and Order* issued in this case by the United States District Court for the Southern District of New York, hereinafter the "District Court Order"); *see also* [Doc. 278, p. 117] (Mr. Lee's deposition testimony, hereinafter "Lee Deposition," where Mr. Lee describes himself, Mr. Kim and a third friend as being "like the three musketeers").  The sale was financed primarily by a loan from Noah Bank and facilitated by loan documents prepared by Samuel Ahne ("Mr. Ahne"), Mr. Lee's former attorney.  *See generally* [Doc. 24-1] (the Noah Bank lending agreement); [Def. 56.1 Statement, Doc. 200-1, p. 4]; [Pls. 56.1 Response, Doc. 204-1, p. 2].

Following the closing, the Debtor's business performed poorly.  *See* [Lee Deposition, Doc. 278, pp. 117–118] (where, at his deposition, Mr. Lee testifies that the Debtor "was a store [that] was not profitable at all"); [Second Amended Complaint, Doc. 1-38, p. 78] (where Plaintiffs allege

---

[2]    At the time he acquired the Debtor, Mr. Lee owned and operated a similar deli-café business in Manhattan. *See* [Lee Deposition, Doc. 278, p. 115]; *see also id.* at p. 131 (where Mr. Lee notes that, prior to immigrating to the United States, he operated a restaurant in Korea for roughly a year-and-a-half).

that the Debtor "operat[ed] at a loss because the business revenue failed to cover basic operating expenses"). Three years after the sale, Mr. Lee and the Debtor defaulted on the Noah Bank loan, and the Debtor thereafter filed a voluntary petition for chapter 11 relief on April 10, 2015. *See* [District Court Order, Doc. 239, p. 1]; *see also* [Ch. 11 Dkt., Doc. 1].

On July 1, 2015, the United States District Court for the Southern District of New York referred this adversary proceeding to this Court in accordance with the Amended Standing Order of Reference, M-431 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.). [Doc. 1]. Plaintiffs' Second Amended Complaint asserts a number of claims precipitated by Mr. Lee's purchase of the Debtor, including:

    (i)      claims arising under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962, *et seq.*, against various defendants, including Mr. Kim, *see* [Second Amended Complaint, Doc. 1-38, pp. 66–75];

    (ii)     claims against Mr. Ahne and his firm for breach of fiduciary duty relating to Mr. Ahne's representation of Mr. Lee during the December 2012 closing, *id.* at pp. 75–76; and

    (iii)    the instant claim against Mr. Kim for fraud in the inducement, *see id.* at pp. 78–79.

Other than Plaintiffs' claim against Mr. Ahne and the instant claim against Mr. Kim, all of the claims asserted in Plaintiffs' Second Amended Complaint have been dismissed. *See* [Doc. 116, p. 43] (*Memorandum Decision and Order* from this Court dated October 31, 2018, dismissing, *inter alia*, Plaintiffs' RICO claims); *see also* [Doc. 210] (*Memorandum, Decision and Order* dated December 18, 2020, dismissing all claims asserted against Mr. Ahne); *but see* [District Court Order, Doc. 239] (reversing the dismissal of the claim against Mr. Ahne relating to the drafting of a buyback agreement).[3]

---

[3] This Court presided over a jury trial as to the remaining claim against Mr. Ahne from May 21, 2024, through May 24, 2024. *See* [Doc. 321]. The jury returned a verdict in favor of Mr. Ahne. *See* [Doc. 322]; *see also* [Doc. 318] (the completed jury verdict form); *but see* [Doc. 319] (Plaintiffs' *Motion for JNOV and for New Trial, Under Federal Civil Rules 50(a) & 59*).

With respect to Plaintiffs' fraud in the inducement claim, Plaintiffs allege the following:

> Based upon his operation of the subject business, defendant Cheol M. Kim knew or should have known that [the Debtor] was operating at a loss because the business revenue failed to cover basic operating expenses . . . He also knew that he had been operating the business by "cutting corners," such as in violation of labor laws and regulations and had been notified of an audit from the NYS Labor Department. Defendant Cheol M. Kim knew that, if he were to disclose the true and accurate picture of the financial state of the business, plaintiff would not purchase the business so he enlisted [another defendant] to provide "back up" support for his knowingly making false representations that the business was generating a profit which was sufficient to provide a six figure salary-income for the owner-operator. []. For defendant Cheol M. Kim, inducing and persuading plaintiff to close title without due diligence was vital because, had anyone engaged in minimal due diligence, his fraudulent intent would have been uncovered. While the responsibility to "seal the deal" was entrusted upon defendant Ahne . . . Cheol M. Kim led the pack by knowingly making false representations that the business was profitable when he clearly knew that it was not profitable at all.

[Second Amended Complaint, Doc. 1-38, p. 78]; *see also* [Doc. 260, p. 19] (the parties' *Joint Pretrial Order*, hereinafter the "Pretrial Order," where Plaintiffs claims that the Debtor's "gross revenue failed to pay for [its] expenses; the wage expense had to come from somewhere else, [Mr. Kim's] pocket, and thus the business was a remarkably unprofitable business").

The Court held a bench trial on Plaintiffs' fraud in the inducement claim on December 13, 2024. *See generally* [Trial Transcript, Doc. 285]. There, the Court heard testimony from both Mr. Kim and from Irvin Chai ("Mr. Chai"), the loan officer who represented Noah Bank throughout the sale of the Debtor. *See id.* at pp. 8–87 (Mr. Chai's testimony); *id.* at pp. 88–193 (Mr. Kim's testimony). Mr. Lee's testimony was also introduced via deposition.[4] *See generally* [Lee Deposition, Doc. 278].

---

[4]     Mr. Lee died on April 30, 2018. *See* [Doc. 313, p. 6]. This action is being prosecuted by Ms. Park, his widow, on behalf of his estate and by the chapter 7 Trustee on behalf of the estate of the Debtor. [District Court Order, Doc. 239, p. 1 n.1].

Following the hearing, the Court requested and received from the parties post-trial briefs regarding the testimony and evidence introduced at the hearing. *See* [Doc. 328] (*Post-Trial Brief of Defendant Cheol Min Kim*, hereinafter "Defendant's Post-Trial Brief"); [Doc. 329] (Plaintiffs' *Post-Trial Memorandum as to the Cheol Min Kim Fraud in the Inducement*, hereinafter "Plaintiffs' Post-Trial Brief").

<u>**ANALYSIS**</u>

## I.    <u>JURISDICTION</u>

Federal courts have "original but not exclusive [subject matter] jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." *See* 28 U.S.C. § 1334(b). Proceedings "aris[e] under" title 11 where a party "clearly invoke[s] substantive rights created by federal bankruptcy law." *Panthers Cap., LLC v. Jar 259 Food Corp*, 2023 WL 4823942, at *2 (E.D.N.Y. Mar. 6, 2023) (citing *In re Robert Plan Corp.*, 777 F.3d 594, 596 (2d Cir. 2015)). Proceedings "arise in" a title 11 case where a party asserts "claims that are not based on any right expressly created by [the Bankruptcy Code], but nevertheless, would [not exist] outside of the bankruptcy." *Id.* (citing *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010)); *see also In re Grupo Aeromexico,* 2023 WL 6206093, at *11 (Bankr. S.D.N.Y. Sept. 22, 2023) ("While the [underlying state law action] does not directly implicate rights under title 11, the claims sold to Plaintiffs would not exist except for Debtors' bankruptcy case."). If a proceeding does not "arise under" title 11 or "arise in" a title 11 case, that proceeding may nevertheless "relate to" a case under title 11 if "th[at] action's outcome might have any conceivable effect on the bankrupt estate." *SPV Osus Ltd. v. UBS AG,* 882 F.3d 333, 339–340 (2d Cir. 2018).

Here, Plaintiffs' claim for fraud in the inducement arises solely under law of the state of New York, and this adversary proceeding predates this bankruptcy. *See generally* [Doc. 1]; [Second Amended Complaint, Doc. 1-38]. For these reasons, the Court possesses neither "arising

under" or "arising in" jurisdiction over the Plaintiffs' claim within the meaning of 28 U.S.C. §

1334(b). *See* [Doc. 115, p. 3] (the Court's prior *Memorandum Decision and Order* entered October

31, 2018).

However, it has already been determined by the Court that the Debtor' claim against Mr.

Kim "fall[s] within the scope of the Court's non-core related-to jurisdiction because any recovery

by the Debtor from this litigation will impact the value of the estate." *Id.* at p. 4. It has likewise

been determined that:

> [T]he claims of the Debtor and Lee and Park against Kim derive from a common
> nucleus of operative facts—namely, the underlying Acquisition and Loan
> transactions with [Mr. Kim and Noah Bank]—and it would not be judicially
> economical to try these overlapping matters in different proceedings. Accordingly
> . . . supplemental jurisdiction [exists] to adjudicate Lee and Park's claims against
> [Mr. Kim] in this action.

*Id.* at pp. 4–5 (citing 28 U.S.C. § 1367). Subject matter jurisdiction thus exists over this action in

accordance with 28 U.S.C. § 1367 and 28 U.S.C. § 1334(b).[5]

## II.    FRAUD IN THE INDUCEMENT

To prevail on a claim for fraud in the inducement, a plaintiff "'must satisfy the same

elements as a claim for common law fraud.'" *Friar v. Wyndham Vacation Resorts, Inc.,* 2021 WL

1062615, at *4 (S.D.N.Y. Mar. 19, 2021). A plaintiff must therefore "prove five elements by clear

and convincing evidence: (1) a material misrepresentation or omission of fact, (2) made with

knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of

---

[5]      If a matter is a non-core—that is, if the matter "relate[s] to" a title 11 proceeding—a bankruptcy court
generally cannot enter a final judgment with respect to that matter and must instead "submit proposed findings of fact
and conclusions of law to the district court" for review. *See* 28 U.S.C. § 157(c)(1).

However, Section 157(c)(2) provides that, with the consent of all parties, a bankruptcy court may enter a final
judgment with respect to a proceeding that "relate[s] to" a proceeding arising under title 11. With respect to Plaintiffs'
claim against Mr. Kim, the parties to this case have so consented. *See* [Pretrial Order, Doc. 260, p. 4], where both
parties "consent to the Bankruptcy Judge [] enter[ing] final orders or judgments as an Article III [judge] of the Court.").

the plaintiff, (5) that causes damage to the plaintiff." *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (considering the elements of a fraud claim). When a claim requires clear and convincing evidence, its elements must be proven by "evidence that makes [each] fact to be proved 'highly probable.'" *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 640 (S.D.N.Y. 2015).

### A.  <u>Reasonable Reliance</u>

To establish the fourth element of a fraud in the inducement claim (reasonable reliance),[6]

a plaintiff's burden is two-fold: (i) first, the plaintiff must show "actual reliance—that [the

plaintiff] actually relied on the [false] information being disclosed;" and (ii) the plaintiff must also

establish "reasonable or justifiable reliance—that a reasonable participant would have considered

the information important in making [the] decision . . . ."  *Cambridge Capital LLC v. Ruby Has

LLC*, 675 F. Supp. 3d 363, 428–29 (S.D.N.Y. 2023) ("It [] is not sufficient that a party have actually

---

[6]      Because the Court finds that Plaintiffs have not provided clear and convincing evidence of reasonable
reliance, an essential element of their claim, it is unnecessary to address in detail the other elements necessary to
prove a claim of fraud in the inducement.  However, the Court also finds that Plaintiffs have failed to establish their
damages by clear and convincing evidence.  Plaintiffs' Post-Trial Brief claims:

> Here, plaintiffs' loss is the $300,000 to $400,000 that would have been earned during the life of
> the lease term remaining on the lease, when Jae Ho Lee acquired the business in 2012 . . . The
> commencement date [of the lease] was May 2003, so as of December 2012, there was still 11
> years remaining.  The Court should grant the higher sum of $400,000 per year or a blended
> average of $350,000 per year times 11 years or $4,400,000 or $3,850,000 plus prejudgment
> interest as of 2014 (9% per year times 9 years = 81%) and post-judgment interest.  Punitive
> damages should [also] be assessed against Cheol Min Kim.

[Plaintiffs' Post-Trial Brief, Doc. 329, pp. 20–22].  Under New York law, both compensatory and punitive damages
are available for a successful fraudulent inducement claim. *See generally Bloomfield Inv. Res. Corp. v. Daniloff*,
2023 WL 3597618 (S.D.N.Y. May 23, 2023), *aff'd in part, vacated in part, remanded*, 2024 WL 3517850 (2d Cir.
July 24, 2024) (awarding both punitive and compensatory damages for a fraudulent inducement claim).
Compensatory damages are designed to "make the victim whole—to assure that the victim receive fair and just
compensation commensurate with the injury sustained."  *Ross v. Louise Wise Servs., Inc.*, 68 N.E.2d 189, 196 (N.Y.
2007).  Punitive damages are damages intended to "punish the tortfeasor and to deter th[e] wrongdoer and others
similarly situated from indulging in the same conduct in the future []."  *Id.*

In this case, Plaintiffs have established neither the existence nor the extent of the losses caused by Mr. Kim's alleged
fraudulent inducement, and instead spend much of their Post-Trial Brief seeking the profits that they were
purportedly promised.  *See* [Plaintiffs' Post-Trial Brief, Doc. 329, pp. 20–22].  Such damages would, however, be
unavailable here, as "[t]he true measure of damage [for fraud] is indemnity for the *actual pecuniary loss* sustained as
the direct result of the wrong [under] what is known as the out-of-pocket rule . . . ."  *Route 217, LLC v. Greer*, 990
N.Y.S.2d 276, 278 (N.Y. App. Div. 3d Dept. 2014) (emphasis added); *Contl. Cas. Co. v. PricewaterhouseCoopers,
LLP*, 933 N.E.2d 738, 742 (N.Y. 2010) ("[Fraud] damages are to compensate plaintiffs for what they lost because of
the fraud, not for what they might have gained []").  Although it is undisputed that Mr. Lee paid $1.8 million dollars
in exchange for the Debtor, *see* [District Court Order, Doc. 239, p. 2], Plaintiffs have presented no evidence of the
true value of the Debtor at the time of closing, or of the expenses they incurred as a result of the Debtor's
acquisition.  *See generally* [Plaintiffs' Post-Trial Brief, Doc. 329]; *see also infra*, Part II(a)(ii) (where the Court finds
that "[t]he Debtor's actual profitability at the time of the closing is [] an open question").  Plaintiffs have not
established by clear and convincing evidence that their "actual pecuniary loss sustained as the direct result" of Mr. Kim's
alleged misrepresentation and therefore could not receive compensatory damages.  For this reason, Plaintiffs
likewise would not be entitled to punitive damages, as "punitive damages may not be awarded absent sustainable
compensatory damages []."  *Rivera v. City of New York*, 836 N.Y.S.2d 108, 117 (N.Y. App. Div. 1st Dept. 2007).

relied on a misstatement . . . [as] the party claiming fraud must at least have conducted 'minimal diligence' and not have been reckless."). The Court addresses each prong in turn.

### i. *Actual Reliance*

In this case, Plaintiffs argue that Mr. Kim committed two distinct (albeit related) acts of fraud. Plaintiffs first assert that, prior to the December 2012 sale, Mr. Kim "us[ed] a phony set of business records and financial statements . . . [that] intentionally omitted [an] almost $1 million shortfall" and thereby deceived Mr. Lee as to the Debtor's profitability. *See* [Plaintiffs' Post-Trial Brief, Doc. 329, p. 16] (claiming that Mr. Kim created a false "Cash Flow Statement and other financial statements, both for internal consumption and shown to Mr. Lee, that omitted the [Debtor's] wages because inclusion of the wages would have resulted in an almost $1 million net operating loss") (internal quotations omitted).

Mr. Lee, however, testified at his deposition that he "did [] not review [] one single piece of document regarding th[e] [Debtor]" prior to the closing. *See* [Lee Deposition, Doc. 278, pp. 137–38]; *see also id* at p. 116 (where Mr. Lee testifies that he did not receive "any paperwork, any tax returns or financial statements during October or November of 2012 concerning [the Debtor]" from Mr. Kim. Mr. Lee's testimony thus indicates that he did not base his decision to purchase the Debtor upon a "phony set of business records and financial statements," *see* [Plaintiffs' Post-Trial Brief, Doc. 329, p. 16], and instead relied solely upon the alleged *verbal* representations made by Mr. Kim regarding the Debtor's profitability.

Curiously, the narrative provided by Mr. Lee is contradicted by Mr. Kim, who testified both in his deposition and at trial that he did in fact provide Mr. Lee with the Debtor's tax returns prior to the closing. *See* [Kim Deposition, Doc. 98-4, p. 33]; [Trial Transcript, Doc. 285, pp. 148–49]; *but see* [Lee Deposition, Doc. 278, p. 116] (where Mr. Lee confirms that Mr. Kim did not

9

"give [him] any paperwork, any tax returns or financial statements during October or November of 2012 concerning [the Debtor]").    As discussed *infra*, Part II(A)(ii), the accuracy of these tax returns is questionable.

Even assuming that these tax returns were inaccurate, however, the Court finds the narrative provided by Mr. Lee to be credible.  During his deposition, Mr. Lee indicated repeatedly that, prior to the closing, he was ignorant of virtually every aspect of both the sale and the Debtor's business, notwithstanding the fact that he had purchased a comparable deli and café business prior to his acquisition of the Debtor.  *See, e.g.*, [Lee Deposition, Doc. 278, p. 116] ("Q: Before buying Basic Food Group in December of 2012, did you ever see tax returns for Basic Food Groups from earlier years?  A: No . . . I figured that [] [the Debtor] was generally generating profit and that's why [Mr. Kim was] able to buy [] other stores."); *id.* at p. 119 ("On the *day of the closing*, I learned that the price was set at $1.8 million . . . I never even asked anyone, such as real estate agents or anybody like that in purchasing Basic Food Group because [Mr.] Kim told me that he was going to give me the store at a cheaper price than the market price . . . .") (emphasis added); *id.* ("Q: The day before the closing, did you have any understanding about whether you would have to repay the owner's mortgage? . . . A: No . . . I did not know [wh]at the amount [was], but I did know that there that was a balance."); *id.* at p. 126 ("Q: Did you ever have in your possession a copy of the lease prior to closing?  A: No."); *id.* at p. 127 ("Q: Were you aware that there was a promissory note to be signed at closing for $300,000 before you went to the closing?  A: No."); *id.* at pp. 137–38 ("Q. How many minutes, hours, days in total would you say you spent at Basic Food Group prior to the date of the closing? A. I did not do any due diligence at all. Q. So did you not review not one single piece of document regarding that store? A. I did not."); *see also id.* at p. 120 (where Mr. Lee states that he believed Noah Bank was responsible for "check[ing] the sale volume of the

store more diligently" prior to issuing the loan). Given his blind willingness to purchase the Debtor, the Court finds it likely that Mr. Lee did not look at the Debtor's tax returns prior to the closing.

In any event, considering the conflicting testimony provided by Mr. Lee and Mr. Kim, the Court finds that Plaintiffs have not carried their high burden of establishing by clear and convincing evidence Mr. Lee's actual reliance on a "phony set of business records and financial statements . . . ." *See De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 640 (S.D.N.Y. 2015). ("Clear and convincing evidence is evidence that makes the fact to be proved *highly probable*.") (emphasis added) (quotations omitted).

### ii.    *Minimal Diligence*

Plaintiffs also claim that Mr. Kim "made verbal representations [to Mr. Lee] that the [Debtor] was profitable by $300,000 to $400,000 per year," representations that Mr. Lee claims he believed given their longstanding social relationship. *See* [Plaintiffs' Post-Trial Brief, Doc. 329, p. 18].

As noted above, it is "not sufficient that a party have actually relied on a misstatement . . . [as] the party claiming fraud must at least have conducted minimal diligence" in order to establish that their reliance was in fact reasonable. *Cambridge Capital LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 429 (S.D.N.Y. 2023) ("It is well established that to recover in an action grounded upon fraud the plaintiff must be able to demonstrate 'deception,' i.e., that he relied upon the defendant's representations and that the foregoing was reasonable and justifiable under the facts of the particular case."); *see also Grain D'Or LLC v. Wizman,* 2023 WL 5609101, at *12 (S.D.N.Y. Aug. 30, 2023) ("[W]here a party has 'the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he cannot claim justifiable

reliance on defendant's misrepresentations."); *Banque Franco-Hellenique de Com. Intern. et Mar., S.A. v. Christophides*, 106 F.3d 22, 26 (2d Cir. 1997) ("While the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused."). The adequacy of a plaintiffs' diligence is a "fact-intensive" inquiry that depends upon, *inter alia*, the "sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (noting that "[t]he question of what constitutes reasonable reliance is always nettlesome"); *JP Morgan Chase Bank v. Winnick*, 350 F.Supp. 2d 393, 406 (S.D.N.Y. 2004) (noting further that a "heightened degree of diligence is required where the victim of fraud had hints of its falsity") (internal quotations omitted).

As a threshold matter, whether Mr. Kim verbally misrepresented Debtor's profitability is a matter of dispute. The respective testimonies of Mr. Kim and Mr. Lee provide the only evidence of discussions regarding the Debtor's profitability, and on this point, the evidence is contradictory. *Compare* [Lee Deposition, Doc. 278, pp. 117, 138] (where Mr. Lee testifies that "Cheol Min Kim said: Oh, you know about that, too. In one year, this store produces about 300 to 400, 350 to $400,000 in profit . . . .") *with* [Trial Transcript, Doc. 285, pp. 157–160, 173] (where Mr. Kim testifies that he told Mr. Lee that the Debtor allowed him to make a salary of only $50,000 to $70,000 per year, apparently less than the amount Mr. Kim paid the Debtor's manager). Plaintiffs have therefore not provided clear and convincing evidence of an affirmative misrepresentation on the part of Mr. Kim.

Additionally, at the bench trial held December 13, 2023, Mr. Kim testified that the tax returns submitted in 2009, 2010 and 2011 may have been inaccurate. *See, e.g.*, [Trial Transcript, Doc. 285, pp. 182, 194] (where Mr. Kim notes that the Debtor's reported gross revenue for 2011 "could

be wrong"); *id.* at pp. 101–103 (discussing the Debtor's wage and salary expenses, which were apparently in excess of $950,000 per year, a sum roughly $800,000 more than the wage and salary expense reported in 2011); *but see* [Kim Deposition, Doc. 98-4, p. 17] (where, at a deposition conducted September 27, 2024, Mr. Kim stated that the Debtor's 2011 tax returns were "essentially . . . correct"). Plaintiffs make much of the fact that—based solely on Mr. Kim's bench trial testimony and the Debtor's pre-sale tax returns—the "true level of [the Debtor's] expenses were hidden," and argue that Mr. Kim used these tax returns to induce Mr. Lee to acquire the Debtor. *See* [Plaintiffs' Post-Trial Brief, Doc. 329, pp. 14, 16] (discussing Mr. Kim's trial testimony).

This argument, of course, ignores Mr. Lee's testimony that he "did [] not review [] one single [] document regarding th[e] [Debtor]" prior to the closing. *See* [Lee Deposition, Doc. 278, pp. 137–38]; *see also supra*, Part(II)(A)(i) (finding that Mr. Lee did not rely on tax returns when deciding to purchase the Debtor). More importantly, this argument ignores the dearth of evidence regarding the Debtor's true profitability. Again, the only evidence presented by the Plaintiffs on this point is the Debtor's tax returns (which show that the Debtor turned a modest profit) and Mr. Kim's testimony regarding those returns (which suggest that Mr. Kim underreported *both* the Debtor's gross revenue *and* wage and salary expenses). *See* [Plaintiffs' Post-Trial Brief, Doc. 329, p. 19] (where—citing no evidentiary support beyond the tax returns and Mr. Kim's testimony— Plaintiffs claim that the Debtor "was taking heavy losses and [the Debtor's] tax returns were disguising the extent of the losses"); *id.* at p. 14 (where Plaintiffs conclude that "if prepared accurately, [the Debtor's tax returns] could not possibly show any profitability"). In short, assuming the tax returns proffered by Plaintiffs were inaccurate as to the Debtor's wage and salary expenses, it is very possible that those returns were also inaccurate as to the Debtor's gross

revenue. Because Plaintiffs have not established Debtor's actual profitability at the time of the

closing, there is no way to accurately assess the veracity of Mr. Kim's alleged misrepresentations.

However, even if Mr. Kim did misrepresent the Debtor's profitability, Mr. Lee did not

engage in the diligence necessary to render his reliance on those misrepresentations reasonable.

Indeed, Mr. Lee provided the following testimony at his deposition:

> Q. So between the end of October and the actual date of the closing, what due
> diligence did you do in regards to Basic Food Group?
> A. I did not do any due diligence.
> Q. You did say you visited the store. How many hours in total did you visit that
> store?
> A. No, just I stopped by.
> Q. How many minutes, hours, days in total would you say you spent at Basic Food
> Group prior to the date of the closing?
> A. I did not do any due diligence at all.
> Q. So did you not review not one single piece of document regarding that store?
> A. I did not.
> Q. Did you look at the accounts receivable?
> A. No.
> Q. Did you look at the accounts payable?
> A. No.
> Q. Did you look at the payroll?
> A. No.
> Q. Did you look at the time cards?
> A. No.
> Q. Did you look at the sales receipts?
> A. No.
> Q. Did you meet with the accountant?
> A. No.

*See* [Lee Deposition, Doc. 278, pp. 137–38]; *see also id* at p. 116 (where Mr. Lee testifies that he

did not "do anything . . . to check to see if what Mr. Kim [said] was true" because he "trust[ed]

Mr. Kim at that time to give [him] truthful information"); *id*. at p. 119 ("I never [spoke with]

anyone, such as real estate agents or anybody like that in purchasing Basic Food Group because

[Mr.] Kim told me that he was going to give me the store at a cheaper price than the market price

. . . ."). This testimony suggests unequivocally that (other conducting an on-site inspection of the

store) Mr. Lee failed to engage in any sufficient pre-purchase investigation of the Debtor's operational viability.[7]

The issue then becomes whether Mr. Lee's failure to investigate the Debtor's profitability can be excused. In the fraud context, a pre-purchase investigation is not required where:

(i)     the facts allegedly misrepresented are "peculiarly within the [defendant's] knowledge" such that the plaintiff "has no independent means of ascertaining the truth," *see JP Morgan Chase Bank v. Winnick,* 350 F.Supp. 2d 393, 406 (S.D.N.Y. 2004);[8] or

(ii)    there is a "special relationship of trust or confidence [that] creates a duty for one party to impart correct information to another," *see Wright v. Selle*, 811 N.Y.S.2d 525, 527 (N.Y. App. Div. 4th Dept. 2006) (collecting cases).[9]

---

[7]     This is surprising given that Mr. Lee had experience purchasing and running a similar deli and café business prior to his acquisition of the Debtor. *See* [Lee Deposition, Doc. 278, p. 136] (where Mr. Lee testifies that, prior to purchasing his first deli-café business, he met with an accountant twice and reviewed "the books, sales, [he] looked at all, everything," including the business' sales returns and tax receipts).

Indeed, as discussed below, Mr. Lee's experience in the deli-café industry should have put him on notice that the Debtor was performing poorly given his knowledge of certain deficiencies in the Debtor's business model. *See infra* (discussing Mr. Lee's awareness of the fact that Debtor lacked both a catering business and a hot food stand); *In re Rickel & Associates, Inc.,* 272 B.R. 74, 89 (Bankr. S.D.N.Y. 2002) ("[I]n exercising due diligence, the plaintiff is only required to make a minimal investigation-enough to avoid a charge of recklessness—*unless he has a hint of the falsity*.") (emphasis added); *Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 81 (2d Cir. 1980) ("Decisions holding that reliance on misrepresentations was not justified are generally cases in which plaintiff was placed on guard or *practically faced with the facts*.") (emphasis added).

[8]     *See also Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC,* 910 N.Y.S.2d 762 (N.Y. Sup. Ct. 2010) ("[T]he peculiar knowledge exception applies 'not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty.'").

[9]     *See also Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, 2013 WL 628533, at *13 (S.D.N.Y. Feb. 15, 2013) ("[A] party is not required to perform independent inquiries in order to reasonably rely on their fiduciaries representations."); *Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC,* 910 N.Y.S.2d 762 (Sup. Ct. 2010) ("[A] plaintiff alleging fraud based upon [] concealment must allege a duty to disclose material information . . . based upon some special relationship between the parties[]") (citing *Albion Alliance Mezzanine Fund, L.P. v. State Street Bank and Trust C*o., 8 Misc.3d 264, 269 (Sup.Ct., N.Y. Co.2003), *aff'd* 2 AD3d 162 (1st Dep't 2003)).

Neither exception applies to the facts of this case.  As a threshold matter, Mr. Lee's experience in the deli-café industry (coupled with his in-person visits to the store) suggested that the Debtor could have been struggling financially.  At his deposition, Mr. Lee testified:

> At the time when Cheol Min Kim bought it, I even went to Cheol Min Kim's store and looked at the store. At that time the catering part was very profitable, but I'm not exactly sure, but one or two years past [sic]. After that time the catering part [] all disappeared, so all -- not disappeared, but *all the people who were doing catering* [] *left*, so the sales volume *rapidly decreased* . . . [and] [a]t the deli in the wintertime a hot food stand is absolutely necessary. *Cheol Min Kim took away the hot food stand, too*.

*See* [Lee Deposition, Doc. 278, p. 120] (emphasis added); *see also id.* at p. 139 ("Q: So you knew that the store – strike that. Did you know that Basic Food Group had lost catering business prior to the closing? A: Yes. Q: Did you know that they did not have the hot food during the wintertime prior to the closing? A: Yes.").  It is also undisputed that:

(i)     Mr. Lee both personally viewed operational documents *and* hired an accountant prior to purchasing his first deli-café business, *see id.* at p. 136;

(ii)    documents evidencing the Debtor's financial affairs—including its wages, accounts payable, and accounts receivable—were available to Mr. Lee when he visited the store in anticipation of his purchase of the Debtor, *see id.* at pp. 118, 138–39; and

(iii)    prior to the closing, Mr. Lee could have inspected those documents personally,[10] or could have otherwise hired an independent professional to view them on his behalf, *see id.* at p. 138.

For these reasons, the Court finds that Mr. Lee possessed both the experience and the reason to engage in a diligent preliminary investigation of the Debtor's business.  Perhaps more importantly, the Court finds that Mr. Lee was given the opportunity to obtain information regarding the true profitability of the Debtor prior to the closing.  Any information regarding the Debtor's profitability thus could not have been "peculiarly within the knowledge" of Mr. Kim.

There was also no "special relationship of trust or confidence" that would excuse Mr. Lee's unconditional reliance on the representations of Mr. Kim.  It is undisputed that the parties did not share a formal fiduciary relationship, and though the record indicates that they were close friends for a number of years prior to Mr. Lee's purchase of the Debtor, "friendship alone does not establish a confidential relationship."  *Wilson v. Diocese of New York of Episcopal Church*, 1998 WL 82921, at *11 (S.D.N.Y. Feb. 26, 1998) (citing *Johnston v. DeHaan*, 37 A.D.2d 1028, 325 N.Y.S.2d 762, 765 (3d Dep't 1971)); *see also Roni LLC v. Arfa,* 903 N.Y.S.2d 352, 355 (N.Y. App.

---

[10]    Indeed, at the bench trial conducted on December 13, 2024, Mr. Kim testified:

Q: Were you surprised to hear that Jae Ho Lee was claiming that he trusted you so much that he didn't need to look at any books or records?
A: I was surprised . . . Yes, I was surprised.
Q: You were surprised. And did, in fact, Jae Ho Lee do anything to look at books or records or any preparation for making his decision?
A: So when I say I was surprised, it's because -- because we spoke almost every day. We met three, four times a week. He came to the store at the time of purchase. He called -- when he was thinking to purchase, he called his son. His son came to the store, called his father. This is a great area. I can see Bryant Park across the street. It's busy. I mean, his office -- he knows where my office is. He knows where the books are.  For him to tell me now -- well, at the time that he didn't -- or I did not offer, it's -- I -- I just don't understand . . . [T]he opportunity was there.

[Trial Transcript, Doc. 285, pp. 191–92]; *see also id.* at p. 159 (where Mr. Kim testifies that he invited Mr. Lee into the store's office prior to the sale of the Debtor to review the Debtor's operational documents); [Lee Deposition, Doc. 278, p. 138] ("Q: How many times did you [Mr. Lee] request for documents regarding Basic Food -- Basic Food Group?  A: One time.  Q: And were you satisfied with [Mr. Kim's] response?  A: It's not that I was satisfied or not.  I just laughed it off because I trusted him.").

Div. 1st Dept. 2010), *aff'd*, 963 N.E.2d 123 (N.Y. 2011) ("[P]ersonal connections . . . alone

between parties to business transactions do not establish a fiduciary relationship.").

In short, Mr. Lee's failure to conduct a sufficient preliminary investigation of the Debtor's

operating documents rendered him effectively blind as to the profitability of the business he sought

to purchase.  Because information regarding the Debtor's profitability was reasonably available,

and considering the relationship of the parties prior to the closing, this failure was inexcusable.

For these reasons, Mr. Lee's reliance on any alleged misrepresentations regarding the Debtor's

profitability was unreasonable as a matter of law.

## III.   THE RELEASE

As a final matter, Plaintiffs' Second Amended Complaint indicates that the purchase

documents executed by Mr. Lee and Mr. Kim included a release (the "Release") that read:

> To all whom these Presents shall come or may concern, know that Jae Ho Lee and
> Basic Food Groups, LLC [] . . . hereby releases and discharges Cheol M. Kim . . .
> from all actions, causes of action, suits, debts, dues, sums of money, accounts,
> reckonings, bonds, bills, specialties, covenants, contracts, controversies,
> agreements, promises, variances, trespasses, damages, judgments, extents,
> executions, claims and demands whatsoever in law, admiralty and equity, that [Mr.
> Lee and the Debtor] or the [their] successors and assigns had, have or may have
> had from December 13, 2012 to end of the World.

*See* [Second Amended Complaint**,** Doc. 1-38, pp. 39–40].  Mr. Kim's Post-Trial Brief argues that

the Release's plain language "bars [Mr.] Lee's claims in this case against [Mr.] Kim."

[Defendant's Post-Trial Brief, Doc. 328, p. 18].  The Court agrees.

Although Mr. Lee's native language was Korean, his deposition testimony indicates that

he could speak and read English at a level sufficient to understand the Release's plain language.

*See* [Lee Deposition, Doc. 278, pp. 115, 134].  The record also indicates that—either at or prior to

the closing—Mr. Chai or Mr. Ahne (or both) explained the closing documents to Mr. Lee prior to

the execution of those documents.[11]  *See* [Trial Transcript, Doc. 285, pp. 66–67]; [Lee Deposition, Doc. 278, p. 126].  The undisputed evidence thus indicates that Mr. Lee either knew or should have known of the Release and its effect on his ability to sue Mr. Kim for causes of action arising from his acquisition of the Debtor.

It is well-established under the law of New York that "a valid release constitutes a complete bar to an action on a claim which is the subject of the release . . . [i]f the language of a release is clear and unambiguous, [because] the signing of a release is a jural act binding on the parties []." *Armenta v. Preston,* 147 N.Y.S.3d 920 (N.Y. App. Div. 4th Dept. 2021); *see also Centro Empresarial Cmpresa S.A. v. Am. Movil, S.A.B. de C.V.,* 2011 WL 2183293, at *4–5 (N.Y. 2011) ("Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release . . . ." ) (internal quotations omitted); *Locafrance U. S. Corp. v. Intermodal Sys. Leasing, Inc*., 558 F.2d 1113, 1115 (2d Cir. 1977) ("When, as here, a release is signed in a commercial context by parties in a *roughly equivalent bargaining position* and with *ready access*

---

[11]    Notably, prior to the closing, Mr. Ahne—also fluent in Korean—emailed both the sale documents and a summary of their terms to Mr. Lee and offered to explain them to his client.  *See* [Lee Deposition, Doc. 278, p. 126] ("Q: [] [W]hen you received the email, did you read it? A: I cannot remember clearly, but I think I did not read [it] in that much detail.").  Notwithstanding Mr. Ahne's offer, Mr. Lee testified:

> Q: And is it your testimony that you have not seen any of the closing documents prior to the date of the closing?
> A: Yes.
> Q: Now, when you were at the closing for Basic Food Group, did you object to any of the closing documents?
> A No.
> Q: Did you ask any questions about the numbers or any of the language in the closing documents?
> A: No, no.
> Q: Did you ask for any of the portion of the closing documents to be explained to you or translated to you?
> A: No.
> Q: Did you request that the closing date be rescheduled?
> A: No.
> Q: Did you feel any type of pressure to sign the closing documents on the closing date?
> A: No.

*See id.* at p. 138.

*to counsel*, the general rule is that, if 'the language of the release is clear[] . . . the intent of the parties [is] indicated by the language employed.'") (emphasis added); *In re Times Square JV LLC*, 659 B.R. 408, 419 (Bankr. S.D.N.Y. 2024) (collecting cases applying New York law and noting that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms").

As noted above, a fair reading of the record indicates that Mr. Lee either knew or should have known of the Release's plain language. Additionally, although the Release is mentioned in their Second Amended Complaint, Plaintiffs' Post-Trial Brief does not address either the Release or the effect the Release should have on Mr. Lee's ability to sue Mr. Kim. *See generally* [Plaintiffs' Post-Trial Brief, Doc. 329]. Because Plaintiffs have not carried their burden of demonstrating the Release's inapplicability,[12] the Court agrees with Mr. Kim in that "Plaintiffs' claims in this case

---

[12]     As a procedural matter, a defendant invoking an affirmative defense relating to a contractual release must first establish that the plaintiff did in fact execute a release, and that the release applies to the claim at issue. *See Armenta v. Preston*, 147 N.Y.S.3d 920 (N.Y. App. Div. 4th Dept. 2021) (citing *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 2011 WL 2183293, at *4–5 (N.Y. 2011)). The plaintiff then must show that "there has been fraud, duress or some other fact which will be sufficient to void the release . . . ." *Id.* (citing same).

Under New York law, a cause of action "accrues . . . 'when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court.'" *New York U. v. Factory Mut. Ins. Co.*, 2018 WL 1737745, at *7 (S.D.N.Y. Mar. 27, 2018) (citing CPLR § 213(8)); *see also Panos v. Universal Forest Products, Inc.*, 2020 WL 416445, at *4 (S.D.N.Y. Jan. 27, 2020), *aff'd*, 828 F.App'x. 81 (2d Cir. 2020) ("A claim based on fraud accrues as soon as 'the claim becomes enforceable, [which occurs] when all elements of the tort can be truthfully alleged in a complaint.") (internal quotations omitted). Assuming that Plaintiffs even possessed a viable fraud in the inducement claim, that claim presumably would have accrued on December 13, 2012, i.e., the day Mr. Lee successfully "induc[ed] and persuad[ed] [Mr. Lee] to close title" on a business that "was operating at a loss because the business revenue failed to cover basic operating expenses []." [Second Amended Complaint, Doc. 1-38, pp. 77–78] (describing Plaintiffs' cause of action against Mr. Kim). This claim would therefore fall within the language of the Release, which applies to "all actions [or] causes of action . . . that [Mr. Lee and the Debtor] or the [their] successors and assigns had, have or may have had *from December 13, 2012 to end of the World*." *Id.* at pp. 39–40 (emphasis added).

Although the undisputed language of the Release clearly bars the claim at issue here, Plaintiffs have not, as discussed above, established the requisite elements of their fraud in the inducement claim. *See generally supra*, Part II. Plaintiffs have therefore not demonstrated the existence of "fraud, duress or some other fact which w[ould] be sufficient to void the [R]elease . . . ." *Armenta*, 147 N.Y.S.3d 920.

were released upon [Mr.] Lee's execution of the general [R]elease at the closing of the sale of [the Debtor]." [Defendant's Post-Trial Brief, Doc. 328, p. 35].

### CONCLUSION

Based on the above analysis, the Court finds that Plaintiffs have not provided clear and convincing evidence of Mr. Lee's actual reliance upon operational documents prepared by Mr. Kim. The Court further finds that Plaintiffs have not provided clear and convincing evidence of Mr. Lee's reasonable reliance on any misrepresentations made by Mr. Kim. Finally, the Court finds that the Release bars any claims Plaintiffs have against Mr. Kim arising from the sale of the Debtor. For these reasons, the Court GRANTS judgment on the fraud in the inducement claim in favor of Mr. Kim, and that claim is DISMISSED accordingly.

**IT IS SO ORDERED.**

Dated: September 18, 2024
New York, New York

/S/ John P. Mastando III
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE